**THE KICK LAW FIRM, APC**
Taras Kick (State Bar No. 143379)
taras@kicklawfirm.com
Daniel J. Bass (State Bar No. 287466)
daniel@kicklawfirm.com
Roy K. Suh (State Bar No. 283988)
Roy@kicklawfirm.com
815 Moraga Drive
Los Angeles, California 90049
Telephone:   (310) 395-2988
Facsimile:   (310) 395-2088

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler admitted *pro hac vice*
matt@guptawessler.com
1900 L Street NW Suite 312
Washington, D.C. 20036
Telephone:   (202) 888-1741
Facsimile:   (202) 888-7792

Jennifer D. Bennett (State Bar No. 296726)
jennifer@guptawessler.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone:   (415) 573-0336

Attorneys for Plaintiff Clayton Salter, individually
and on behalf of all others similarly situated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON SALTER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> QUALITY CARRIERS INC., an Illinois Corporation; et al. <br><br> Defendants. | CASE NO.: 2:20-cv-00479-JFW-JPR <br><br> Assigned to the Honorable John F. Walter <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Hearing Date:   April 5, 2021 <br> Time:   1:30 p.m. <br> Courtroom:   7A <br> Judge:   John F. Walter |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

**Cases**

*Alexander v. FedEx Ground Package System, Inc.,*
   765 F.3d 981 (9th Cir. 2014) ........................................................................ 24

*Alfred v. Pepperidge Farm, Inc.,*
   322 F.R.D. 519 (C.D. Cal. 2017) ............................................................24, 27

*Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services,*
   *Inc.,* 2009 WL 249888 (S.D. Cal. Feb. 2, 2009) .........................................25

*Augustus v. ABM Security Services Inc.,*
   2 Cal. 5th 257 (2016) .................................................................................26

*Ayala v. Antelope Valley Newspapers, Inc.,*
   59 Cal. 4th 522 (2014) ...............................................................................21

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) .....................................................................28

*Bowerman v. Field Asset Services, Inc.,*
   242 F. Supp. 3d 910 (N.D. Cal. 2017) ........................................................24

*Byorth v. USAA Casualty Insurance Co.,*
   333 F.R.D. 519 (D. Mont. 2019) ................................................................14

*California Trucking Association v. Becerra,*
   433 F. Supp. 3d 1154 (S.D. Cal. 2020). ......................................................17

*Chun-Hoon v. McKee Foods Corp.,*
   2006 WL 3093764 (N.D. Cal. Oct. 31, 2006) .......................................21, 23

*Dilts v. Penske Logistics, LLC,*
   267 F.R.D. 625 (S.D. Cal. 2010) ................................................................27

*Dynamex Operations West, Inc., v. Superior Court of Los Angeles,*
   4 Cal. 5th 903 (2018) ....................................................................17, 19, 20

MEMORANDUM OF POINTS AND
AUTHORITIES

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ............................................................... 15

*Estrada v. FedEx Ground Package System, Inc.,*
    154 Cal. App. 4th 1 (Ct. App. 2007) .................................................. 24

*Fleming v. Matco Tools Corp.,*
    2021 WL 673445 (Feb. 21, 2021) .............................................. 18, 20

*Guifu Li v. A Perfect Franchise, Inc.,*
    2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) ...................................... 27

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ............................................................. 16

*In re Wal-Mart Stores, Inc. v. Wage and Hour Litigation,*
    2008 WL 413749 (N.D. Cal. Feb. 13, 2008) ..................................... 27

*James v. Uber Technologies, Inc.,*
    2021 WL 254303 (N.D. Cal. Jan. 26, 2021) .......................... 17, 19, 20, 26

*Johnson v. Serenity Transportation, Inc.,*
    2018 WL 3646540 (N.D. Cal. Aug. 1, 2018) .............................. 19, 20, 27

*Karl v. Zimmer Biomet Holdings, Inc.,*
    2020 WL 4340172 (N.D. Cal. July 28, 2020) ............................... *passim*

*Leyva v. Medline Industries Inc.,*
    716 F.3d 510 (9th Cir. 2013) ............................................................... 28

*Mazza v. America Honda Motor Co.,*
    666 F.3d 581 (9th Cir. 2012) ............................................................... 14

*Moreno v. JCT Logistics, Inc.,*
    2019 WL 3858999 (C.D. Cal. May 29, 2019) ...................... 20, 25, 27

*Nash v. Horizon Freight Systems, Inc.,*
    2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) .................................. 21

*O'Connor v. Uber Technologies, Inc,*
    2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) .................................. 14

MEMORANDUM OF POINTS AND
AUTHORITIES

*Rannis v. Recchia*,
    380 F. App'x 646 (9th Cir. 2010)...................................................................14

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010)..............................................................14, 15

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*,
    48 Cal. 3d 341 (1989)....................................................................17, 21, 22

*Senne v. Kansas City Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019)...................................................................16

*Sevilla v. Aaron's, Inc.*,
    2019 WL 2879874 (C.D. Cal. Mar. 25, 2019) ...............................................27

*Smith v. Cardinal Logistics Management Corp.*,
    2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ...............................................25

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...........................................................................16

*Villalpando v. Exel Direct Inc.*,
    303 F.R.D. 588 (N.D. Cal. 2014) ......................................................*passim*

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................14, 16, 17

*Yokoyama v. Midland National Life Insurance Co.*,
    594 F.3d 1087 (9th Cir. 2010)..................................................................28

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ..................................................................29

# **Table of Contents**

I.    Introduction .......................................................................................6

II.   Statement of the case .....................................................................6

III.  Argument .......................................................................................13

      This Court should certify the class under Rule 23. .......................13

            A.    This case satisfies Rule 23(a)'s requirements. ..........................13

                  1.    The class is sufficiently numerous. .................................13

                  2.    The legal and factual issues are common to the class.....14

                  3.    The named plaintiff's claim is typical of the class..........14

                  4.    The named plaintiff is an adequate representative..........15

            B.    This case meets Rule 23(b)(3)'s requirements. ........................16

                  1.    Common issues predominate. ........................................16

                  2.    A class action is the superior method of adjudicating
                        this case. .......................................................................28

IV.   Conclusion .....................................................................................29

MEMORANDUM OF POINTS AND
AUTHORITIES

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.     INTRODUCTION

This case challenges an employer's misclassification of employees as independent contractors. The employer in this case, a trucking company named Quality Carriers, initially classified its truck drivers as employees. To save money, however, Quality Carriers started classifying some of its drivers as independent contractors instead. The drivers' jobs stayed much the same. But their wages changed significantly: Once the drivers were reclassified, the company started passing along its business expenses to the drivers in violation of California's wage-and-hour laws.

