Taras Kick (State Bar No. 143379)
taras@kicklawfirm.com
Daniel J. Bass (State Bar No. 287466)
daniel@kicklawfirm.com
Roy K. Suh (State Bar No. 283988)
Roy@kicklawfirm.com
THE KICK LAW FIRM, APC
815 Moraga Drive
Los Angeles, California 90049
Telephone:  (310) 395-2988
Facsimile:   (310) 395-2088

Matthew W.H. Wessler, admitted *Pro Hac Vice*
matt@guptawessler.com
GUPTA WESSLER PLLC
1900 L Street, Suite 312
Washington, DC. 20036

Jennifer D. Bennett (State Bar No. 296726)
jennifer@guptawessler.com
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, California 94111

Attorneys for Plaintiff Clayton Salter

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON SALTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUALITY CARRIERS INC., an Illinois Corporation; QUALITY DISTRIBUTION INC., a Florida Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No: 2:20-cv-00479-JFW-JPR<br><br>Assigned to the Honorable John F. Walter<br><br>**DECLARATION OF FRED THOMAS** |

I, FRED THOMAS, declare as follows:

1. I am a former driver for Defendants Quality Carriers, Inc. and Quality Distribution, Inc (collectively "Defendants"). I have personal knowledge of the facts stated herein, and if called to testify, could and would competently testify thereto.

2. I provide this declaration in support of Plaintiff Clayton Salter's ("Plaintiff") Motion for Class Certification.

3. I first started working for Defendants from around the year 2000 when while working as a driver for Montgomery Tank Lines, that company merged or otherwise became affiliated and part of Defendants' operations in California. At that time I was a company driver being paid as a W-2 employee by Defendants and was certified to haul hazmat loads. Sometime thereafter I stopped working for Defendants and worked for a few other companies for several years until around 2010 when I again started working for Defendants, again as a company driver being paid as a W-2 employee.

4. Around January 2015 I was reclassified from a W-2 employee to an owner operator being paid as a 1099 independent contractor, when Defendants' Terminal Manager, who I believe was named Crystal Coons, offered the truck I had already been driving as a lease. Several other employee drivers were reclassified around the same time as me, I am not sure if all company drivers were reclassified at that time, though I know Defendants had discussed getting rid of all company drivers and only having owner operators. These discussions were part of the reasons I became an owner operator.

5. When I was redesignated as an owner operator my daily work did not otherwise change, just how I was paid and expenses I was required to pay myself, including fuel, the regular lease payment on the truck I had already been driving, and paying into a required escrow account.

6. Throughout my time working for Defendants, I predominately drove chemicals that required a hazmat certification to move. I would typically start my day at Defendants' yard in Southgate, California and drive to one of Defendants' customer locations that I had been dispatched to by the Defendants. There I would load the chemicals in questions, often bleach, and move them to another customer's location where I had been dispatched to by Defendants.

7. I would typically receive my dispatches from the Defendants by the end of the day the day before. These dispatches would be offered on a take it or leave it basis, often with statements like "that is all I have for you" and when I declined a load, I would often go completely without work for a day or two. In more than one instance when I declined a load I was contacted by the Defendants' terminal manager, Crystal, and directly told that declining the load meant that I did not want to work and that I would not be offered anything else.

8. When I received dispatches from Defendants, I would be told a specific time or limited window of when I would need to make the pickup and delivery by. Similarly, when given multiple deliveries from dispatch on the same day I would be told what order to do them in, which coupled with the limited options available to drive to each location, meant my route was effectively set each day I worked for Defendants.

9. Though I had some discretion as to when I could report to the terminal to pick up my truck before picking up my first delivery for the day, I had that same discretion as both a company driver and owner operator. Sometimes, however, Defendants would directly tell me when I would need to report to the terminal to get in my truck a practice that did not change when I was reclassified as an owner operator.

10. Defendants had several policies in place regarding how I was supposed to drive for them. These policies included a maximum driving speed, regardless of the local speed limit, and maintaining a minimum following distance

both set by Defendants. Similarly, Defendants required that I could not leave my truck unattended when pulling a hazmat load. I was required to remain within sight of my truck at all times and could only be up to a certain distance from it when doing so. Though I do not recall the specific distances set by the Defendants now, I do recall that these policies did not change based on how Defendants classified me.

11. Defendants also had specific policies and training on how to load and unload trailers, including very specific procedures on how to connect hoses, fill and unload tanks, prevent leaks, and being required to put on safety gear upon arriving at client locations. Drivers were also required to inform Defendants when they arrived at customer locations, at least through a required on-board system, though sometimes we would also need to call our dispatcher as well.

