Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
P: 626-795-4700
F: 626-795-4790

Christopher J. Eckhart (SBN 331414)
ceckhart@scopelitis.com
E. Ashley Paynter (SBN 333428)
apaynter@scopelitis.com
Alaina C. Hawley (SBN 309191)
ahawley@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-637-1777
F: 317-687-2414

Attorneys for Defendants,
Quality Carriers, Inc. and Quality Distribution, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON SALTER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUALITY CARRIERS, INC., an Illinois Corporation; QUALITY DISTRIBUTION, INC., a Florida Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 2:20-cv-00479-JFW-JPR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: April 5, 2021<br>Time: 1:30 p.m.<br>Courtroom: 7A<br>Judge: John F. Walter |

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................ 1

II.   BACKGROUND ......................................................................... 1

    A.    Quality's Business Model ................................................. 1

    B.    The Independent Contractor Agreements ........................... 3

    C.    Plaintiff And His Declarants ............................................ 4

        1.    Clayton Salter ..................................................... 4

        2.    Omar Jones ......................................................... 5

        3.    Fred Thomas ....................................................... 6

III.  ARGUMENT ............................................................................ 6

    A.    Salter's Experience Operating Out Of A Single Terminal For A Single Customer Is Not Typical Of The Class .................................. 7

    B.    Commonality and Predominance ...................................... 9

        1.    Individual issues overwhelm common questions with respect to Salter's misclassification claim. ..............10

            a.    California employment classification tests. ................. 10

            b.    The *Borello* test ............................................. 11

            c.    The ABC test. ................................................. 18

        2.    Plaintiff lacks common, classwide evidence of meal and rest break violations. ..........................................20

        3.    Plaintiff cannot prove Section 2802 liability on a classwide basis..............................................................22

        4.    Plaintiff's Derivative Claims under Sections 203 and 226 should not be certified.........................................24

    C.    Superiority/Class Waiver ................................................24

IV.   CONCLUSION .........................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Am. Trucking Associations, Inc. v. City of Los Angeles,*
  133 S. Ct. 2096 (2013) ...................................................................18

*American Airlines v. Wolens,*
  513 U.S. 219 (1995) .......................................................................18

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
  568 U.S. 455 (2013) ......................................................................... 9

*Ayala v. Antelope Valley Newspapers, Inc.,*
  59 Cal. 4th 522 (2014) ...................................................................20

*Ayala v. U.S. Xpress, Inc.,*
  2019 WL 1986760 (C.D. Cal. May 2, 2019) ...................................21

*Brinker Rest. Corp. v. Superior Ct.,*
  53 Cal. 4th 1004 (2012) .................................................................22

*Brown v. Ralphs Grocery Co.,*
  197 Cal. App. 4th 489 (2011) ........................................................25

*California Trucking Association v. Becerra,*
  433 F. Supp. 3d 1154 (S.D. Cal. 2020) ..........................................19

*Canava v. Rail Delivery Serv. Inc.,*
  2020 WL 2510648 (C.D. Cal. Feb. 27, 2020) .................................25

*Cole v. CRST, Inc.,*
  317 F.R.D. 141 (C.D. Cal. 2016) .............................................21, 22

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) .......................................................................... 7

*Curry v. Equilon Enters., LLC,*
  23 Cal. App. 5th 289 (2018) ........................................... 14, 15, 16, 17

*Dilts v. Penske Logistics, LLC,*
  188 F. Supp. 3d 1016 (S.D. Cal. 2016) ..........................................22

*Dynamex Operations West, Inc. v. Superior Court of Los Angeles,*
  4 Cal. 5th 903 (2018) .....................................................................10

*Ellis v. Costco Wholesale Corp.,*
  657 F.3d 970 (9th Cir. 2011) ........................................................8, 9

*Gallardo v. United Parcel Serv., Inc.,*
  No. CV1008624SJOJEMX, 2011 WL 13217707 (C.D. Cal. Aug. 22, 2011) .....24

*Gen. Tel. Co. of the Sw. v. Falcon,*
  457 U.S. 147 (1982) ........................................................................ 7

ii

*Gentry v. Superior Court,*
   42 Cal. 4th 443 (2007) ..................................................................25

*Haitayan v. 7-Eleven, Inc.,*
   No. 18-5465, 2021 WL 757024 (C.D. Cal. Feb. 8, 2021) ..........................9, 10

*Haitayan v. 7-Eleven, Inc.,*
   No. CV 17-7454 DSF (ASX), 2020 WL 1290613 (C.D. Cal. Feb. 19, 2020) ....20

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) .......................................................... 8

*Hart v. Massanari,*
   266 F.3d 1155 (9th Cir. 2001) .........................................................19

*In re Snap Inc. Securities Litig.,*
   334 F.R.D. 209 (C.D. Cal. 2019)...................................................... 6

*In re Wells Fargo Home Mort. Overtime Pay Litig.,*
   571 F.3d 953 (9th Cir. 2009) ........................................................9, 20

*Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.,*
   986 F.3d 841 (9th Cir. 2021) ...........................................................21

*Iskanian v. CLS Transportation Los Angeles, LLC,*
   59 Cal. 4th 348, 327 P.3d 129 (2014) ................................................25

*James v. Uber Technologies Inc.,*
   No 19-cv-06462-EMC, 2021 WL 254303 (N.D. Cal. Jan. 26, 2021) ...............20

*Madrigal v. Tommy Bahama Grp., Inc.,*
   2011 WL 10511339 (C.D. Cal. June 27, 2011) .................................23, 24

*Martinez v. Flower Foods, Inc.,*
   No. CV 15-511 RGK (EX) 2, 2016 WL 10746664 (C.D. Cal. Feb. 1, 2016)....13, 20

*Morales v. Trans World Airlines, Inc.,*
   504 U.S. 374 (1992).......................................................................18

*Murphy v. Kenneth Cole Prods., Inc.,*
   155 P.3d 284 (Cal. 2007) ................................................................22

*Narayan v. EGL, Inc.,*
   285 F.R.D. 473 (N.D. Cal. 2012) ......................................................14

*Narayan v. EGL, Inc.,*
   616 F.3d 895 (9th Cir. 2010) ...........................................................11

*Northwest, Inc. v. Ginsberg,*
   572 U.S. 273 (2014).......................................................................18

*Olson v. California,*
   No. CV 19-10956-DMG, 2020 WL 905572 (C.D. Cal. Feb. 10, 2020) ............11

iii

*People v. Superior Court of Los Angeles County,*
57 Cal. App. 5th 619 (2020) ...........................................................19

*Perez v. Performance Food Grp., Inc.,*
No. LA-CV17-00357 JAK (SKx), 2017 WL 6940526 (C.D. Cal. Dec. 15, 2017)
............................................................................................................21

*Rowe v. New Hampshire Motor Transp. Ass'n,*
552 U.S. 364 (2008) .......................................................................18

*Rowe v. Ulta Salon, Cosms. & Fragrance, Inc.,*
No. SACV191074PAJCX, 2019 WL 6998780 (C.D. Cal. Aug. 30, 2019) ........20

*Ruiz v. Affinity Logistics Corp.,*
No. 05CV2125, 2009 WL 648973 (S.D. Cal. Jan. 29, 2009) .....................22, 23

