**THE KICK LAW FIRM, APC**
Taras Kick (State Bar No. 143379)
taras@kicklawfirm.com
Daniel J. Bass (State Bar No. 287466)
daniel@kicklawfirm.com
Roy K. Suh (State Bar No. 283988)
Roy@kicklawfirm.com
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

**GUPTA WESSLER PLLC**
Matthew W.H. Wessler (admitted *pro hac vice*)
matt@guptawessler.com
Jennifer D. Bennett (State Bar No. 296726)
jennifer@guptawessler.com
1900 L Street NW Suite 312
Washington, D.C. 20036
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

Attorneys for Plaintiff Clayton Salter, individually and on behalf of all others similarly situated

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON SALTER, individually and on behalf of all others similarly situated, Plaintiffs, vs. QUALITY CARRIERS INC., an Illinois Corporation; et al. Defendants. | CASE NO.: 2:20-cv-00479-JFW-JPR<br><br>Assigned to the Honorable John F. Walter<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: April 5, 2021<br>Time: 1:30 p.m.<br>Courtroom: 7A<br>Judge: John F. Walter |

REPLY

# Table of Authorities

**Cases**

*Aguirre v. Genesis Logistics*,
   2013 WL 12129648 (C.D. Cal. Mar. 26, 2013) .................................................. 3

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
   568 U.S. 455 (2013) ......................................................................................... 10

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
   24 Cal. 4th 83 (2000) ....................................................................................... 12

*Ayala v. Antelope Valley Newspapers, Inc.*,
   59 Cal. 4th 522 (2014) ....................................................................................... 5

*Bowerman v. Field Asset Services, Inc.*,
   242 F. Supp. 3d 910 (N.D. Cal. 2017) ............................................................... 7

*Canava v. Rail Delivery Service Inc.*,
   2020 WL 2510648 (C.D. Cal. Feb. 27, 2020) .............................................. 7, 12

*Combe v. Intermark Communications, Inc.*,
   2010 WL 11597517 (C.D. Cal. Nov. 18, 2010) ................................................ 9

*Dalton v. Lee Publications, Inc.*,
   270 F.R.D. 555 (S.D. Cal. 2010) .......................................................... 6, 10, 11

*Dynamex Operations West, Inc., v. Superior Court of Los Angeles*,
   4 Cal. 5th 903 (2018) ..................................................................................... 2, 4

*Estate of Saunders v. Commissioner of Internal Revenue*,
   745 F.3d 953 (9th Cir. 2014) ........................................................................... 12

*Estrada v. FedEx Ground Package System, Inc.*,
   154 Cal. App. 4th 1 (Ct. App. 2007) ................................................................. 6

*Fireside Bank v. Superior Court*,
   40 Cal. 4th 1069 (2007) ..................................................................................... 2

*Fleming v. Matco Tools Corp.*,
   2021 WL 673445 (N. D. Cal. Feb. 21, 2021) .................................................... 4

*Garrido v. Air Liquide Industrial U.S. LP*,
   241 Cal. App. 4th 833 (2015) .......................................................................... 12

*Gonzales v. San Gabriel Transit, Inc.*,
   40 Cal. App. 5th 1131 (2019) ............................................................................ 3

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................................................... 2

*In re Wells Fargo Home Mortgage Overtime Pay Litigation*,
   571 F.3d 953 (9th Cir. 2009) ............................................................................. 6

*Iskanian v. CLS Transportation Los Angeles*, LLC,

59 Cal. 4th 348 (2014) .......... 12

*James v. Uber Technologies, Inc.*, 2021 WL 254303 (N.D. Cal. Jan. 26, 2021) .......... 4

*Johnson v. Serenity Transportation, Inc.*, 2018 WL 3646540 (N.D. Cal. Aug. 1, 2018) .......... 9