The misclassified workers, represented by one of the drivers, Clayton Salter, sued Quality Carriers to recover lost wages. All of the drivers' claims flow from the same theory of liability—that Quality illegally classified them as independent contractors. Because that theory of liability applies equally to all of the drivers that Quality classified as independent contractors, Mr. Salter moves to certify this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class: All current and former drivers of the defendants who were domiciled at the defendants' California terminals and were classified as independent contractors and drove under the defendants' authority within four years prior to, and up until the resolution of, this lawsuit.

## II.    STATEMENT OF THE CASE

***Quality Carriers misclassifies its drivers as independent contractors.*** In 2015, Clayton Salter's longtime employer informed him that, although his work would remain the same, he would no longer be considered an employee. Mr. Salter was a truck driver for Quality Carriers, a trucking company operating in California and in the business of transporting goods and materials for its customer. Declaration of Clayton Salter ("Salter Decl.")  ¶ 7. In California, many of its

customers require the transportation of hazardous materials. *See* QC000543 (explaining that Quality "engages in the business of transporting various products," including "liquid chemical, petroleum products"). Its workers were hired to do just that—truck chemicals and other "hazmat loads" from Quality's facilities to its customers. Declaration of Fred Thomas ("Thomas Decl.") ¶ 3; *see also* Salter Decl. ¶ 7; Declaration of Daniel Bass ("Bass Decl."), Exh. B at 7.

For seven years, Mr. Salter had worked for Quality as a "company driver"—a term used to describe the W-2 employee drivers of Quality and its affiliate companies driving under Quality's Department of Transportation Operating Authority. Salter Decl. ¶¶ 3–4. Throughout this period of work for Quality (including with some of its affiliates), he received a W-2 and was directed by Quality on where to pick up and deliver his loads. Salter Decl. ¶¶ 3, 9–10. As a Quality employee, Mr. Salter was also entitled to certain benefits and protections. For instance, he was entitled to take both meal and rest breaks during his daily deliveries, and Quality was prohibited from passing along its business expenses— such as fuel—onto Mr. Salter. ECF 49-1, First Amended Compl. ¶¶ 12, 32–33, 37– 38, 56–57; Salter Decl. ¶ 21. But, in 2015, Quality reclassified Mr. Salter and several other drivers from employees to "independent contractor[s]." Salter Decl. ¶ 4; *see also* Bass Decl., Exh. C. At that point, Mr. Salter's job titled changed but his actual job, and his relationship with Quality, stayed the same.

In 2015, Quality started to "get[] rid of all" of its California company drivers by reclassifying them as independent contractors. Thomas Decl. ¶ 3. Quality's method for accomplishing this was simple. It had its drivers—including those who had worked as W-2 company drivers in California—sign new form contracts that purported to reclassify them as independent contractors. *See, e.g.*, Bass Decl., Exh B at 3-23; Salter Decl. ¶ 4; Thomas Decl. ¶ 4; Declaration of Omar Jones ("Jones Decl.) ¶ 4. In these contracts, Quality labeled its drivers "independent contractors" and claimed that it had "no right to, and will not, control the manner" in which they

MEMORANDUM OF POINTS AND
AUTHORITIES

1  carried out their job.  Bass Decl., Exh B at 7, 11.

2      But beyond the new label, these drivers' "daily work did not . . . change."

3  Thomas Decl. ¶ 5; Jones Decl. ¶ 5. Quality controlled nearly every aspect of the

4  drivers' jobs just as it previously did with "company drivers" who were classified

5  as W-2 employees. Thomas Decl. ¶ 5; Salter Decl. ¶ 5. Quality's reclassification

6  did, however, lead to one crucial difference for its drivers: It stripped them of the

7  legal benefits and protections they held as employees. After they were redesignated,

8  drivers—instead of Quality—were required to pay for the company's business

9  expenses, including fuel costs, and were denied wage and break benefits required

10  by California's labor code. Thomas Decl. ¶ 5; Jones Decl. ¶¶ 5-7; First Amended

11  Complaint ¶ 15.

12      ***Quality's "independent contractor agreement".*** During the class period,

13  Quality required its "owner operator" drivers to sign one or more of three contracts

14  the company called "independent contractor agreements." *See, e.g.,* QC000543;

15  Bass Decl., Exh. A (Excerpts of the Rule 30(b)(6) deposition of Don Benoit

16  ["Benoit Depo"] at 26:14–24 (noting that the company refers to workers as owner

17  operators). The three form contracts lay out essentially the same policies. *See* Bass

18  Decl., Exhs. B, D-E. They all purport to reclassify the company's drivers as

19  "independent contractors" who "haul[] bulk commodities" on Quality's behalf.

20  Bass Decl., Exh. B at 3.. Although the contracts claim that each driver is "an

21  independent business person," in reality, Quality impose a comprehensive set of

22  uniform and mandatory policies and procedures on all drivers—ranging from how

23  drivers can wash their trucks and what they can wear to the way they drive and how

24  they are paid. Bass Decl., Exh. B at 2, 5, 11; Exh. F at4; Exh. G at 4.

25      ***Equipment requirements.*** Quality's policies begin with its drivers'

26  equipment. Quality requires all of its drivers to sign a sublease with the company

27  and lease a truck—for many that was the same truck they drove as W-2

28  employees—and then pay for the lease through regular lease payments deducted

MEMORANDUM OF POINTS AND
AUTHORITIES

weekly from their pay by Quality. *See* Bass Decl., Exh. H (Equipment Sublease Agreement); Benoit Depo. at 46-49; *see also* Thomas Decl. ¶ 5 (noting that the only change was a new "regular lease payment on the truck I had already been driving"); Jones Decl. ¶ 5; Salter Decl. ¶ 5. Once they have the lease, drivers are not permitted to use the truck as they see fit—the company's so-called "Independent Contractor Agreement[s]" explicitly provide that *Quality* has "exclusive possession, control and use" of their trucks and that it is *Quality* that assumes "complete responsibility" for their operation. Bass Decl., Exh. B at 11. Quality tells all of its drivers that the trucks may "not be used for anything other than company approved business." *Id.*, Exh. F at 5. Nevertheless, the contracts uniformly require drivers to pay for all maintenance costs to keep the truck in "good, safe, and efficient operating condition." *Id.*, Exh. B at 4. But Quality strictly manages how a driver is supposed to maintain the truck—drivers may not, for example, just wash their truck. *Id.* at 5. Instead, they are required to obtain permission from Quality to do so at one of its "pre-approved" facilities. *Id.* And it is Quality, not its drivers, that pays for the truck's insurance. *Id.* at 13..