12. It is my understanding that Defendants could track my truck's location at all times through the onboard computer system we were required to have . I personally experienced this several times while working for Defendants, because sometimes I would be called by my dispatcher and told I had been at the same location for too long. If I were required to stay because of wait times at that loading or unloading location I would often be directed by the dispatcher to inform the customer to hurry the process.

13. To work for Defendants, I was required to have my commercial driving license, my hazmat certification, and to pass a physical exam. Moreover, when I began working for Defendants again around 2010, I was also required to go to a 4–5-day orientation and received further on the job training specifically from Defendants, despite having had worked for them before and having done the same job for many years for similar companies.

14. Every few months I was also required to take online training courses most of which dealt with safety. Similarly, even when I was working for Defendants as an owner operator, if Defendants thought that I violated a company policy, they would issue me a written warning which I was required to sign and

1 agree to completing a specified online training course within a specified time
2 period. These training courses typically took a few hours and included various
3 training topics related to safe driving. For instance, I recall being involved in a
4 minor accident which occurred when I was backing up. Defendants required me to
5 sign a written warning and complete an online safety course thereafter. I received a
6 few such warnings and required trainings while working for Defendants regardless
7 of my classification, including when Defendants referred to me as a contractor.

8     15. When working for Defendants as both a company driver and owner
9 operator I was required to carry a badge with Quality Carriers' name, my name and
10 my picture on it. Without this badge I could not access the locations where I picked
11 up and delivered chemicals, despite my truck and trailer being required to bear
12 Quality Carriers' logo and operating authority information.

13     16. Throughout my work for the Defendants, when I was at a customer
14 location, I was required to wear the safety equipment Defendants provided me.
15 This safety equipment included a hardhat that bore Quality Carriers name and logo.
16 Similarly, when I had the title of a company driver, I was issued a required uniform
17 which included pants and shirts with Quality Carriers' name and logo. When I
18 worked for Defendants as an owner operator, I was still required to follow
19 Defendants' dress and appearance policies. These policies regulated facial hair to
20 small mustaches, required the wearing shirts with minimum sleeve lengths, durable
21 pants and safety boots. I know some drivers who had worked for Defendants as
22 company drivers continued to wear the Quality Carrier's uniforms as they met
23 these requirements.

24     17. When I signed an independent contractor agreement with Defendants
25 around January 2015, I was under the impression that my daily work for
26 Defendants would not change and it did not. I drove the same truck, received
27 similar dispatches from the same dispatcher and reported to the same terminal.
28 Similarly, I used the same onboard computer and communications device that was

already on my truck though now I paid a fee for using it. Likewise, I still used a fuel card that was given to me by the Defendants, but now I was charged for using that fuel card. Moreover, though I was no longer paid hourly, I was still paid on a regular weekly basis, rather than after each load I delivered.

18. The fuel card I was provided by Defendants was used to purchase fuel and other fluids for our trucks. It could also provide a cash advance, like a debit card. I utilized this cash advance to keep cash on hand when driving so I could pay for expenses on my truck when they arose. Some locations would not accept the fuel card and I would use this cash for purchasing fuel, coolant, oil and windshield wiper fluid when needed. I also used cash advances from the fuel card to pay for tire repairs if one was damaged when I was driving and for paying cash for showers at rest stops.

19. While working for Defendants I never found my own clients or negotiated the costs for services that Defendants charged to their customers. This was even the case for the loads which I picked up and delivered as an owner operator.

20. While working for Defendants I never worked for anyone else, nor did I hire anyone to help me with the transportation of materials for Defendants. I did not even realize that was an option and Defendants did not discuss it with me.

21. In the 90's I did form a legal entity, DFS Tankers, which I registered with the government and obtained my own Department of Transportation operating authority number. However, I always worked for another company and DFS Tankers' registrations and operating authority all lapsed years before I began working for the Defendants in 2010.

22. It was my understanding that throughout my work for the Defendants that they could terminate me at anytime. In fact, I was terminated by Defendants around 2017 after my truck had been having chronic mechanical problems and I wanted to take it to be repaired at a different location than Defendants directed. I

DECLARATION OF FRED THOMAS

was told by the terminal manager Crystal, something like "how can you take a truck that isn't yours out of my yard?" When I complained that I was leasing the truck and should be able to take it where I wanted to be repaired the truck was taken away from while it was at the mechanic's shop and I was terminated.

    I declare under penalty of perjury under the laws of the United States of America and the State of California that the forgoing is true and correct. Executed on February 22, 2021 by /s/ Fred Thomas

- 7 -
DECLARATION OF FRED THOMAS