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations,*
48 Cal. 3d 341 (1989) ............................................... 10, 11, 12, 13

*Tyson Foods, Inc. v. Bouaphakeo,*
136 S. Ct. 1036 (2016) ..................................................................... 9

*Vazquez v. Jan-Pro Franchising Int'l, Inc.,*
986 F.3d 1106 (9th Cir. 2021) .......................................................20

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ......................................... 7, 9, 19, 22, 24

*Zinser v. Accufix Rsch. Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ......................................................25

## Statutes

49 U.S.C. § 14501 ...............................................................................18

Cal. Lab. Code § 203 ..........................................................................11

Cal. Lab. Code § 226 .....................................................................11, 22

Cal. Lab. Code § 2750 ...................................................................10, 11

Cal. Lab. Code § 2802 ........................................................................11

## Rules

Fed. R. Civ. P. 23...............................................................................  9

## Regulations

49 C.F.R. § 391 ...................................................................................  4

49 C.F.R. § 395 .................................................................................21

49 C.F.R. § 376.........................................................................2, 3, 20

Hazardous Materials: California Meal and Rest Break Requirements,
   83 FR 47961-01 (Sept. 21, 2018) ...................................................................21

Defendants, Quality Carriers, Inc. (Quality) and Quality Distribution, Inc. (Quality Distribution), respectfully submit this Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Class Certification (Motion).

## I.      INTRODUCTION

Plaintiff, Clayton Salter, operated out of a single terminal and primarily serviced a single customer. His request to represent approximately 150 other independent contractor drivers (Contractors), who worked out of different terminals, for different customers, at different times, and under different contracts and policies, should be rejected. The facts relevant to the elements of the Contractors' individual claims are too varied to adjudicate all of their claims in a single trial. Therefore, the Court should deny Plaintiff's Motion.

## II.     BACKGROUND

### A.      Quality's Business Model

Quality is a for-hire motor carrier authorized by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the U.S. Department of Transportation (DOT), to provide transportation services to the shipping public. Declaration of Don Benoit (*Benoit Decl.*), ¶ 3. Quality specializes in providing transportation and logistics services related to the transportation of chemicals—primarily in liquid form—on behalf of its customers throughout North America. Declaration of Christopher J. Eckhart (*Eckhart Decl.*), Ex. A at 18:2-6. It is a subsidiary of Quality Distribution, which operates as a holding company and does not have any employees, equipment, or customers. *Id.* at 21:3-9; 22:5-7.

Quality does not have any employees or operate any facilities in California. *Benoit Decl.*, ¶ 4. Instead, Quality contracts with a separate company, Winsome Enterprises, Inc. (Winsome), to coordinate and manage the transportation of Quality's customers' freight throughout California. *Id.*, ¶ 4. Winsome shares no common employees or ownership with either Quality or Quality Distribution. Declaration of Richard Wallace (*Wallace Decl.*), ¶ 3. Winsome owns its own trucks and employs its

own drivers. *Id.*, ¶ 5. But unlike Quality, Winsome does not have motor carrier operating authority from the FMCSA. *Id.*, ¶ 6. Therefore, to operate legally under federal law, Winsome maintains a contractual relationship with Quality that allows it to provide transportation services on behalf of and under the authority of Quality to Quality's customers. *Id.*; *Benoit Decl.*, ¶ 6; 49 C.F.R. § 376.11(a). In return for the services Winsome provides, Quality pays Winsome a portion of the amounts charged to customers, and provides back-office settlement processing services from Quality's headquarters in Tampa, Florida. *Benoit Decl.*, ¶ 7.

Winsome leases and operates three main terminals in South Gate, Richmond, and Stockton, California; each of which operates separately. *Wallace Decl.*, ¶¶ 3, 8. For example, the terminals service different customers. *Id.*, ¶ 8. In addition, each terminal has its own Winsome-employed dispatchers. *Id.* These dispatchers offer loads to Winsome's employee drivers. *Id.*, ¶¶ 3, 8. They also offer loads to Contractors who contract directly with Quality to deliver product on behalf of its customers throughout California. *Id.*, ¶¶ 7-8. Contractors based out of the South Gate terminal are offered loads by dispatchers in the South Gate terminal. *Id.*, ¶ 8. Similarly, Contractors based out of the Richmond and Stockton terminals are offered loads from dispatchers in the Richmond and Stockton terminals, respectively. *Id.*

Winsome never decided to "get rid" of its employee drivers by re-classifying them, either in 2015 or at any time since. *Compare* ECF No. 54-3, ¶ 4, *with Wallace Decl.*, ¶ 5. Winsome has employed—and continues to employ—its own company drivers during the entire relevant period. *Wallace Decl.*, ¶ 5.

Finally, in January 2020, the Stockton terminal opened when Winsome purchased the assets of two California trucking companies—Bulk Transportation (Bulk) and DTI Associates, LLC (DTI). *Id.*, ¶ 4. Some of the loads dispatched from the Stockton terminal are offered to Contractors who formerly contracted with Bulk/DTI, but have subsequently contracted with Quality. *Id.*, ¶ 10. Approximately 25 Bulk/DTI independent contractor drivers contracted with Quality. *Id.*

### B.    The Independent Contractor Agreements

The Federal Leasing Regulations, 49 C.F.R. Part 376, govern the relationship between motor carriers and independent contractors. The Federal Leasing Regulations require "a written lease [between the motor carrier and the owner of the equipment] granting the use of the equipment and meeting the requirements contained in § 376.12." *Id.*, § 376.11(a). Quality used three different forms of its Independent Contractor Agreement (Agreement) during the relevant period, the "2015 Agreement," the "2016 Agreement," and the "2018 Agreement." *Benoit Decl.*, ¶ 9; *id.*, Exs. A-C. Salter executed each version of the Agreement. *Id.*, ¶ 14; *id.*, Exs. A-C.

From version to version, the Agreement had some commonalities. Specifically, each version reserved the right to control the "manner and means" the Contractor used to provide transportation services to Quality and Quality's customers to the Contractor, including the right to decline any dispatch for any reason. *Benoit Decl.*, Ex. A § 6; *id.*, Exs. B-C § 1. Each version also permitted the Contractor to hire or contract with drivers to operate the equipment that the Agreement identified. *Id.*, Ex. A § 7; *id.*, Exs. B-C, § 4.01. Each Agreement also set forth the basis of each Contractor's compensation, including compensation for both Quality's use of the Contractor's equipment and the services that the Contractor was to provide to Quality.[1] *Id.*, Ex. A § 4; *id.* Exs. B-C, § 6. The Agreement also identified which party, as between Quality and the Contractor, was responsible for certain expenses, and it authorized Quality to take certain deductions from the Contractor's settlement payments. *Id.*, Ex. A § 4; *id.*, Exs. B-C, Schedule A. No version of the Agreement required the Contractor to personally provide services for Quality. *See id.*, Exs. A-C. Nor did any version require the Contractor to wash his truck using a particular vendor. *Id.* Instead, they all contained provisions regarding when and how a Contractor could wash a Quality-owned trailer. *Id.*, Ex. A § 19; *id.*, Exs. B-C § 3.02.

---

[1] Plaintiff did not request certification of his minimum wage claim. ECF No. 54-1.