*Lee v. ITT Corp.*, 275 F.R.D. 318 (W.D. Wash. 2011) .......... 9

*Leyva v. Medline Industries Inc.*, 716 F.3d 510 (9th Cir. 2013) .......... 11

*Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999 (C.D. Cal. May 29, 2019) .......... 11

*Murphy v. Check 'N Go of California, Inc.*, 156 Cal. App. 4th 138 (2007) .......... 12

*Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010) .......... 9

*Nash v. Horizon Freight Systems, Inc.*, 2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) .......... 6

*Smith v. Cardinal Logistics Management Corp.*, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .......... 10

*Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464 (N.D. Cal. 2017) .......... 9

*Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588 (N.D. Cal. 2014) .......... 6, 8, 11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......... 3

*Western States Trucking Association v. Schoorl*, 377 F. Supp. 3d 1056 (E.D. Cal. 2019) .......... 3

*Wright v. Linkus Enterprises, Inc.*, 259 F.R.D. 468 (E.D. Cal. 2009) .......... 10

*Yokoyama v. Midland National Life Insurance Co.*, 594 F.3d 1087 (9th Cir. 2010) .......... 11

## Table of Contents

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ..................................................................................................... 1

    A. Quality's unexplained arguments against typicality are incapable of defeating certification. ............................................................................ 2

    B. Individualized issues do not predominate over common ones. ............ 2

    C. Quality's cursory arguments on superiority are meritless. ................. 11

III. CONCLUSION ............................................................................................... 12

## I. INTRODUCTION

Court after court has certified cases just like this one. And with good reason. This kind of case is precisely what class certification is for. Quality cannot seriously dispute that the employment status of its drivers is a common question that can be proven with common evidence. Nor does it even attempt to justify the logical conclusion of its position: that we should have 150 identical trials where 150 drivers present the same evidence and make the same arguments to 150 different juries about whether Quality misclassifies its drivers. Instead, it tries to muddy the waters. But every argument Quality makes here has already been rejected in similar cases. This Court should do the same.

## II. ARGUMENT

Quality concedes most of the relevant factors for class certification: (1) The class is sufficiently numerous; (2) the threshold question—whether Quality's drivers were misclassified—is common to the class; and (3) both Mr. Salter and class counsel will adequately represent the class. Quality objects to certification on only three grounds. First, it contends that Mr. Salter's claim is not typical of the class, but it fails to identify any difference between Mr. Salter and other class members that will have any impact on the actual claims in the case or Quality's defenses to those claims. Second, the company argues that individual issues predominate over common ones, but in doing so, it confuses the question of whether a class should be certified with whether that class will prevail on the merits—and the issues of liability (on which common evidence is necessary) and damages (on which it is not). And, third, Quality contends that a class action is not superior to individual cases, but it presents no argument at all in support of this contention—resting entirely on its arguments as to typicality and predominance. All three of these objections fail.[1]

---

[1] Quality asserts that Mr. Salter did not seek certification of his minimum wage claim. That's false. *See* Mem. for Class Certification at 12, 25–26.

### A. Quality's unexplained arguments against typicality are incapable of defeating certification.

To defeat typicality, Quality faces a heavy burden. All a named representative must do to satisfy typicality is show that his claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).[2] To defeat typicality, then, Quality must show not just that Mr. Salter's work was different; it must demonstrate that any differences make his claims somehow atypical. Quality comes nowhere close. Although it asserts (at 8) that there are some differences between Mr. Salter and the others—*e.g.*, that Mr. Salter spent "99 percent" of his time hauling loads for one customer—it completely fails to explain how those differences matter. The most it offers is a generic claim that typicality can be defeated when the "representative is preoccupied with defenses unique to it." Opp. 8. But raising the specter of a unique defense against the named representative "does not automatically render the proposed representative atypical." *Fireside Bank v. Superior Court, 40 Cal. 4th 1069, 1091 (2007)*. There must actually *be* a unique defense. Because Quality identifies none here, its argument fails. *See id.*