Quality also requires all drivers to comply with a set of external signage requirements for the trucks. To "indicate that the property transported is under the responsibility" of Quality, for instance, the company requires that its drivers place its logo on their trucks. Bass Decl., Exh. B at 8, 20; *see also* Benoit Dep. 54: 6–16 (stating all drivers must have the Quality "logo on the truck"). In addition, all drivers are required to pull trailers and wear safety equipment supplied by Quality and emblazoned with the Quality logo. Bass Decl., Exh. B at 20, Exh. G at 3; Benoit Dep. 55: 1–5; 56: 1–3. And if Quality were ever to terminate its relationship with a driver, the contract requires drivers to "permanently cover such identification to the satisfaction" of Quality. Bass Decl., Exh. B at 20. Drivers are also not allowed to personalize their truck to their liking—Quality prohibits "teeth on grills" and "inappropriate signs or slogans." Exh. G at 6. That's because Quality believes

MEMORANDUM OF POINTS AND AUTHORITIES

that "image is critical to *our* business as professional truck drivers." *Id*. (emphasis added).

Quality likewise controls the type and use of other equipment involved in the daily transport of loads. It requires all trucks to have an "onboard computer system" and "communications device" (that it requires drivers to pay for) and mandates that they be "fully interoperable with" Quality's own so that the company can "track" every truck's "location at all times." Thomas Decl. ¶ 12, 17; Jones Decl. ¶ 7, 13; Salter Decl. ¶ 6, 13; Benoit Depo at 36:16–23; 120:18-23; 121: 20-21; Bass Decl., Exh. I. Together, these two pieces of equipment allow Quality to gather an extensive amount of data from all of its drivers. Quality, for example, knows at all times a driver's "duty status," "location," "distance-travelled," and hours worked. Bass Decl., Exh. I at 2.. On top of this, any time a driver decelerates, brakes, accelerates, swerves, or turns, Quality is authorized to collect "video and audio recordings" of its drivers doing so. *Id*.

***Training and certification requirements.*** Quality's policies extend beyond the equipment to the drivers themselves. For starters, Quality requires that all drivers meet its "minimum driver qualification standards," which include a valid commercial driver's license as well as a certificate to move hazardous materials. Bass Decl. Exh. B at 7; Exh. F at 3. Quality also establishes "specific policies" on, and required training for, "how to load and unload trailers, including very specific procedures on how to connect hoses, fill and unload tanks, prevent leaks, and [how to] put on safety gear upon arriving at client locations." Thomas Decl. ¶ 11; Salter Decl. Decl. ¶ 12; Jones Decl. ¶ 12; Bass Decl, Exh J at 3-25, 26-100; Exh. K.

When drivers first start driving for Quality, they are required—without exception—to complete the same training four-day in-person training. Benoit Depo. at 25: 13–25. The required training sets out Quality's uniform policies and procedures materials spanning hundreds of pages. *See* Bass Decl. Exhs F-G, J-O. On-the-job training continues afterward. Benoit Dep. 140: 16–25; 141: 1–9. Even

MEMORANDUM OF POINTS AND AUTHORITIES

after the training period, if Quality determines that a driver "violated a company policy," it will require that driver to "complete[] a specified online training course within a specified time period." Thomas Decl. ¶ 14; Jones Decl. ¶ 15; Salter Decl. ¶ 15.

***Supervision policies.*** Quality's policies governing its supervision of its drivers is no less extensive. It informs drivers of "a specific time or limited window" when they would need to pick up and deliver loads. Thomas Decl. ¶ 8; Jones Decl. ¶ 10; Salter Decl. ¶ 9. And "when given multiple deliveries" on the same day, Quality tells drivers "what order to do them in, which coupled with the limited options available to drive to each location," means that Quality "effectively set[s]" drivers' routes each day. *Id*.

Quality also has "several policies in place" that govern how drivers can drive. Thomas Decl. ¶ 10; Jones Decl. ¶ 11; Salter Decl. ¶ 11. "Those policies include[] a maximum driving speed, regardless of the local speed limit," a required "minimum following distance" that is set by Quality, and a requirement that drivers "remain within sight" of their trucks at all times—including a rule that drivers transporting hazardous materials must stay within a certain distance of the truck. *Id*.; Bass Decl., Exh. F at 4; Benoit Depo. 150: 8–16. Drivers are also required to park their truck in designated secured locations. Benoit Depo. 151: 2–19; Bass Decl., Exh O at 3. And, during transportation, drivers are only allowed to take a thirty-minute break every eight hours worked. Benoit Dep. 143: 18–22; Bass Decl., Exh. L at 3. These policies apply to all drivers driving under Quality's operating authority, remaining in place even for those drivers Quality classified as independent contractors. Salter Decl. ¶ 11; Thomas Decl. ¶ 10; Jones Decl. ¶ 11.

Quality even regulates drivers' personal appearance and possessions. When delivering cargo, drivers must wear Quality-approved safety equipment, including a hard hat emblazoned with Quality's logo. Bass Decl., Exh. G at 3; Benoit Dep. 56: 1–3. And drivers must follow Quality's "dress and appearance policies" regarding

MEMORANDUM OF POINTS AND AUTHORITIES

1   everything from "facial hair" to "wearing shirts with minimum sleeve lengths,

2   durable pants and safety boots." Bass Decl., Exh. G at 4-5; Salter Decl. ¶ 18;

3   Thomas Decl. ¶ 17; Jones Decl. ¶ 17.

4     **Payment policies.** Quality's policies relating to payment are also uniform.

5   The company pays drivers according to the same schedule. Bass Decl., Exh. B at

6   12. Each driver is paid a fixed percentage of revenue raised from each job. Bass

7   Decl., Exh. B at 24. But drivers are not paid after each job; instead, Quality pays all

8   of its drivers on a weekly basis. Benoit Dep. 63-64; Salter Decl. ¶ 20; Thomas Decl.

9   ¶ 17; Jones Decl. ¶ 18.

10     Quality also reserves the right to deduct from drivers' wages "any liability or

11   expense" incurred by Quality that the driver "is obligated to bear." Bass Decl., Exh.

12   B at 25. It also provides its drivers with a "fuel card," but charges its drivers for its

13   use. *Id.* at 10.; Salter Decl. ¶ 21; Thomas Decl. ¶ 17; Jones Decl. ¶ 19. This card can

14   be used "to purchase fuel and other fluids" drivers need for their trucks. In addition,

15   Quality maintains an escrow fund for each driver. Quality can deduct any business

16   expense owed from the escrow fund. Bass Decl., Exh. B at 18,.