However, there are material differences between the 2015 Agreement, the 2016 Agreement, and the 2018 Agreement. Specifically, each version had different term and termination provisions,[2] and the 2016 and 2018 Agreements explicitly contemplate that the Contractor could use the Contractor's equipment to provide transportation services to a different motor carrier. *Id.*, Exs. B-C § 3.07.

### C.   Plaintiff And His Declarants

#### 1.   Clayton Salter

Salter began his relationship with Quality in 2007. *Eckhart Decl.*, Ex. C at 42:17-21; *Benoit Decl.*, ¶ 11. For the entire time that Salter hauled loads under Quality's motor carrier authority, he worked primarily for one customer—Olin Corporation (Olin)—hauling bleach. *Eckhart Decl.*, Ex. C at 66:1-67:2.

Before Quality could hire him, it had to ensure he was qualified in accordance with DOT regulations.[3] After his Quality qualification and orientation, Salter worked with a driver trainer for approximately two months. *Eckhart Decl.*, Ex. C at 60:9-18. Salter testified that it took him a month to a month and a half to learn Olin's processes and systems. *Id.* at 79:11-80:8. After he finished with his driver trainer, Olin personnel observed him work for approximately one week. *Id.* at 94:19-22; 96:13-16. For the rest of the time that he drove under Quality's authority, he worked primarily for Olin and he began and ended every day at Olin's facility in Santa Fe Springs, California. *Id.* at 61:15-17.

In 2008, Quality withdrew its direct involvement in California operations. *Benoit Decl.*, ¶ 11 But, Quality continued to operate under its contract with Winsome. *Wallace Decl.*, ¶ 3. Under that contract, Winsome engaged in the business of transporting freight for Quality's customers using Winsome's trucks and employee drivers in exchange for a portion of the amounts that Quality charged to Quality's customers for transportation

---

[2] *See Benoit Decl.*, Ex. A § 22; *id.*, Ex. B § 10; *id.*, Ex. C § 10.

[3] 49 C.F.R. §§ 391.11(a), 391.31(a)-(c), 391.41; *Benoit Decl.*, ¶ 6.

services. *Id.*; *Benoit Decl.*, ¶¶ 6-7. At that time, Salter became a Winsome employee driver. *Wallace Decl.*, ¶ 11. In 2015, Salter voluntarily ended his employment relationship with Winsome, decided to lease the truck he had been driving from Winsome with the option to purchase it at the conclusion of the lease, and made the business decision to enter into an Agreement with Quality to operate under Quality's operating authority. *Id.* Salter signed three separate Agreements; one in 2015, one in 2016 and one in 2018. *Benoit Decl.*, ¶¶ 13-17. In 2019, he was injured and stopped working and making payments on his truck. *Wallace Decl.*, ¶ 12. Winsome repossessed Salter's truck and Quality terminated his then current Agreement when it learned that Salter no longer had the equipment identified in the Agreement. *Id.*

### 2.   Omar Jones

Prior to contracting with Quality, Jones was an independent contractor driver with Ventura. *Eckhart Decl.*, Ex. B at 98:24-99:14. In connection with his business providing driving services to Ventura, Jones leased a truck from Crossroads Equipment Lease and Finance, LLC (Crossroads). *Id.* at 73:21-74:9; *id.*, Ex. 2. Crossroads does not share any owners or employees with Quality or Winsome. *Benoit Decl.*, ¶ 21. When Jones contracted with Quality, he used his own truck and authorized Quality to deduct his lease payments from his settlements and remit them to Crossroads. *Eckhart Decl.*, Ex. B at 95:25-100:8; *id.*, Ex. 5. And, when Jones left Quality, he purchased his truck from Crossroads and took it with him, pursuant to the option he negotiated into his lease with Crossroads. *Id.* at 100:8-103:13; *id.*, Ex. 6 (Purchase Option Financing Addendum to Master Lease Agreement).

Jones testified he hauled bleach 80 to 90 percent of the time, but that the frequency of loads he hauled for Olin varied and generally did not exceed one to two times per week. *Id.* at 171:2-20. He only received one to two additional days of practical training after his orientation. *Id.* at 123:1-18. Unlike Salter, Jones consistently parked his truck, and therefore began and ended each day, at the South Gate terminal. *Id.* at 201:7-15. He did so because Crossroads—and *not* Quality—required him to. *Id.* at

202:1-14. And unlike Thomas, who regularly hauled loads out of state, Jones testified he hauled just one load out of state to Fernley, Nevada, during the entire time he was under contract. *Id.* at 132:3-23; *Eckhart Decl.*, Ex. D at 81:6-9. Unsurprisingly, Jones testified he had no way of knowing how processes varied for Contractors performing services on behalf of different customers. *Eckhart Decl.*, Ex. B at 204:14-205:17.

### 3. Fred Thomas

Before contracting with Quality, Thomas had operated as an independent contractor driver for several other motor carriers. *Eckhart Decl.*, Ex. D at 38:18-39:9. In 2010, Winsome employed Thomas to haul loads under Quality's authority out of the South Gate terminal. *Wallace Decl.*, ¶ 13. In 2015, Thomas chose to cease his employment with Winsome and sign an Agreement with Quality to once again become an independent business owner. Unlike Jones, Thomas procured his truck by leasing it directly from Winsome. *Eckhart Decl.*, Ex. D at 100:19-22. He chose to lease the truck that he was already using because he was already used to the truck, liked driving it, knew it was reliable and did not break down, and was already furnished with equipment making it compliant with local regulations. *Id.* at 95:4-98:8.

Although Thomas hauled a variety of chemicals early on during his time under contract, at some point Thomas began hauling approximately 75 percent of his loads carrying bleach for various customers on a route from Santa Fe Springs, California to Nevada. *Id.* at 64:5-65:21; 81:6-9. Thomas took several cash advances on his settlement payments: approximately 215 advances for a total of $23,711.68. Declaration of Cliff Dixon (*Dixon Decl.*), ¶ 10. He combined that cash with his own emergency fund and stored it all in a drawer in his home. *Eckhart Decl.*, Ex. D at 154:5-22.

## III.   ARGUMENT

Salter requests Rule 23(b)(3) certification, and, consequently, he must demonstrate the existence of four requirements of Rule 23(a) along with each element of Rule 23(b)(3) by a preponderance of the evidence. *In re Snap Inc. Securities Litig.*, 334 F.R.D. 209, 215 (C.D. Cal. 2019). Rule 23(a) has four requirements—numerosity,

commonality, typicality, and adequacy. To satisfy Rule 23(b)(3), Plaintiff must also establish "through evidentiary proof" that (1) questions of law or fact common to the members of the proposed class predominate over questions affecting individual class members alone, and (2) that a class action is superior to other available methods to resolve the controversy. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotations omitted). "In order to justify a departure from that rule," Salter must "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350 (emphasis in original). And the Court must engage in a "rigorous analysis" of each requirement of Rule 23 to determine the propriety of certification. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Dukes*, 564 U.S. at 352 (quotations and alterations omitted).