### B. Individualized issues do not predominate over common ones.

***ABC Test.*** As an initial matter, Quality concedes (at 10) that, under *Dynamex Operations West, Inc., v. Superior Court of Los Angeles, 4 Cal. 5th 903 (2018)*, "the ABC test presumes that all workers are employees" unless an employer can demonstrate that none of the three "ABC" prongs apply. The company recognizes that *Dyanmex* is retroactive—and therefore covers the whole class period—but it argues (at 10) that "the California Supreme Court confined the applicability of *Dynamex* to claims brought under California Wage Orders." That is

---

[2] Unless otherwise specified, all internal quotation marks, citations, and alterations omitted.

wrong. As the California Court of Appeal has explained, "*Dynamex* did not reach the question of whether the ABC test applies to non–wage order related Labor Code claims." *Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131, 1157 (2019). The Court of Appeal, however, has now answered that question, holding that *Dynamex*—and thus the ABC test—applies to *any* Labor Code claims that "are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order," including "non-wage order allegations" that are "equivalent or overlapping" with conduct governed by the wage orders. *Id*. That standard covers *every* claim here. See *id.* at 1157-60.

That is fatal to Quality's opposition because the company also concedes that certification is proper under at least prong B of the ABC test. *See* Opp. 19 (arguing that certification is inappropriate "as to prongs A and C"). Because the answer to that question—one way or the other—"will resolve an issue that is central to the validity of each one of the claims in one stroke," and because, as Quality concedes, that question can be answered with common evidence, certification is appropriate. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Quality's only response (at 18-19) is to argue that the ABC test is preempted. Not so. *See W. States Trucking Ass'n v. Schoorl*, 377 F. Supp. 3d 1056, 1072 (E.D. Cal. 2019) ("[T]he FAAAA does not preempt *Dynamex*' interpretation of California wage orders"). And regardless, this objection is itself a question common to the class—preemption is an affirmative defense and Quality does not argue that it might apply to only some, but not others, in the class. As a result, it is "appropriate to evaluate preemption" only after class certification once the case has reached the merits. *Aguirre v. Genesis Logistics*, 2013 WL 12129648 at *5 (C.D. Cal. Mar. 26, 2013).

Even for the other prongs, Quality is wrong that this case cannot be certified. Quality argues (at 19) that certification would be inappropriate under prong A because, in practice, its "actual incidence of control" varies depending on a number

of different circumstances. That misses the point—twice. First, *Dynamex* is clear that a worker is an employee under Prong A if they are subject to "the type and degree of control a business typically exercises over employees" "*either* as a matter of contractual right *or* in actual practice." 4 Cal. 5th at 958 (emphasis added). Quality directs its argument solely at actual practice, but that doesn't get it far enough. Under *Dynamex*, the contract alone is sufficient.

In any case, the question at certification is not whether this prong is satisfied on the merits, but rather whether that question can be answered through common evidence. But Quality does not argue that its contracts are sufficient common evidence to satisfy prong A. It can't. The company's contracts establish a policy of control that applies to all of its drivers. Cert. Mem. 17–19. For example, Quality's contracts state that it is the company that has "exclusive possession, control and use" of the trucks. *Id.* at 9. Consistent with that right of control, Quality's contracts lay out a variety of common policies. *Id.* at 8–12. Quality's contracts will thus provide common evidence of the degree to which Quality could control its drivers' work. *See, e.g., James v. Uber Techs. Inc.*, 2021 WL 254303 at *8 (N.D. Cal. Jan. 26, 2021) (certifying class with fewer uniform terms under its contracts).