17     **Discharge policies.** Quality's original independent contract agreement was

18   effective for two years. Bass Decl., Exh. E at 3. After that, each contract was

19   effective until the end of the year in which it was signed. *See, e.g.,* Bass Decl., Exh.

20   B at 19. But Quality and the driver can mutually agree to terminate at any time.

21   Bass Decl., Exh. G at 5. After the 2015 agreement expired, each subsequent

22   contract allowed Quality to terminate the contract "immediately" if it feels the

23   driver breached the agreement. *Id.* Quality interprets that as giving it the "right" to

24   "to cancel or terminate any contract at any time with or without justification with at

25   least 24 hours notice." Bass Decl., Exh. O at 4.

26     **Drivers sue Quality for violation of California labor laws.** In 2019,

27   Mr. Salter filed suit against Quality for its misclassification of its workers and its

28   corresponding failure to comply with California's labor laws. *See* First Amended

MEMORANDUM OF POINTS AND AUTHORITIES

Complaint ¶¶ 30–74 (asserting claims for (1) failing to provide employees required meal and rest breaks, (2) failing to pay required minimum wages, (3) failing to pay required wages to discharged employees, (4) failing to provide required wage statements, (4) failing to indemnify for necessary expenditures, (5) unlawfully deducting business expenses from drivers' wages, and (6) committing unfair and unlawful business practices in violation of California Business and Professional Code).

## III.   ARGUMENT

### **This Court should certify the class under Rule 23.**

Because plaintiffs can satisfy both the requirements of Rule 23(a) and (b), class certification is appropriate. Rule 23(a) requires plaintiffs to demonstrate that (1) the class is sufficiently numerous to make joinder of all class members impracticable, (2) there are common factual or legal issues, (3) the named plaintiff's claim is typical of the class, and (4) the named plaintiff will fairly and adequately protect the interests of the class.

Rule 23(b) requires one of three things. Under subsection (b)(1), plaintiffs must demonstrate that separate actions would risk inconsistent results. Under (b)(2), plaintiffs must show that the defendant "has acted or refused to act on grounds that apply generally to the class," such that injunctive or declaratory relief is appropriate. And under (b)(3), the plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This class satisfies (b)(3).

### A.   This case satisfies Rule 23(a)'s requirements.

#### 1.   The class is sufficiently numerous.

To start, this class satisfies Rule 23(a)(1)'s requirement that the class be "so numerous that joinder of all members is impracticable." Generally, "the numerosity requirement [is] satisfied when a class includes at least 40 members." *Rannis v.*

MEMORANDUM OF POINTS AND AUTHORITIES

1   *Recchia*, 380 F. App'x 646, 650–51 (9th Cir. 2010). An "exact number . . . is not

2   required"; numerosity is satisfied when plaintiffs show "a reasonable estimate."

3   *Byorth v. USAA Casualty Ins. Co.*, 333 F.R.D. 519, 528 (D. Mont. 2019). Quality's

4   payroll records demonstrate that there were at least 146 drivers, working in

5   California, that Quality classified as independent contractors during the class

6   period. Bennett Decl. ¶ 9.

7   **2.      The legal and factual issues are common to the class.**

8   This case also comfortably satisfies Rule 23(a)(2)'s requirement that there be

9   "questions of law or fact common to the class." Commonality is met if the class has

10   even "a single significant question of law or fact," *Mazza v. Am. Honda Motor Co.*,

11   666 F.3d 581, 589 (9th Cir. 2012), that is "capable of classwide resolution." *Wal-*

12   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, the threshold question

13   is common: Did Quality Carriers misclassify its drivers as independent contractors

14   instead of employees? Because Quality has "uniform policies and practices" for

15   managing all of its drivers, the answer to that question is "susceptible to classwide

16   treatment." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. 2014).

17   "Indeed, given the threshold and determinative nature of the employment

18   classification question, it should come as no surprise that district courts 'throughout

19   this circuit have found that commonality is met when the proposed class of

20   plaintiffs asserts that class members were improperly classified as independent

21   contractors instead of employees.'" *O'Connor v. Uber Techs., Inc*, 2015 WL

22   5138097 at *8 (N.D. Cal. Sept. 1, 2015).

23   **3.      The named plaintiff's claim is typical of the class.**

24   This class likewise meets Rule 23(a)(3)'s requirement that the named

25   plaintiff's claims be typical of the class's claims, a requirement that is

26   "permissive." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (internal

27   citation omitted).  Typicality is satisfied when "each class member's claim arises

28   from the same course of events, and each class member makes similar legal

MEMORANDUM OF POINTS AND
AUTHORITIES

arguments to prove the defendant's liability." *Id.* (internal citation omitted). So it is here. Mr. Salter's claims are typical of the class because each class member's claims, including those of Mr. Salter, arise from the same conduct—Quality's misclassification of its drivers as independent contractors—and depend on the same legal theory—that this misclassification led to the violation of California's worker protection laws. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 475 (N.D. Cal. 2017) (typicality requirement met where representative's claim arose from employer's "uniform" "policy of misclassifying" its workers).

### 4.    The named plaintiff is an adequate representative.

Finally, Rule 23(a)(4) asks whether the named plaintiff "will fairly and adequately protect the interests of the class." The named plaintiff and class counsel are adequate when: (1) neither has "any conflicts of interest" and (2) both will "prosecute the action vigorously." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (cleaned up). Neither presents a problem here.

*The named plaintiff.* The named plaintiff, Mr. Salter, has an identical interest in this suit as the rest of the class. Like all other class members, Mr. Salter was wrongly classified as an independent contractor, forced to bear Quality's business expenses, and injured by Quality's unlawful business practices. If he wins the relief he is seeking—wages and damages owed to him under California's labor laws—the rest of the class will win as well. Because his and the class's claims will rise and fall together, he does not have a conflict and will vigorously represent the class. Salter Decl. ¶¶ 4–24.

*Class counsel.* Proposed co-lead class counsel are the Kick Law Firm, a Los Angeles based firm specializing in consumer class actions and complex civil litigation and Gupta Wessler PLLC, a national plaintiffs'-side firm based in D.C. with an office in San Francisco that specializes in Supreme Court, appellate, and complex litigation on behalf of workers and consumers. Together, these two law firms have a wealth of experience representing employees in class actions. Neither

MEMORANDUM OF POINTS AND AUTHORITIES

have a conflict with the class and both will vigorously represent it. *See* Bass Decl.
at ¶¶ 1-14; Wessler Decl. ¶¶1–14.