Plaintiff's Motion fails for several reasons. First, Plaintiff's claims are not typical of the class he seeks to represent. In addition, Plaintiff's misclassification theory does not present common issues of fact or law that predominate over individualized issues. Moreover, proving misclassification does not prove liability; Plaintiff must still prove the elements of his substantive claims. But on that front, Plaintiff' lacks common, classwide evidence of liability. For these and other reasons, the Motion should be denied.

## A.    Salter's Experience Operating Out Of A Single Terminal For A Single Customer Is Not Typical Of The Class

"The test of typicality is whether other members have the same or similar injury,

whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quotations omitted). Salter is unique among the members of his proposed class. Specifically, throughout the time he was under contract with Quality, he spent "99 percent" of his time hauling loads of bleach for Olin from its location in Santa Fe Springs, California. *Eckhart Decl.*, Ex. C at 66:1-67:16.

Olin had specific requirements for its loads and specific training that drivers had to engage in before they could haul Olin's freight. Salter testified that he had no personal knowledge of how other customers or Winsome California locations operated. Nor could he compare his experience working for Olin to any other driver's experience.

It is well settled that "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotations omitted). Here, the threat that the suit will devolve from a representative action into litigation related to the peculiar facts surrounding Salter's experiences under contract with Quality is concrete. As discussed below, the specific circumstances of each Contractor's experience under contract with Quality are material to the resolution of the claims in this suit. Salter's experience at Olin will focus the parties on facts that are not common to the class. Salter has offered no foundationally firm basis from which the Court could extrapolate his experiences to those of the class; nor could he. Indeed, Salter testified that he has no knowledge of any other terminal or customer. *Eckhart Decl.*, Ex. C at 180:10-182:8; 229:2-231:24. His personal experiences are irrelevant to the experiences of putative class members who worked for different customers or at one of the several different terminals.[4] Salter's

---

[4] This is particularly true with respect to those drivers who worked for Bulk or DTI prior to Winsome's acquisition of assets from Bulk and DTI in 2020.

1  "unique background and factual situation" render him an inappropriate class
2  representative. *See Ellis*, 657 F.3d at 984-85.

3         **B.**    **Commonality and Predominance**

4         "Commonality" describes the prong of Rule 23(a) that requires a plaintiff to show
5  that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).
6  This requires Salter to demonstrate more than that all members of the proposed class
7  have allegedly suffered a violation of the same provision of law. *Dukes*, 564 U.S. at
8  350. Rather, to meet the commonality prong, the claims must turn on a common
9  contention that is "of such a nature that it is capable of classwide resolution—which
10  means that determination of its truth or falsity will resolve an issue that is central to the
11  validity of each one of the claims in one stroke." *Id.*

12         Even if Salter can carry his burden on the commonality prong of Rule 23(a), he
13  must also demonstrate that "questions of law or fact common to class members
14  predominate over any questions affecting only individual members." Fed. R. Civ.
15  P. 23(b)(3). "[T]he focus of the predominance inquiry" is whether "a proposed class is
16  sufficiently cohesive to warrant adjudication by representation." *Amgen Inc. v. Conn.*
17  *Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotations omitted). Courts
18  should consider "whether the common, aggregation-enabling, issues in the case are
19  more prevalent or important than the non-common, aggregation defeating, individual
20  issues." *Haitayan v. 7-Eleven, Inc.*, No. 18-5465, 2021 WL 757024, at *6 (C.D. Cal.
21  Feb. 8, 2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 2045 (2016)).
22  It is an abuse of discretion to "rely on [uniform] policies to the near exclusion of other
23  relevant factors touching on predominance." *In re Wells Fargo Home Mort. Overtime*
24  *Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009). And yet, that is exactly what Salter invites
25  the Court to do. The Court should ignore Salter's invitation down the garden path.
26  Instead, it should analyze the balance between the individual and common issues as
27  they relate to the actual elements of Salter's claims. *See id.* at 959. Properly focused,
28  there can be no question but that individual issues predominate over common ones.

1. **Individual issues overwhelm common questions with respect to Salter's misclassification claim.**

   a. **California employment classification tests.**

Each of Salter's substantive claims turns first on his employment status. During the class period (October 2015 to present), two different tests applied to determine worker employment status. The applicability of each test turns on the claim Salter asserts and when the alleged violation occurred.

The first test is the common law "*Borello* test" set forth in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989). *Borello* focuses on the "right to control work" as well as many other factors including (a) whether the worker is engaged in a distinct occupation or business, (b) the amount of supervision required, (c) the skill required, (d) whether the worker supplies the tools required for the job, (e) the length of time for which services are to be performed, (f) the method of payment (*i.e.* pay by the job or by the hour), (g) whether the work is part of the regular business of the principal, and (h) whether the parties believe they are creating an employer-employee relationship. *Id.* at 355-58.

The second test is the "ABC test," first adopted in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal. 5th 903 (2018), and later codified in Labor Code § 2750.3, effective on January 1, 2020. In short, the ABC test presumes that all workers are employees unless the putative employer can demonstrate: (a) the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (b) the worker performs work outside the usual course of the hiring entity's business; and (c) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity. *Id.* at 916-17.

The California Supreme Court confined the applicability of *Dynamex* to claims brought under the California Wage Orders. *See Dynamex*, 4 Cal. 5th at 913-14; *see also Haitayan*, 2021 WL 757024, at *4. Accordingly, to the extent that the ABC test is not

preempted (discussed below), it applies to claims brought under Industrial Welfare Commission Wage Order 9-2001 (Wage Order No. 9). The only claims arising under Wage Order No. 9 that Salter seeks to certify are his claims for missed meal and rest breaks.

The ABC test in Labor Code § 2750.3, which applies to *all* claims under the Labor Code, is not retroactive. *See Olson v. California*, No. CV 19-10956-DMG, 2020 WL 905572, at *12 (C.D. Cal. Feb. 10, 2020). Therefore, to the extent it is not preempted, the statutory ABC test only applies to Labor Code violations that occurred after January 1, 2020. The Labor Code claims that Salter seeks to certify include his claim for indemnification under California Labor Code § 2802, his inaccurate wage statement claim under California Labor Code § 226, and his waiting time claim under California Labor Code § 203. In sum, Plaintiff's meal and rest break claims are subject to the ABC test, if it is not preempted. Absent preemption, Plaintiff's remaining claims are subject to the ABC test for violations that occurred after January 1, 2020, but are subject to the *Borello* test for violations that occurred before January 1, 2020.

### b. The *Borello* test.

Under *Borello*, "the individual factors cannot be applied mechanically as separate tests; they are intertwined, and their weight depends on particular combinations." *Id.* Consequently, when it decides employment status under the *Borello* test, the Court must "assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, and that it is the rare case where the various factors will point with unanimity in one direction or the other." *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) (quotations omitted). This is not a "rare" case—the record is replete with evidence pointing in every which direction. Salter's claims that turn on the *Borello* test will be overwhelmingly focused on issues unique to each Contractor.

***Right of Control.*** In *Borello,* the California Supreme Court identified the factors that a Court must consider when determining whether an *individual* who provides services is an independent contractor or an employee and noted "that the right to control

. . . is the 'most important' or 'most significant' consideration." 48 Cal. 3d at 350. Of course, when determining the propriety of a "plaintiff's" classification it is the putative employer's "right to control" *that individual's* "work details" that must be examined. *Id.* The record here demonstrates that whether Quality had the right to control *any individual* cannot be answered with common evidence.