Quality's only argument against certification under prong C is just as weak—it states that the evidence necessary to establish this prong "varies" because one driver "had his own operating authority" and so "could have hauled" loads independent of Quality. Opp. 20. But here, too, Quality misses the point. What matters for this prong is whether the company had a uniform policy of "expressly prohibiting" its drivers from doing so. *Fleming v. Matco Tools Corp., 2021 WL 673445 at *10 (N. D. Cal. Feb. 21, 2021)*). Quality makes no effort to dispute that it had that uniform policy here—and for good reason. Quality's contracts gave it, and not the drivers, the right to "exclusive possession, control and use" of the trucks. Cert. Mem. 9. The company's training materials were even more explicit: No driver could use their truck for "anything other than company approved business." *Id*. And

even the one driver that Quality singles out never hired himself out independently because he did not even know that he had his own operating authority. Jones Decl. ¶¶ 20, 24.

**Borello Test.** Quality also argues against certification under the *Borello* test, *S.G. Borello & Sons, Inc. v. Dep't of Indus. Rels.*, 48 Cal. 3d 341 (1989). In its view (at 9), the misclassification question under the *Borello* test "will be overwhelmingly focused on issues unique to each Contractor." But as with the ABC test, it can reach this conclusion only by ignoring the actual question that matters—did it have the right to control its workers?—and focusing instead on an irrelevant one—did it exercise that right in the same way over each driver? It is, to be clear, the former question that carries legal significance under *Borello*. *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 533 (2014) ("[W]hat matters . . . is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise").

And on that question, Quality (once again) does not meaningfully challenge the fact that common evidence—from its own contracts and training materials—that will provide a common answer for each *Borello* factor. Take the right of control—the first and most important factor. Quality insists (at 12) that its contracts did not confer "a right of control" over its drivers because they only required drivers to "perform their contractual obligations in a 'safe and prudent manner' and with 'reasonable diligence, speed, and care.'" Not so. As we have explained, Quality's contracts do much more than that—they specifically confer on Quality a right of control over its workers, by, for instance, authorizing the company to track and record its drivers "at all times." Cert. Mem. 10. But even so, Quality's argument "focuse[s] on the wrong legal question." *Ayala*, 59 Cal. 4th at 535. The right question, for certification, is not whether Quality actually has the right to control its workers but whether that right "is commonly provable." *Id.* On this, Quality appears to agree that common evidence—the contracts—will provide a
5 REPLY

common answer to this question. It may disagree on what that common answer should be, but because Quality's contracts lay out a uniform policy on the right to control, this question is susceptible to common proof. *See Villalpando v. Exel Direct Inc.*, 303 F.R.D 588, 608 (N.D. Cal. 2014); *Nash v. Horizon Freight Sys., Inc.*, 2020 WL 7640878 at *2 (N.D. Cal. Dec. 23, 2020).[3]

      Quality next focuses (at 12-13) on its training procedures, arguing that these vary in material ways that could provide a basis to deny certification. The record once again refutes this. During the class period, Quality used two training materials, each spanning thousands of pages. Of those, Quality identifies three pages that changed in 2019. But the employer's policies do not need to be exactly the same to provide classwide proof. Policies that are, as here, "substantially identical" in the key respects are more than sufficient. *Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 563 (S.D. Cal. 2010). The slight differences Quality identifies do nothing to change the fact that Quality's training materials lay out its "control over every exquisite detail of the drivers' performance," *Estrada v. FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1, 11–12 (Ct. App. 2007), including everything from how

---

[3] Quality urges this Court not to "'rely on [uniform] policies" if doing so would exclude "other relevant factors touching on predominance.'" Opp. 9 (citing *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009)). But Quality never actually identifies any other relevant factors that are at risk of being ignored. Moreover, Quality's reliance on *Wells Fargo* is misplaced. In that case, the Ninth Circuit *approved* the use of "uniform corporate policies" in determining predominance where those policies are relevant to the underlying legal question—in those circumstances, the court explained, the policies "carry great weight." *Id.* at 959. The problem in *Wells Fargo* was that the bank's common policy was not actually relevant to the legal question in the case. *See id.* at 959. Here, in contrast, the relevant legal question—whether Quality maintained the right to control its drivers—can actually be answered by the company's policies. Under *Wells Fargo* itself, therefore, those policies may—and should—be relied upon to demonstrate that common issues predominate. *Cf. id.* (providing example of policy relevant to legal issue, reliance on which would mean that common issues predominate).

they could wear their hair to how they were supposed to load and unload cargo. Cert. Mem. 8–12. Quality makes no attempt to show that any of these policies ever changed and that is what matters at this stage.