### B.   This case meets Rule 23(b)(3)'s requirements.

#### 1.   Common issues predominate.

Because plaintiffs in this case seek money damages, this class should be
certified under Rule 23(b)(3). *See Dukes*, 563 U.S. at 362 ("individualized
monetary claims belong in Rule 23(b)(3)"). Subsection (b)(3) contains two
requirements, predominance and superiority, both of which are met here.

First, common questions must "predominate over any questions affecting
only individual members." Fed. R. Civ. P. 23(b)(3). A common question is one
"susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036, 1045 (2016) (quoting Rubenstein, *Newberg on Class Actions*
§ 4.50). "When common questions present a significant aspect of the case and they
can be resolved for all members of the class in a single adjudication, there is clear
justification for handling the dispute on a representative rather than on an individual
basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting 7A
Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice &
Procedure* § 1777 (2d ed. 1986)). For employment cases in particular,
predominance "is rarely defeated on the grounds of differences among employees
so long as liability arises from a common practice or policy of an employer."
*Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 938 (9th Cir. 2019)
(quoting Newberg on Class Actions § 23:33 (5th ed. 2012)). And where an
employer adopts "blanket corporate policies" that apply to the class, "such policies
'often bear heavily'" in the predominance analysis. *Senne*, 934 F.3d at 938.

As explained above, the central question here is whether Quality illegally
classified its employees as independent contractors. All of the plaintiffs' other
claims depend entirely on the answer to that question. In California, there are two
tests to distinguish between employees and independent contractors: the "ABC"

MEMORANDUM OF POINTS AND
AUTHORITIES

test, *see Dynamex*, 4 Cal. 5th at 955. and the test derived from the California Supreme Court's decision *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989) (known as the *Borello* test). Because courts in this circuit have applied both tests, we address each below.[1] But regardless of which test ultimately applies, the same common questions predominate.

*ABC Test.* To establish that a worker is truly an independent contractor under the ABC test, the employer must "establish *each* of the three factors embodied in the ABC test—namely (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." *Dynamex,* 4 Cal. 5th at 957; *see also James v. Uber Techs., Inc.*, 2021 WL 254303, at *4 (N.D. Cal. Jan. 26, 2021) (articulating the test).

The answer to either A, B, or C "will resolve [the] issue"—whether the drivers are employees or independent contractors—"that is central to the validity of each one of the [drivers'] claims in one stroke." *Dukes*, 564 U.S. at 350. In addition, because each part is "independently determinative," if this Court concludes that there is "sufficient commonality" under one prong, then it can certify the whole class. *Dynamex*, 4 Cal. 5th at 966. Here, all three can be proven on a classwide basis.

*(A) Control over work.* Under prong A, when workers are "subject to the same uniform terms" under an employer's "standardized" contract, common issues predominate. *James*, 2021 WL 254303 at *8. This is true even if an employer uses

---

[1] In particular, we address both because the ABC test has been preliminarily enjoined pending an appeal in the Ninth Circuit. *See California Trucking Ass'n v. Becerra*, 433 F. Supp. 3d 1154, 1163 (S.D. Cal. 2020).

MEMORANDUM OF POINTS AND AUTHORITIES

contracts that are technically different but materially similar. *Id.* at *9. That is exactly the case here. Quality required each driver to sign essentially the same form contract—labeled an "independent contract agreement"—that, as explained below, set out a detailed list of company-wide policies that applied to all of its drivers across the board. In addition, the company also imposed a series of policies on its drivers—including everyone in this class—that are laid out clearly in a set of training materials that all drivers were required to review and agree to. QC002429–3184; *see also* Benoit Dep 141:10–19. Taken together, Quality's contracts and training materials will provide common evidence of the degree of control the company has over its workers. *See Fleming v. Matco Tools Corp.*, 2021 WL 673445 at *8 (Feb. 21, 2021) (certifying class "subject to substantively identical contracts").

To see why, start with Quality's form contracts. The contracts lay out common policies on: (1) how drivers were required to lease their truck, Bass Decl., Exh. H; (2) who had real ownership and control over that truck (Quality), *Id.* at 5, 11; (3) who had to pay for the trucks upkeep (the driver), *Id.* at 4; (4) what equipment had to bear Quality's logo and how that logo had to be removed after the driver was discharged, *Id.* at 8, 20; *see also* Benoit Dep. 54: 6–16, 56: 1–3; (5) what communications and tracking technology drivers were required to buy or borrow, Bass Decl., Exh. I; (6) how much information Quality had a right to gather from that technology, *id.*; (7) that technology had to be compatible with Quality's own so it could track and record drivers "at all times", Benoit Dep 36: 16–23; Jones Decl. ¶ 7, 13; Salter Decl. ¶ 6, 13; Thomas Decl. ¶¶ 12, 17; (8) the minimum training driver had to possess, Bass Decl., Exh. B at 7; Exh. F at 3 (9) when and how drivers were paid, Bass Decl., Exh. B at 12; Salter Decl. ¶ 20; Jones Decl. ¶ 18; Thomas Decl. ¶ 17; (10) which expenses drivers had to pay for themselves (like fuel), Bass Decl., Exh. B at 10, 25; *see also* Benoit Dep. 56: 1–3; (11) how long each contract lasts, *see, e.g.,* Bass Decl., Exh. B at 19; , Exh. E at 3; and, finally (12) the extent to

MEMORANDUM OF POINTS AND AUTHORITIES

which Quality had the right to terminate a contract prematurely. Bass Decl., Exh. B at 19.

Quality's training materials lay out even more extensive company-wide policies of control. At training, drivers are told that their trucks cannot be used for anything other than company approved business. Bass Decl., Exh. F at 5. And the materials contain dozens of policies and "very specific procedures" on a range of topics, including (1) how drivers are required to load and unload their cargo, (2) how they are supposed to pick up and drop off loads, (3) how they must choose the routes they could take to deliver cargo, (4) how they select the order of delivery, (5) how they park or leave their trucks, (6) what speeds they could drive, (7) their appearance and dress, and (8) the limited breaks drivers could take. Thomas Decl. ¶ 11; Salter Decl. Decl. ¶ 12; Jones Decl. ¶ 12; Bass Decl., Exh. F at 3; Exh. J at 3–25, QC002905–2979; Exh. K at 3-11.