Indeed, each version of the Agreement indicates that Quality did not retain a right of control over the "manner and means" of how any Contractor was to perform transportation services. *See Benoit Decl.*, Ex. A § 6; *id.*, Exs. B-C § 1. Similarly, no version of the Agreement required any Contractor to personally perform transportation services for Quality's customers. Instead, the ICAs required that the Contractors perform their contractual obligations in a "safe and prudent manner" and with "reasonable diligence, speed, and care." *Id.*, Exs. B-C §§ 2.02; 4.03. The application of these broad phrases varies based on the circumstances of each individual Contractor. The differences are illustrated by the different types of instruction that each Contractor received at Quality's orientation as well as the different types of customer-specific training each Contractor received.

For example, in the four years prior to when Plaintiff initiated this lawsuit, Quality's has utilized two different sets of PowerPoint slides to facilitate the classroom portion of instruction at the orientations. Frederick Marsicano (*Marsicano Decl.*), ¶ 7. Among the many differences between the two sets of slides, the second set: (i) removed a company-wide policy setting a maximum speed limit of 65 miles per hour (*Marsicano Decl.*, ¶ 8; *id.* Ex. A; *id.*, Ex. B); (ii) removed a carve-out for independent contractors in Quality's "corrective action policy" (*Marsicano Decl.*, ¶ 9; *id.*, Ex. C); and (iii) removed a provision of the termination policy contained in earlier slides, which stated that Quality could terminate the Agreement "at any time with or without justification" with 24 hours advance notice, and which materially differed from Quality's Agreement in use at the time. *Compare id.*, *with Benoit Decl.*, Ex. C, § 10.

Following orientation, Quality provided Contractors additional, hands-on

training, which varied from an additional three to four days to an additional four weeks, depending on the Contractors' experience and level of comfort performing the services under his/her contract, as well as the requirements of the specific customer(s) the Contractor hauled loads for. *Eckhart Decl.*, Ex. A at 140:16-141:9. For example, one of the Declarants, Omar Jones, only received an additional one to two days of training after attending orientation, while Plaintiff rode with other drivers for approximately two months in order to become familiar with the work. *Compare id.*, Ex. B at 123:5-18, *with id.*, Ex. C at 60:9-18. Different customers provided varying levels of training as well. *Wallace Decl.*, ¶ 9. Salter, who hauled loads primarily for one customer, a company that manufactures industrial bleach named Olin, provided an additional week of training to ensure he was loading his tanker correctly. *Id.* at 94:19-22; 96:13-16. Salter testified that in total, it took him over a month to acquire the skills needed to haul loads of bleach for that customer. *Id.* at 79:11-80:8. A different customer, Nalco Water, required that Contractors complete several different training modules in order to deliver shipments on its behalf. *Wallace Decl.*, ¶ 9.

These differences are not merely indicative of differences in Quality's *exercise* of control. Rather, they indicate a difference in the actual scope of Quality's *right of control*. *See Martinez v. Flower Foods, Inc.*, No. CV 15-511 RGK (EX) 2, 2016 WL 10746664, at *11 (C.D. Cal. Feb. 1, 2016). Because the only limitation on a Contractor's freedom under the Agreement is that he must perform work in a "safe and prudent manner" and with "reasonable diligence, speed, and care," the training and policies giving life to those phrases must be the starting point for the Court's analysis of whether Quality's right to control the Contractors is uniform. The substantial variations discussed above demonstrate that there is no common answer to this question as the facts and circumstances attending the relationship between Quality and its Contractors varied not only across time, but from customer to customer. "[T]he *Borello* factors suggest that the court cannot look only to the details of the relationship as specified between the two parties but must also consider the [presumptive] employer's

and presumptive employee's situations." *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 480 (N.D. Cal. 2012). Here, "[t]he evidence shows that, while they may have interacted on the same terms with [Quality, the Contractors] were situated very differently in their operations." *Id.*

**Secondary Factors.** Individual issues likewise predominate for the secondary *Borello* factors.

**Right to Discharge Without Cause.** All three Agreements contain a different termination clause. The 2015 Agreement and the 2018 Agreement permit either party to terminate the Agreement on 30-days' notice. *See Benoit Decl.*, Ex. A § 22; *id.*, Ex. C § 10. But the 2016 Agreement only permitted the Contractor to terminate the Agreement without cause. *Id.*, Ex. B § 10. Quality could only end the Agreement without the Contractor's agreement in the event of material breach. The orientation slide that Salter points to for the proposition that Quality retained the right to terminate the Agreement at any time on 24hours' notice without cause stands in direct contradiction to the language of these Agreements, and was only used for part of the class period. *Marsicano Decl.*, ¶ 9; *id.*, Ex. C. Salter provides no evidence that the slide was ever actually used or that it altered the varying termination policies embodied in the ICAs.

**Distinct Occupation or Business.** This factor asks whether any particular Contractor engaged in a "distinct occupation or business." *Curry v. Equilon Enters., LLC*, 23 Cal. App. 5th 289, 304 (2018). The evidence on this factor, likewise, varies. For example, Jones had his own California operating authority and has, since his time at Quality, formed an LLC. *Eckhart Decl.*, Ex. B at 43:1-24. Salter has never had a formally organized business entity. Further, the 2016 Agreement and the 2018 Agreement each explicitly reserved the right for the Contractor to use his equipment for another motor carrier. On the other hand, the 2015 Agreement did not provide an explicit right to do so. *Benoit Decl.*, Exs. B-C § 3.07.

Further, despite the implication in Plaintiff's declaration that he felt he could not hire additional drivers, Jones and Thomas both testified—consistent with their

Agreements—that no one at Quality ever told them they could not do so. *Compare* ECF No. 54-2, ¶ 23, *with Eckhart Decl., Ex. D* at 142:12-19; *id.,* Ex. B at 157:20-25; Exs. B-C, § 4.01. Likewise, Quality never told them that they were prohibited from hauling for other companies while under contract with Quality, as their Agreements specifically stated they could. *Eckhart Decl.*, Ex. D at 148:16-20; *id.,* Ex. B at 162:13-164:2; *Benoit Decl.*, Exs. B-C, § 1 ("Contractor retains the right (subject to the terms of Section 3.07 below) to provide services for other motor carriers…").

  **Supervision.** The supervision that each Contractor allegedly experienced varied from Contractor to Contractor. Specifically, Salter's proposed class involves Contractors operating from one of several different terminals and sub-terminals. Each terminal had its own dispatchers. *Wallace Decl.*, ¶ 8. Salter and his Declarants all worked out of the South Gate terminal. They have not offered any testimony or evidence related to supervision and control emanating from the other terminals. The testimony they have offered suggests that supervision was materially different from dispatcher to dispatcher, even within the same terminal. Consistent with the flexibility afforded under the terms of their contracts,[5] Plaintiff and the Declarants had varying experiences in receiving dispatches and making operational decisions. For example, Plaintiff asserts in his declaration that, despite the Agreements' provision giving the Contractors the freedom to choose the loads they hauled, he believed that if he declined a load, he would have no work for at least a day. ECF No. 54-2, ¶ 8. Yet when examined at his deposition, he conceded that belief was "just speculation," and that he was *never* told he could not decline to haul a load offered to him. *Eckhart Decl.*, Ex. C at 207:17-209:23. Thomas, in contrast, testified he refused loads on multiple occasions, and that whether he felt he was permitted to without consequences varied depending on which dispatcher was offering the load to him. *Id.,* Ex. D at 72:18-75:22.