Quality's focus (at 13) on additional training requirements that may have been required by its customers or a driver's experience fare no better. Once again, Quality does not dispute that it had the right to dictate its drivers' training, nor that this right can be shown through common evidence, *see* Cert. Mem. 10-11, but instead that it exercises that right differently driver-to-driver. Opp. at 12–13. But, again, what matters here is that Quality has the same right to dictate all of its drivers' training, even if the way it exercises that right varies. *See Bowerman v. Field Asset Servs., Inc.*, 242 F. Supp. 3d 910, 931 n.27 (N.D. Cal. 2017).

Quality makes the same basic mistake in analyzing the secondary *Borello* factors. It relies on evidence demonstrating, it contends, the varied level of control the company actually exercises over its drivers. Opp. at 14–18. But, again, that is not the right inquiry. The inquiry that governs employment classification is whether the company maintained *the right* to control its workers—whether or not it actually exercised that control. *See, e.g.*, *Bowerman*, 242 F. Supp. 3d at n.27 (rejecting reliance on differences in actual control exercised over class members because relevant inquiry is right to control); *Canava v. Rail Delivery Serv. Inc.*, 2020 WL 2510648, at *10 (C.D. Cal. Feb. 27, 2020) (same).

Thus, for example, Quality's argument (at 15-16) that its supervision over each driver varies is irrelevant. Quality does not, and cannot, dispute that its *right* to supervise its drivers can be demonstrated with common evidence. After all, its contracts allow it to track and record its drivers "at all times." Thomas Decl. ¶¶ 12, 17. And, in its training materials, Quality makes clear that it has the right to supervise how a driver loads and unloads cargo. Cert. Mem. 10.

Unable to seriously contest that its right to control can be evaluated through common evidence, Quality attempts to manufacture divisions within the class by

pointing to minor differences that don't actually matter—and certainly do not predominate. For example, Quality notes (at 17) that its drivers worked for different lengths of time but concedes that its contracts provided employment for at least a year, a length of time that suggests an employment relationship. *See, e.g., Antelope Valley Press*, 162 Cal. App. 4th at 855 (noting that a contract hiring someone for a specific duration rather than to achieve a specific result is "at odds" with the idea that worker is independent contractor). Any differences in how long its drivers actually worked, therefore, are immaterial. Similarly, the company asserts (at 17) that there are variations in when its drivers submitted their paperwork for payment. But it provides no explanation for why that matters. The company's method for compensating its drivers, Quality concedes (at 17), is uniform across the class. Cert. Mem. 12. And it is the method of compensation that is relevant, not the exact date on which a driver was paid. *See Borello*, 48 Cal. 3d at 351 (describing factor as "the method of payment, whether by the time or by the job"). Quality's arguments for whether its workers engage in a distinct business (at 14),[4] what skills are required (at 16), who provides the necessary instrumentalities (at 16),[5] and whether the parties believed they were forming an employer-employee relationship (at 18) fail for similar reasons.

Quality focuses (at 14) on the fact that while its contracts generally permit it

---

[4] Quality maintains that its drivers can hire helpers. Even if that were true, because "all drivers are subject to the *same* rules and requirements with respect to the hiring of second drivers and helpers," this factor is "suitable for treatment on a classwide basis." *Villalpando*, 303 F.R.D. at 608.