Together, these contracts and the training materials will provide ample common evidence on the key question in this case—which is the degree that Quality had the right to control its drivers' work. Courts have had little difficulty certifying similar misclassification classes under prong (A). *See James*, 2021 WL 254303 at *8 (certifying a class with fewer uniform terms under its standardized agreement); *Fleming*, 2021 WL 673445 at *8 (certifying class under prong (A) where workers were "subject to substantively identical contracts" that laid out a uniform policy of control). *Johnson v. Serenity Transp., Inc.*, 2018 WL 3646540 at *11 (N.D. Cal. Aug. 1, 2018) (same).

***(B) Work outside of the usual course of the hiring entity's business.*** Prong (B) is likewise amenable to common evidence. This factor asks whether workers were hired to provide services "within the hiring entity's usual business operations." *Dynamex*, 4 Cal. 5th at 960. So, for example, while a clothing company that needs a plumber is hiring an independent contractor, when it hires workers to sew clothes it is hiring employees. *Id.* at 959–60. Here, Quality is a

trucking company that transports and delivers materials to its customers. QC000543. The class members here were all hired precisely for that purpose. As Quality itself states, it is "*our*"—the drivers' and Quality's—"business as professional truck drivers." QC003239. (emphasis added). Because all of Quality's drivers are hired for the same purpose, prong (B), and therefore the entire issue of misclassification, can be resolved on a classwide basis. *See James*, 2021 WL 254303 at *10 (a class of Uber drivers that all engage in the same business satisfy the predominance requirement under prong (B)); *Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999 at *13 (C.D. Cal. May 29, 2019) (same); *Johnson*, 2018 WL 3646540 at *11 (same).

   *(C) Customarily engaged in an independent business.* Prong (C), too, can be resolved through common evidence. This factor asks whether "an individual [has] *independently* made the decision to go into business for [herself]." *Dynamex*, 4 Cal. 5th at 962. If a company "simply designate[s] an independent contractor" through "unilateral action," then "there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification." *Id.*

   Whether Quality hired over a hundred separate businesses or one set of workers can be answered in the same way. A class can provide a common answer to prong (C) when an employer "adopt[s] a new business structure under which it require[s] all of its [workers] to enter into a contractual agreement that specified the [worker's] status as an independent contractor." *Dynamex*, 4 Cal. 5th at 966. That's exactly what happened here. All drivers signed materially the same agreement with Quality. *See Karl v. Zimmer Biomet Holdings, Inc.*, 2020 WL 4340172 at *7–*8 (N.D. Cal. July 28, 2020) (certifying class where employer had common contracts which determined the extent to which workers were allowed to run their own business); *Fleming*, 2021 WL 673445 at *9–*10 (N.D. Cal. Feb. 21, 2021) (certifying class where contract set "common obligation" throughout the class to

MEMORANDUM OF POINTS AND AUTHORITIES

1  not use company equipment for outside business).

2  **Borello Test.** Under *Borello*, "the principal test of an employment

3  relationship is whether the person to whom service is rendered has the right to

4  control the manner and means of accomplishing the result desired." *Borello*, 48 Cal.

5  3d at 342. Though the right of control is the "most important" factor, several

6  secondary indicia are also relevant. *Id.* 350–51 (internal quotations omitted). All of

7  these factors, though, involve common issues that can be resolved through common

8  evidence. *See Villalpando*, 303 F.R.D. at 608–09 (holding all Borello factors are

9  capable of classwide resolution); *Karl*, 2020 WL 4340172 at *6–*8 (same).

10  **Right of control.** Here, the right-of-control question is common for much the

11  same reason that prong (A) of the ABC test is. Predominance in a

12  "misclassification" case is met "if the scope of the right of control" is "susceptible

13  to classwide proof." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522,

14  533, 537 (2014). The "written contract is a necessary starting point." *Id.* at 535. It

15  does not matter "how much control a hirer *exercises*, but how much control the

16  hirer retains the *right* to exercise." *Id.* at 533. The contracts between Quality and its

17  drivers are all materially the same. Whether they delineate sufficient control or not,

18  the fact that the agreement is the same for all the class members spells out a

19  "necessary" "degree of control" that is "uniform across the class." *Id.* at 534, 535.

20  In this context, no less than before, courts routinely certify misclassification cases

21  as class actions where the workers are all subject to the materially the same form

22  employment contract. *See Villalpando, 303 F.R.D.* at 608; *Nash v. Horizon Freight

23  Sys., Inc.*, 2020 WL 7640878 at *2 (N.D. Cal. Dec. 23, 2020) (certifying class

24  where form contract demonstrated uniform right of control). *Karl*, 2020 WL

25  4340172 at *4–*6  (same); *Chun-Hoon v. McKee Foods Corp.*, 2006 WL 3093764

26  at *3–*4 (N.D. Cal. Oct. 31, 2006) (certifying class where an employer distributed

27  an employment manual to "standardize its arrangement" with its workers).

28  **Secondary factors.** Common questions also predominate for every secondary

21

1    *Borello* factor.

2        **Whether employer has the right to discharge at will,** ***Borello*, 48 Cal. 3d at

3    **350.** Quality's later form contracts include the same discharge policy for all class

4    members. Quality may terminate the agreement if it believes a driver has breached

5    the contract. Bass Decl., Exh G at 5. In addition, Quality states in its training

6    materials that it "reserves the right to cancel or terminate any contract at any time

7    with or without justification with at least 24 hours notice." Bass Decl., Exh O at 4.

8    These contracts and training materials will provide common evidence of Quality's

9    discharge policy. *See Ruiz v. Affinity Logistics Corp*., 754 F.3d 1093, 1102 (9th Cir.

10   2014) (allowing certification of misclassification class with a form agreement

11   which allowed employer to dismiss worker without cause and with sixty days

12   notice); *Villalpando*, 303 F.R.D. at 603–04, 609 (finding this factor amenable to

13   classwide treatment because of form contract containing a common discharge

14   policy); *Soares,* 320 F.R.D. at 482 (same).

15       **Whether the one performing the services is engaged in a distinct**

16   **occupation,** ***Borello*, 48 Cal. 3d at 351.** This factor is the same as prong (C) of the

17   ABC test, and for the same reasons, it is amenable to classwide treatment. Quality's

18   contracts require all class members to engage in the same job—transporting

19   hazardous materials for Quality. Bass Decl., Exh B at 3. These contracts, therefore,

20   will provide a common answer to this question. *See Ruiz,* 754 F.3d at 1103–1104;

21   *Karl,* 2020 WL 4340172 at *7, *8 (certifying class where employer had common

22   contracts determining type of work workers could engage in).