---

[5] *See Benoit Decl., Exs. B-C,* § 1 ("**Contractor is not obligated to accept any specific shipment offered by [Quality]**") (bold in original).

While Plaintiff claims in his declaration that he would be called by a dispatcher when waiting at a location for too long, his own testimony belies that assertion. *Compare* ECF No. 54-2, ¶ 13, *with Eckhart Decl.*, Ex. C at 102:12-103:6 ("I think maybe if I was there over–you know … maybe I've been sitting there two hours or something in the yard … I would probably call the dispatcher just to let them know that, you know, I ain't able to load at the moment …").

***Skills Required.*** Salter correctly asserts that Quality required each Contractor who actually provided driving services to be qualified consistent with DOT standards. However, as discussed above, each customer required that drivers hauling their commodities have different levels of skill and familiarity with that customer's systems and equipment. There is even variation within a single customer. For example, Salter testified that it took him over a month to acquire the skills he needed to haul bleach for Olin. *Id.* at 79:11-80:8. On the other hand, Jones, who also primarily hauled bleach, sometimes for Olin, only received one to two additional days of practical training after his orientation. *Eckhart Decl.*, Ex. B at 123:1-18.

***Provision of tools and equipment.*** Contrary to Salter's assertions, Quality does not dictate how Contractors furnish the equipment used to provide services and Contractors' methods for the acquisition of such equipment varied. *See generally Benoit Decl.*, Exs. A-C. Some Contractors own their trucks when they execute an Agreement. *Benoit Decl.* ¶ 20. Others, like Jones, chose to lease equipment through equipment leasing companies with no relationship to Defendants. *See Eckhart Decl.*, Ex. B at 76:23-77:21. Others elected to lease their equipment from Winsome. *See id.,* Ex. C at 107:18-21; 110:16-20.

Likewise, the record evidence varies with respect to Contractors' experiences with regard to the provision of other equipment. While Salter claims he was required to wear a Quality uniform, along with the personal protective equipment provided to him, the testimony of his Declarants stands in direct conflict with his assertion. *Compare* ECF No. 54-2 at ¶¶ 17-18, *with Eckhart Decl.*, Ex. B at 206:9-15; *id.,* Ex. D at 171:6-

15. Finally, although Quality provided multiple forms of PPE to some Contractors at the time they contracted, others, such as Thomas, already had the majority of PPE needed, and therefore only received a respirator. *Id.* at 125:5-24. While Jones and Plaintiff bought their own steel-toed boots, Thomas had his own. *Id.*, Ex. B at 224:3-7; *id.*, Ex. C at 114:7-16; *id.*, Ex. D at 125:14-24. Some Contractors, like Salter, opted to purchase additional equipment, such as a Gore-Tex chemical suit, which he preferred over the chemical suit Quality provided, because it was more light-weight. *Id.*, Ex. C at 113:1-114:9.

**Length of time for which services are performed.** The terms of each Agreement varied from one to three years. But, in each instance the Contractor was free to terminate his or her Agreement on 30-days' notice. And, at least one of Salter's Declarants did just that—Thomas terminated his Agreement on his own initiative and cut short the length of time when he would be performing services. *Eckhart Decl.*, Ex. D at 201:10-12. Because this factor is in the unique control of each Contractor, the evidence necessarily varies across the proposed class.

**Method of payment.** Each week, Quality issues Contractors settlement statements summarizing their compensation. *Eckhart Decl.*, Ex. A at 63:6-15. While Contractors received compensation on a weekly basis, they were paid a set percentage of the "Adjusted Gross Revenue" of each load delivered. *See Benoit Decl.*, Exs. A-C, Schedule A-1, ¶ 2. And despite Plaintiff's assertion that he was simply paid on a weekly basis, Contractors were paid following submission of paperwork establishing delivery of each load. *See id.*, Exs. B-C § 6.03. As a result, the schedule on which a Contractor is to be paid is within each Contractor's control and varies according to his or her practice.

**Regular business of the principal.** None of the Agreements required the Contractors to personally provide services under the Agreement. *Id.*, Ex. A § 7; *id.*, Exs. B-C, § 4.01. To the extent that a Contractor did not personally provide services, he was not engaged in the transportation of hazardous material, contrary to Plaintiff's

1  conclusory assertion. Consequently, this factor may vary across the putative class.

2  ***The parties' belief regarding whether they are forming an employer-employee***

3  ***relationship.*** This factor is inherently subjective and will necessarily vary from

4  Contractor to Contractor. For instance, Thomas, a seasoned owner-operator, is well

5  positioned to understand that he is entering an independent contractor relationship with

6  Quality, while other drivers may have a different understanding. To know, each

7  Contractor would have to offer testimony on his or her beliefs.

8  **c.    The ABC test.**

9      The FAAAA provides that a state "may not enact or enforce a law . . . related to

10  a price, route, or service of any motor carrier . . . with respect to the transportation of

11  property." 49 U.S.C. § 14501(c)(1). The United States Supreme Court has addressed

12  the preemptive scope of the FAAAA and its predecessor the Airline Deregulation Act

13  (ADA) on several occasions—each time emphasizing the broad preemptive scope of

14  their provisions. *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378 (1992);

15  *American Airlines v. Wolens,* 513 U.S. 219, 222-24 (1995); *Rowe v. New Hampshire*

16  *Motor Transp. Ass'n,* 552 U.S. 364, 370-71 (2008); *Am. Trucking Associations, Inc. v.*

17  *City of Los Angeles,* 133 S. Ct. 2096, 2102 (2013); *Northwest, Inc. v. Ginsberg,* 572

18  U.S. 273, 281-83 (2014). By enacting the FAAAA, Congress expressed its overarching

19  goal "as helping ensure transportation rates, routes, and services that reflect maximum

20  reliance on competitive market forces, thereby stimulating efficiency, innovation, and

21  low prices, as well as variety and quality." *Rowe,* 552 U.S. at 371 (internal quotations

22  omitted). The Supreme Court has explained that "the ban on enacting or enforcing any

23  law 'relating to rates, routes, or services' is most sensibly read . . . to mean States may

24  not seek to impose its own public policies or theories of competition or regulation *on*

25  *the operations* of [a motor] carrier." *Wolens,* 513 U.S. at 229 n.5 (emphasis added). In

26  other words, deregulation is just that–the elimination of government interference with

27  the private arrangements made between willing market participants in the transportation

28  industry. When, as here, a test lends itself to an "all or nothing" result, there can be no

18

question but that it defeats Congress's goal of allowing willing market participants to freely make the choices they determine best serve their interests.