[5] Quality argues that its drivers have complete discretion in deciding how to acquire their trucks, but this, too, would be a uniform policy susceptible to classwide proof. In any event, Quality does not dispute that its contracts gave it the right to deduct payments for its drivers' trucks from their wages, regardless of where they got the trucks. Cert. Mem. 8–10. Nor does the company dispute that it is Quality who has ultimate control over the trucks. *Id*. Quality also does not dispute that its contracts gave it the right to require all drivers to obtain the same communications technology, tracking systems, and safety equipment. *Id*.

to terminate a driver without cause, the contract for a single year permitted termination for material breach. But the contract language itself makes clear that distinction is illusory. Quality's contract defines breach to include any violation of Quality's policies or a customer or shipper's requirements. Bass Decl., Ex. B, at 18. In other words, the provision hands Quality the very same control that an at-will termination provision gives the company—the ability to ensure that its drivers comply with its orders. Compare *Narayan v. EGL, Inc.*, 616 F.3d 895, 903 (9th Cir. 2010) (permitting termination of contract with 30-days' notice is "substantial indicator of an at-will employment relationship") *with Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 480 (N.D. Cal. 2017) (agreement allowing termination for failure to comply with customer requirements or breach of contract is "classwide[] evidence of control"). And, in any event, this single variation does not predominate over the mountain of common evidence. *Cf. Bowerman*, 2015 WL 1321883, at *10 n.4 (upholding class certification despite the existence of a different termination provision in one of the company's contracts).[6]

Quality even attempts to rely on distinctions that don't actually exist. It speculates (at 17) that *if* a driver did not personally perform work for Quality, then that driver would not be performing the regular business of the company. But it points to no evidence that this was the case for any drivers. See *Johnson v. Serenity Transp., Inc.*, 2018 WL 3646540, at *8 (N.D. Cal. Aug. 1, 2018) (rejecting asserted differences among class members that are "unsupported by . . . any evidence").

"[M]inor variations"—here nonexistent variations, really—cannot defeat class certification. *Combe v. Intermark Commc'ns, Inc.*, 2010 WL 11597517, at *8 (C.D. Cal. Nov. 18, 2010); see also *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468,

---

[6] To the extent that the slightly different termination policies in the contracts make a difference, sub-classes would be suitable for the workers employed by Quality prior to 2019. See *Lee v. ITT Corp.*, 275 F.R.D. 318, 323 (W.D. Wash. 2011).

473 (E.D. Cal. 2009) (minor factual differences between individual class members cannot defeat class certification). Indeed, courts have repeatedly certified classes in cases just like this one despite variations between class members like those Quality identifies or the lack of common proof on some of the secondary factors. *See, e.g., Dalton*, 270 F.R.D. at 562–64 (citing multiple cases); *Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364, at *10 (N.D. Cal. Sept. 5, 2008) (certifying class of drivers despite differences as to whether they "owned their own trucks," "established [their] own corporation[s]," and "had their own operating authority" because these differences were "largely subsumed under the ultimate issue of [the company's] control over its delivery drivers"). After all, Rule 23 "does *not* require a plaintiff . . . to prove that each element of [their] claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (cleaned up). The rule requires only "that common questions *predominate* over any questions affecting only individual class members." *Id.* (cleaned up).

Bottom line: The center of gravity of this litigation is whether Quality maintained a right to control its drivers, such that they are employees, not independent contractors. Because that question can be answered through common evidence, the class should be certified.

***Claim-specific arguments.*** Quality raises a host of additional arguments in an attempt to defeat certification, even though every driver's claims turn on the same common question. All fail.

First, Quality argues that that the meal and rest break claim is preempted, but again, preemption is itself a class-wide question. It cannot, therefore, defeat certification. Next, Quality asserts (at 21) that its evidence demonstrates that it complied with California's meal and rest break law. Wrong again. Not only is that false—Quality's policy permits only one thirty-minute break per eight-hour period, which violates California law, *see* Cert. Mem. 25—but it also is a merits argument. And, because Quality does not contest that even this evidence is common to the

class, it actually undermines its own case against certification. *Cf. Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999, at *16 (C.D. Cal. May 29, 2019) (holding that whether drivers' schedules permitted them to take meal breaks is a classwide issue); *Villalpando*, 303 F.R.D. at 609 (similar).