23       **Whether the work is usually done under supervision,** ***Borello*, 48 Cal. 3d at

24   **351.** As noted above, *supra* 13–14, Quality has the same extensive policy of

25   supervision for all of its drivers. Quality reserves the right to supervise its drivers

26   from the moment they start their trucks to deliver cargo until after they park those

27   trucks in Quality's facilities when the job is done. Thomas Decl. ¶ 8; Jones Decl.

28   ¶ 10; Salter Decl. ¶ 9; Benoit Dep. 151: 2–19; Bass Decl., Exh O at 3. Courts have

MEMORANDUM OF POINTS AND
AUTHORITIES

consistently held that such a uniform policy of supervision allows for class certification. *See Villalpando*, 303 F.R.D. at 596–97, 609; *Karl*, 2020 WL 4340172 at *7 (factor susceptible to classwide treatment where employer had uniform policy of supervision); *Chun-Hoon*, 2006 WL 3093764 at *3  (same).

***Skill required in the particular occupation*, Borello, 48 Cal. 3d at 351.** This, too, is a common issue. Quality requires all of its drivers to have the same minimum skillset. Bass Decl., Exh. B at 7; Exh. F 3. In addition, all class members were required to obtain a certification to transport hazardous materials. Bass Decl., Exh. B at 7. Because Quality has a "uniform policy as to drivers' qualifications," this factor can be resolved on a classwide basis. *See Villalpando*, 303 F.R.D. at 609; *Soares*, 320 F.R.D. at 482 (holding this factor susceptible to common treatment where minimum level of skill required was same for all workers); *Karl*, 2020 WL 4340172 at *8 (same).

***Who provides the necessary instrumentalities*, Borello, 48 Cal. 3d at 351.** All drivers are contractually required to acquire their tools in the same way: Quality requires each to own or lease their trucks from either Quality or an affiliate, Thomas Decl. ¶ 4; Salter Decl. ¶ 4; Jones Decl. ¶ 4; *see also* Bass Decl., Exh. H, and to purchase or borrow Quality's communications and tracking technology. Bass Decl., Exh. I. In addition, all drivers are required to wear the same safety equipment bearing Quality's logo. Bass Decl., Exh. B at 8; Benoit Deposition 56: 1–3. Courts have certified classes with similar arrangements. *See Ruiz*, 754 F.3d at 1104 (class certified where drivers were required to lease trucks and required to buy the same instruments); *Soares*, 320 F.R.D. at 482 (this factor susceptible to common proof where all workers were "contractually obligated" to use employer's equipment); *Karl,* 2020 WL 4340172 at *7 (certifying class where employers all had "standard-issue equipment").

***Length of time services are to be performed*, Borello, 48 Cal. 3d at 351.** Quality's contracts will provide common evidence of the term length. Initially, all

contracts lasted two years. Bass Decl., Exh. E at 3. Starting in 2017, each driver's contract lasted until the end of the year. *See, e.g.*, Bass Decl., Exh. B at 19. Classes with less uniform contract periods than this have previously been certified. *See Alexander v. FedEx Ground Package System, Inc.*, 765 F.3d 981, 996 (9th Cir. 2014) (class certified with a contract term of one to three years); *Villalpando*, 303 F.R.D. at 603, 609 (certifying class with term lengths of one to three years); *see also Bowerman v. Field Asset Services, Inc.*, 242 F. Supp. 3d 910, 955 (N.D. Cal. 2017) (upholding certification of class with template contract laying out a one-year term).

    ***Method of payment, whether by the time or job, Borello*, 48 Cal. 3d at 351.** Quality has the same pay schedule for all of its drivers. Bass Decl., Exh. B at 12. Each plaintiff receives a percentage of the revenue received. *Id*. at 24. Though plaintiffs are paid by the job, they are paid on a weekly basis after Quality takes deductions out of their pay. Thomas Decl. ¶ 17; Salter Decl. ¶ 20; Jones Decl. ¶ 18. Such a uniform policy is certifiable. *See Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 12 (Ct. App. 2007) (certifying class where workers were uniformly paid on a weekly basis); *Villalpando*, 303 F.R.D. at 592, 609 (certifying class where workers' contract set uniform schedule compensating workers with a percentage of revenue); *Alfred v. Pepperidge Farm, Inc.*, 322 F.R.D. 519, 528 (C.D. Cal. 2017) (same).

    ***Whether the work is a regular part of the business of the employer, Borello*, 48 Cal. 3d at 351.** As stated under prong (B) of the ABC test, all drivers do the same job for Quality under materially the same contract—and that job *is* the business of their employer, transporting hazardous materials. Bass Decl., Exh B at 3. When all workers do the same job, common issues predominate under this factor. *See Alexander*, 765 F.3d at 996; *Villalpando*, 303 F.R.D. at 609; *Karl*, 2020 WL 4340172 at *8.

*Whether parties believe they are creating an employer-employee relationship,* **Borello, 48 Cal. 3d at 351.** All of Quality's drivers were required to sign an agreement stating that they were "not an employee of Quality" and did not wish to enter "into an employment relationship." Bass Decl., Exh B at 3. This disclaimer is belied by Quality's extensive control over drivers, control which is common to the class and demonstrated through policies and procedures applicable to the class. *See Karl,* 2020 WL 434072 at *8 (certifying class where common contract demonstrated workers intention to become independent contractors); *Smith v. Cardinal Logistics Mgmt. Corp.,* 2008 WL 4156364 at *9 (N.D. Cal. Sept. 5, 2008) (same).

*The plaintiffs' additional claims.* Much like the threshold question, each of the plaintiffs' additional claims—which are all derivative of the misclassification claim—meets Rule 23's predominance requirement.

*Failure to provide required rest-and-meal periods.* Quality has a universal policy—common to every class member—of only giving its drivers one thirty-minute break per eight hours of work. Benoit Dep. 143: 18–22; Bass Decl., Exh. L at 3. Because it misclassifies its workers, it also refuses to pay any of its drivers for missed rest-and-meal periods required under California law. *See* Benoit Dep. 143: 12–18. Whether drivers are employees, and are therefore entitled to compensation for non-compliant periods, is a question that can be answered on a classwide basis. *See Moreno,* 2019 WL 3858999 at *16; *Villalpando,* 303 F.R.D. at 598, 609; (holding this claim provable on a classwide basis because of uniform policy for meal and rest periods); *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services, Inc.,* 2009 WL 249888 at *6 (S.D. Cal. Feb. 2, 2009) (same).