As the Southern District of California observed when it enjoined the state's enforcement of the ABC test, "Ninth Circuit jurisprudence touching on the issue strongly suggests preemption." *California Trucking Association v. Becerra*, 433 F. Supp. 3d 1154, 1164 (S.D. Cal. 2020).[6] Indeed, *California Trucking Association v. Su*, noted that "an all or nothing rule requiring services be performed by certain types of employee drivers . . . was likely preempted" by the FAAAA. 903 F.3d 953, 964 (9th Cir. 2018). Salter's argument as to the "B" prong demonstrates that he conceives of the ABC test as just such an "all or nothing" proposition. His argument boils down to the idea that because Quality is a transportation company, any driver it engages to provide those services *must* necessarily be an employee. The FAAAA does not permit such a result. *See Cal. Trucking Ass'n*, 433 F. Supp. 3d at 1163-64. Accordingly, the Court need not consider the test in its analysis of the propriety of class certification. *See Dukes*, 564 U.S. at 350.

Even if the Court does analyze the ABC test for the purpose of class certification, the only appropriate conclusion is that as to prongs A and C, certification is inappropriate. Specifically, under prong A—Quality's right and exercise of control— both the right to control and Quality's actual incidence of control vary across time periods, customers, and terminals. As discussed above, Contractors worked out of different terminals, with different dispatchers who purportedly exercised control, but at differing levels. Further, each customer had different requirements and different levels of training and compliance in which each Contractor had to engage.[7]

---

[6] The California Court of Appeal has held that the FAAAA does not preempt the ABC test. *See People v. Superior Court of Los Angeles County*, 57 Cal. App. 5th 619 (2020). However, this Court is bound to follow the precedent of the Ninth Circuit on issues of federal law. *See Hart v. Massanari*, 266 F.3d 1155, 1170-71 (9th Cir. 2001).

[7] The existence of uniform contracts alone are not sufficient to certify a misclassification case. The California Supreme Court rejected the argument that the "parties' course of

Similarly, the evidence that Salter needs to demonstrate the existence of prong C—whether each Contractor is engaged in a distinct occupation or business—varies from Contractor to Contractor. This variation is apparent even among Salter and his Declarants. For example, Jones had his own operating authority and could have hauled intrastate loads using his California authority independent of any loads tendered to him by Quality. *Eckhart Decl.*, Ex. B at 43:3-20. At the same time, Salter did not have his own authority and would have to lease his tractor to a separate carrier altogether in order to haul loads using his tractor. *See* 49 C.F.R. § 376.11(a). That these circumstances are materially different—even among Salter's handpicked witnesses—portends that whether Quality can meet its burden under prong C is not something that can be decided on a classwide basis. *See James v. Uber Technologies Inc.*, No 19-cv-06462-EMC, 2021 WL 254303, at *11-*12 (N.D. Cal. Jan. 26, 2021).

### 2. Plaintiff lacks common, classwide evidence of meal and rest break violations.

Proving misclassification does not automatically establish liability. See *In re Wells Fargo Home Mort. Overtime Pay Litig.*, 571 F.3d at 955. Even if the Court concludes Plaintiff's misclassification theory presents a common question for the class, the Court should still reject certification of Salter's meal and rest break claim.

---

conduct is irrelevant" to the misclassification inquiry because "the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of rights at odds with the written terms." *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 535 (2014). The Court should reject Salter's position and instead follow the decisions from this district that demand actual evidence of uniform control to justify class certification. *Martinez*, 2016 WL 10746664, at *10–11; *Rowe v. Ulta Salon, Cosms. & Fragrance, Inc.*, No. SACV191074PAJCX, 2019 WL 6998780, at *6 (C.D. Cal. Aug. 30, 2019); *see also Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021) (noting prongs A and C are "the most factually oriented"); *Haitayan v. 7-Eleven, Inc.*, No. CV 17-7454 DSF (ASX), 2020 WL 1290613, at *6 (C.D. Cal. Feb. 19, 2020) (denying parties' cross summary judgment motions because the parties' factual disputes regarding control had to be "determined by a jury").

First, Plaintiff cannot enforce California's meal and rest break rules against Defendants for two reasons. First, the Pipeline and Hazardous Materials Safety Administration (PHMSA) has determined that California's meal and rest break laws do not apply to loads containing hazardous materials. *Hazardous Materials: California Meal and Rest Break Requirements*, 83 FR 47961-01 (Sept. 21, 2018). Second, the Ninth Circuit recently affirmed an order from the Federal Motor Carrier Safety Administration that concluded the federal Hours of Service Regulations, 49 C.F.R. Part 395, preempted California's Break Rules as applied to property-carrying commercial motor vehicle drivers like Plaintiff. *Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841 (9th Cir. 2021). The mandate has not yet been issued, but district courts do not have jurisdiction to review the FMCSA's Order. *See Ayala v. U.S. Xpress, Inc.*, 2019 WL 1986760 (C.D. Cal. May 2, 2019).

Second, Plaintiff has omitted critical evidence. First, the Wage Order was posted at the South Gate Terminal, so the Contractors were aware of California's meal and rest break rules. *Eckhart Decl.*, Ex. D at 83:22-84:8; *Wallace Decl.*, ¶ 14. Second, the Agreements gave the Contractors complete control over the manner and means of performing their services, which would include the decision when and where to take breaks. *Benoit Decl.*, Ex. A § 6; *id.*, Exs. B-C § 1. And as evidenced by the Relief of Responsibility card, Quality informed Contractors that they were completely relieved of duty and responsibility for a load after they properly parked and secured their equipment. *Eckhart Decl.*, Ex. D at 125:25-16; *Id.*, Ex. 5 (Relief of Responsibility Card). Therefore, the Contractors were provided with the opportunity to take duty-free meal and rest breaks.

An employer has no obligation to police employees to ensure that breaks are taken. *See*, *e.g. Perez v. Performance Food Grp.*, *Inc.*, No. LA-CV17-00357 JAK (SKx), 2017 WL 6940526, at *7 (C.D. Cal. Dec. 15, 2017) (citing string of cases); *Cole v. CRST, Inc.*, 317 F.R.D. 141, 145 (C.D. Cal. 2016). Rather, an employer is only liable for premium pay if the employer in fact impedes or discourages employees from taking

1    an uninterrupted off-duty meal break or rest break. *See Brinker Rest. Corp. v. Superior*

2    *Ct.*, 53 Cal. 4th 1004, 1040 (2012); *compare* Cal. Lab. Code § 226.7(b). Whether a

3    Contractor actually took a meal break, and if not, the reason why, requires testimony

4    from individual Contractors. For example, Jones testified he did not have time to take

5    breaks because of the schedule he kept. Thomas testified he took breaks for non-hazmat

6    loads, but that the "laws" related to hazardous materials he learned during truck driving

7    school forced him to stay with his truck during meal breaks. All three Contractors

8    testified Quality never told them they were not allowed to take a meal or rest break.

9    *Eckhart Decl.*, Ex. B at 148:20-149:17; *id.*, Ex. C at 76:5-13; *id.* Ex. D at 138:19-140:2.[8]

10   And Plaintiff only alleges that Contractors had to stay with their trucks "at times." *Pl's*

11   *Br.* at 25. In short, Salter cannot prove liability on a classwide basis.

    **3.    Plaintiff cannot prove Section 2802 liability on a classwide basis.**

12

13       Plaintiff's expense reimbursement claim[9] is inappropriate for certification

14   because adjudication of that claim will require individualized inquiries into the

15   necessity of each Contractor's expenses and whether the compensation they received

16   from Quality to cover those expenses was adequate, such that "common questions do

17   not predominate over individual questions." *Ruiz v. Affinity Logistics Corp.*, No.