Finally, Quality contends individualized issues will matter for whether and when drivers took breaks and what deductions from class members' wages were illegal. But Quality vastly overstates the extent to which any individualized inquiry might be needed. It does not dispute that it has timesheets for each driver, as well as records of each driver's wages and the deductions it took from those wages. Berger Decl. ¶¶ 8–11. Computing damages, then, will be a ministerial exercise. And to the extent there are individualized issues, they are, by definition, damages issues. The potential for individualized damage assessments "does not detract from the action's suitability for class certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). To the contrary, "damages determinations are individual in nearly all wage-and-hour class actions." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). Yet such cases are routinely certified. *See, e.g. Dalton*, 270 F.R.D. at 564 (rejecting similar argument).[7]

### C. Quality's cursory arguments on superiority are meritless.

Quality's only argument contesting superiority is a cursory assertion (at 25) that "[f]or the reasons explained above"—the company's arguments on typicality, commonality, and predominance—"this case cannot be efficiently tried as a class action." But Quality's typicality, commonality, and predominance arguments fail. By its own reasoning, then, its superiority argument, too, must fail. Quality makes

---

[7] Quality's arguments on the Section 203 and 206 claims are derivative of its arguments on the other claims, so they fail for the same reasons. Quality also makes a conclusory assertion that Mr. Salter has not provided any evidence in support of certification of the claim against it for its failure to provide accurate wage statements. Not so. But that claim, like the rest, hinges on misclassification. Cert. Mem. 2.

the same conclusory argument with respect to its class-action waiver. Opp. 25. And it fails for the same reason.

In a footnote (at n.11), Quality half-heartedly asserts that public policy weighs in favor of enforcing its class-action waiver. "Arguments raised only in footnotes" are waived. *Est. of Saunders v. Comm'r of Internal Revenue*, 745 F.3d 953, 962 n.8 (9th Cir. 2014). And even if Quality had not waived it, courts routinely hold that companies may not enforce a class-action waiver upon workers bringing claims under California's worker-protection laws in circumstances like this.[8] And Quality's waiver—imposed as part of a procedurally unconscionable take-it-or-leave-it form contract, March 18, 2021 Salter Decl. ¶ 5—not only violates public policy but is unconscionably one-sided. *See Ingle*, 328 F.3d at 1176 (holding that because there is no circumstance "under which an employer would bring a class proceeding against an employee," such a waiver is "is manifestly and shockingly one-sided" and therefore "substantively unconscionable"). For that reason, too, it's unenforceable. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 113-14 (2000) (unconscionably one-sided provisions in adhesive contracts are unenforceable).

## III. CONCLUSION

The plaintiffs' motion for class certification should be granted.

Dated: March 19, 2021           Respectfully Submitted,

                                By:  /s/ Daniel J. Bass

                                     Taras Kick
                                     Daniel J. Bass

---

[8] *See, e.g., Ingle v. Cir. City Stores, Inc.*, 328 F.3d 1165, 1176 (9th Cir. 2003); *Canava*, 2020 WL 2510648, at *5-*6 (collecting cases); *Murphy v. Check 'N Go of Cal., Inc.*, 156 Cal. App. 4th 138, 148 (2007), abrogated on other grounds recognized in *Iskanian v. CLS Transp. L.A.*, LLC, 59 Cal. 4th 348, 366 (2014); *Garrido v. Air Liquide Indus. U.S. LP*, 241 Cal. App. 4th 833, 847 (2015); March 18, 2021 Salter Decl. ¶¶ 5-7; March 19, 2021 Bass Decl. ¶¶ 3-6.

Roy K. Suh
**THE KICK LAW FIRM, APC**

Matthew W.H. Wessler
Jennifer D. Bennett
**GUPTA WESSLER PLLC**

Attorneys for Plaintiff Clayton Salter, on behalf of himself and all others similarly situated