Given that Quality required drivers to stay with their trucks at times, Bass Decl., Exh. F at 5; Exh. G at 7), drivers were denied legally compliant breaks which require them to be able to leave their work location and be absent control. See

*Augustus v. ABM Sec. Servs.*, Inc., 2 Cal. 5th 257, 272–73 (2016), *as modified on denial of reh'g* (Mar. 15, 2017). As a result, class-wide meal and rest break damages can be calculated by multiplying the respective number of meal and rest break eligible shifts worked by each driver by that driver's rate of pay. Berger Decl.¶¶ 12-13.

*Unlawful wage deductions.* Quality has a uniform policy of charge backs for all of its drivers. Bass Decl., Exh. B at 31-34. . Any "liability or expense" incurred that the driver is obligated to pay is automatically deducted from her wages. *Id*. at 25. This includes, among other things, fuel and maintenance costs. *Id*. at 33. Because this policy applies equally to all drivers, "Plaintiffs' claims for unlawful deductions from wages and coerced purchases" is "susceptible to common proof." *See Villalpando*, 303 F.R.D. at 609; *James*, 2021 WL 254303 at *12 (certifying with where employer had uniform policy of not reimbursing workers for business costs).

Labor Code § 2802(a) requires an employer to indemnify an employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties. Defendant violated Labor Code § 2802 by requiring drivers they misclassified as independent contractors to bear Defendants' operational costs, deducting these necessary expenditures directly from the driver's pay. Bass Decl., Exh. B at 25. Defendants' own records reflect 47 categories of deductions from the Driver's pay. Berger Decl. ¶ 14. For each category of deduction, the total amount of deductions can be calculated by employee and by specific time periods during the class. *Id.*

*Failure to pay wages due discharged or resigned employees*. Quality had a universal policy of not paying its drivers who had been discharged or resigned on a timely basis. *See* Bass Decl., Exh. B at 20; Benoit Dep. 63:14-64:6. Time-stamped paystubs will provide common evidence of defendants' failure to do so. Courts have frequently agreed this claim can be proven on a classwide basis. *Dilts v.*

MEMORANDUM OF POINTS AND AUTHORITIES

*Penske Logistics, LLC*, 267 F.R.D. 625, 640 (S.D. Cal. 2010); *In re Wal-Mart Stores, Inc. v. Wage and Hour Litigation*, 2008 WL 413749 at *11 (N.D. Cal. Feb. 13, 2008) (employer's policy of turning a "blind eye" to wages due discharged employees was susceptible to common proof); *Alfred,* 322 F.R.D. at 550 (certifying this claim for class treatment because threshold misclassification question was a common one).

Labor Code § 203 sets a waiting time penalty of up to 30 days for the Defendants' failure to pay all wages due to former drivers in the class. These waiting time penalties can be calculated by multiplying the driver's hourly rate of pay at termination of employment by the average hours worked by that driver per day times the 30-day maximum period. Berger Decl.¶ 17.

***Failure to provide accurate itemized wage statements.*** Quality refused to provide all of its workers with itemized wage statements. This it is required to do if its workers are employees—a question that turns on the threshold misclassification claim as well. Because that threshold question here susceptible to common proof, this claim will be as well. *See Sevilla v. Aaron's, Inc.*, 2019 WL 2879874 at *15 (C.D. Cal. Mar. 25, 2019); *James*, 2021 WL 254303 at *12–13 (predominance requirement for this claim met when the threshold question of misclassification was also certifiable); *Johnson*, 2018 WL 3646540 at *15 (same); *Alfred*, 322 F.R.D. at 550 (same). Wage statement penalties under Labor Code § 226 are established by statute and so can be measured on a per-violation basis for each driver. *See* Berger Decl.¶ 18.

***Unfair and unlawful business practices.*** Plaintiffs' UCL claim is derivative of its other claims. Because the underlying claims are susceptible to classwide proof, the UCL claim is as well. *Moreno*, 2019 WL 3858999 at *17; *Dilts*, 267 F.R.D. at 640; *Alfred*, 322 F.R.D. at 550; *Guifu Li v. A Perfect Franchise, Inc.*, 2011 WL 4635198 at *15 (N.D. Cal. Oct. 5, 2011).

The sole individual question in this case is the amount of damages owed to

MEMORANDUM OF POINTS AND AUTHORITIES

each plaintiff. "But damages determinations are individual in nearly all wage-and-hour class actions." *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). Their presence "cannot, by itself, defeat class certification under Rule 23(b)(3)." *Id.* at 514. If damages directly result from plaintiffs' theory of liability, then their individualized assessment "does not detract from the action's suitability for class certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). Here, though damages will necessarily vary by individual, as explained above, how that amount is calculated will not. In each case, the value for each break and rest period lost and business cost deducted can be calculated from Defendants' own records. Once liability is established, divvying up the lost wages will be a "mechanical task." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

And here, plaintiffs have obtained an expert who has reviewed the records provided by the Defendants. *See* Berger Decl. ¶¶ 8-9. Using Defendants' own records, that expert has identified, by driver identification number, 146 potential class members. Berger Decl. ¶ 9-. And the expert can also identify, again with the Defendants' records, (1) the number and length of shifts worked by each class members for specific time periods, (2) the start and end location of each delivery during each shift, (3) the number of pay periods worked by each class members, during specific time periods and for specific locations. Berger Decl. ¶¶ 10-11. In addition, the expert is able to compare the income sheets to the deductions made by Defendants to determine the type and amount of income and deductions paid to certain drivers during certain time periods. Berger Decl. ¶ 11. And, given that the income records include location information, the expert can also determine where certain income was earned. *Id.*

### 2. A class action is the superior method of adjudicating this case.

Finally, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." This requirement, too, is met here.

Superiority "focus[es] on the efficiency and economy" of adjudicating on a classwide basis. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001). Because each class member has the same question—whether they were misclassified—it would be an inefficient use of judicial resources to require each member to bring this question individually. In addition, this class is manageable. Defendants are required to maintain employment records. This makes it easy to contact and give notice to all class members.

## IV.    CONCLUSION

The plaintiffs' motion for class certification should be granted.

Dated:  February 26, 2021                    Respectfully Submitted,

                                        By:    /s/ Daniel J. Bass

                                            Taras Kick
                                            Daniel J. Bass
                                            Roy K. Suh
                                            **THE KICK LAW FIRM, APC**

                                            Matthew W.H. Wessler
                                            Jennifer D. Bennett
                                            **GUPTA WESSLER PLLC**

                                            Attorneys for Plaintiff Clayton Salter, on
                                            behalf of himself and all others similarly
                                            situated

MEMORANDUM OF POINTS AND
AUTHORITIES