18   05CV2125, 2009 WL 648973, at *7-8 (S.D. Cal. Jan. 29, 2009). For example, some

19   Contractors, such as Omar Jones, leased their trucks from third parties before

20   contracting with Quality. Jones' lease agreement with Crossroads, which does not share

21   any owners or employees with Quality or Winsome, had specific obligations regarding

22   maintenance of the truck and insurance coverage he was required to carry. *See Eckhart*

23

24   [8] *See also Murphy v. Kenneth Cole Prods., Inc.*, 155 P.3d 284, 293 (Cal. 2007); *Dilts v.

25   *Penske Logistics, LLC*, 188 F. Supp. 3d 1016, 1020 (S.D. Cal. 2016); *Cole v. CRST,

     *Inc.*, 317 F.R.D. at 143–144.

26   [9] Although Plaintiff's motion mentions his claim under Section 221, his brief only

27   requests certification of the 2802 claim. Therefore, Plaintiff's Section 221 claim should

     not be certified. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23

28   does not set forth a mere pleading standard.").

*Decl.*, Ex. B at 77:23-79:12; *id.*, Ex. 2 ¶¶ 4-6, 9. To determine whether costs associated with maintenance and insurance are reimbursable under Section 2802, the Court would have to consider whether those costs were required by Quality or Crossroads, as well as whether they were related to their work for Quality or for another business entity. *See Madrigal v. Tommy Bahama Grp., Inc.*, 2011 WL 10511339, at \*9-10 (C.D. Cal. June 27, 2011).

Other deductions for fuel card advances and equipment costs are no more susceptible to class-wide treatment. While some Contractors, such as Plaintiff, rarely received cash advances on their fuel card, others, such as Fred Thomas, received them on a frequent basis—taking 215 advances for a total of $23,711.68 over just a year and eight-month period, some of which he combined with his personal cash savings in a drawer in his home. *See Dixon Decl.*, ¶ 10; *Eckhart Decl.*, Ex. D at 154:155-3. Whether all (or even any) of those funds were used to purchase items required by Quality requires an individualized inquiry into each purchase.[10] Plaintiff has likewise failed to identify any common policy establishing the necessity of expenditures for uniforms or personal protective equipment. For example, while Plaintiff claims he was required to wear a Quality uniform, along with the personal protective equipment provided to him, the testimony of his Declarants stands in direct conflict with his assertion. *Compare* ECF No. 54-2 at ¶¶ 17-18, with *Eckhart Decl.*, Ex. B at 206:9-14 (Q: "Were you required to wear a uniform during that time period [when under contract with Quality]" A: "I had a hard hat with Quality, QC, on it that I wore and I was issued a few T-shirts to wear with Quality on them, but I don't remember nobody saying oh, you have to wear them…"); *id.*, Ex. D at 165:10-19 (Q: "When you were a contractor…were you required to wear a uniform?" A: "No."; Q: "Could you have worn your own hard hat that did not have a Quality logo?" A: Yes.").

---

[10] Moreover, the adjudication of Plaintiff's Section 2802 claim will require individualized inquiries into where the expenses at issue were incurred, and whether California law applies to them.

Expenditures for other forms of PPE were no more common. Plaintiff, for example, testified that he purchased a Gore-Tex suit to wear while hauling loads not because Quality required it (they provided him with a rubber chemical suit for the same purpose), but simply because he preferred its light-weight material. *Id.*, Ex. C at 111:1-17. As this Court has held in similar circumstances, class certification is inappropriate where—as here—determination of liability on an expense reimbursement claim depends on individualized inquiries into whether contractors incurred business expenses because they were required or of their own accord. *See Gallardo v. United Parcel Serv., Inc.*, No. CV1008624SJOJEMX, 2011 WL 13217707, at *3-4 (C.D. Cal. Aug. 22, 2011); *Madrigal*, 2011 WL 10511339, at *9-10.

### 4.     Plaintiff's Derivative Claims under Sections 203 and 226 should not be certified.

Plaintiff's claims under Sections 203 and 226 are derivative. Therefore, if the Court denies decertification of Plaintiff's meal and rest break and expense reimbursement claims, it should also deny certification for Plaintiff's Sections 203 and 226 claims. The Court should deny certification on Plaintiff's Section 226 claim for an independent reason: Plaintiff's motion and brief fail to cite any evidence or argument that Quality failed to provide itemized wage statements. *Dukes*, 564 U.S. at 350. Therefore, Plaintiff has not met his burden on this claim.

### C.     Superiority/Class Waiver

Under the terms of his Agreements, Salter waived his "right to participate as a member in any class action lawsuit against [Quality] or act as a representative of a class of similarly situated persons in any lawsuit against [Quality]." *Benoit Decl.*, Exs. B-C § 11.04. "[T]he validity of a class waiver turns on whether a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and whether the disallowance of the class action will likely lead to a less comprehensive enforcement of labor or employment laws for the employees alleged to be affected by the employer's

violations." *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348, 364, 327 P.3d 129, 136 (2014) (quotations and alterations omitted). "The kind of inquiry a trial court must make is similar to the one it already makes to determine whether class actions are appropriate." *Brown v. Ralphs Grocery Co.*, 197 Cal. App. 4th 489, 497 (2011), as modified (July 20, 2011). For the reasons explained above, this case cannot be efficiently tried as a class action. Therefore, Plaintiff cannot meet his burden of proof to avoid his class action waiver. *Id.* at 496-97. For the same reasons, Plaintiff failed to satisfy the superiority requirement under Rule 23. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (Plaintiff "bears the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" (quotations omitted)).[11]

## IV.   CONCLUSION

For these reasons, Plaintiff's Motion should be denied.

Dated: March 12, 2021                        Respectfully submitted,

                                             */s/ Christopher J. Eckhart*
                                             Christopher J. Eckhart

                                             Attorney for Defendants, Quality Carriers, Inc. and Quality Distribution, Inc.

4833-2762-9535, v. 16

---

[11] To be sure, the four factors courts consider to determine whether a class waiver is contrary to public policy weigh in favor of enforcing the waiver. *Gentry v. Superior Court*, 42 Cal. 4th 443, 463-64 (2007). Salter can potentially recover over $100,000, substantially more than what other courts have considered too "modest." *Cf. Canava v. Rail Delivery Serv. Inc.*, 2020 WL 2510648, at *4 (C.D. Cal. Feb. 27, 2020) (potential recovery of $27,000). *Dixon Decl.*, ¶ 12. Moreover, Plaintiff has not demonstrated that the Contractors legitimately feared retaliations. To the contrary, Thomas stood his ground when he was told he could not get his truck repaired at his preferred shop, and he ultimately terminated his Agreement as a result. *Eckhart Decl.*, Ex. D at 181:10-188:7. Contractors also knew their rights in the event of misclassification because the Wage Order was posted at the South Gate terminal. *Id.* at 83:22-84:8; *Wallace Decl.*, ¶ 14. Finally, there aren't any real-world obstacles to the vindication of the class members' rights through individual litigation.