**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.   **CV 20-479-JFW(JPRx)**                                        Date:  April 9, 2021

Title:         Clayton Salter -v- Quality Carriers, Inc., et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

   **Shannon Reilly**                              **None Present**
   **Courtroom Deputy**                            **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
                None                                          None

**PROCEEDINGS (IN CHAMBERS):**         **ORDER DENYING PLAINTIFF'S MOTION FOR CLASS
                                        CERTIFICATION [filed 2/26/21; Docket No. 54]**

          On February 26,2021, Plaintiff Clayton Salter ("Plaintiff") filed a Motion for Class Certification
("Motion").  On March 12, 2021, Defendants Quality Carriers, Inc. ("Quality") and Quality
Distribution, Inc. ("Quality Distribution") (collectively, "Defendants") filed their Opposition.  On
March 19, 2021, Plaintiff filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure
and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without
oral argument.  The matter was, therefore, removed from the Court's April 5, 2021 hearing
calendar and the parties were given advance notice.  After considering the moving, opposing, and
reply papers, and the arguments therein, the Court rules as follows:

**I.        Factual and Procedural Background**

          **A.      The Parties**

          Quality is a for-hire motor carrier registered with the Federal Motor Carrier Safety
Administration ("FMCSA"), an agency of the U.S. Department of Transportation ("DOT"), and
authorized to provide transportation services to the shipping public.  Quality specializes in
providing transportation and logistics services related to the transportation of chemicals – primarily
in liquid form – on behalf of its customers throughout North America.  Quality Distribution is a
holding company and does not have any employees, equipment, or customers.  Quality is a
subsidiary of Quality Distribution.

          Quality does not have any employees or operate any facilities in California.  Instead, Quality
contracts with a separate company, Winsome Enterprises, Inc. ("Winsome"), to coordinate and

manage the transportation of freight for Quality's customers throughout California.[1]  Although Winsome owns its own trucks and employs its own drivers, it does not have motor carrier operating authority from the FMCSA.  Therefore, in order to provide transportation services on behalf of Quality and comply with federal law, Winsome has entered into a contract with Quality allowing it operate under Quality's motor carrier authority.  *See* 49 C.F.R. § 376.11(a).  In return for the transportation services provided by Winsome, Quality pays Winsome a portion of the amounts it charges its customers.

Winsome leases and operates three main terminals in California: South Gate, Richmond, and Stockton.[2]  Winsome operates each of these terminals separately.  Each terminal services different customers and has its own Winsome-employed dispatchers, who offer loads of freight to Winsome's employee drivers.

In addition to Quality's agreement with Winsome to provide transportation services in California on its behalf, Quality also contracts directly with independent contractor drivers ("Independent Contractor Drivers").  The relationship between Quality and each Independent Contractor Driver is governed by an Independent Contractor Agreement ("Agreement").  Each Independent Contractor Driver operates out of one of the three Winsome-operated terminals and Winsome-employed dispatchers in each terminal offer loads of freight to Quality's Independent Contractor Drivers.

Plaintiff worked as an Independent Contractor Driver for Quality from March 2015 until December 2019, and operated out of the South Gate terminal.  Prior to becoming an Independent Contract Driver, from 2008 until March 2015, Plaintiff worked for Winsome as an employee driver.[3]  However, in March 2015, after being advised by Winsome's President and CEO Richard Wallace that he could make more money as an Independent Contractor Driver, Plaintiff voluntarily ended his employment with Winsome and became a Independent Contractor Driver for Quality.  In order to become an Independent Contractor Driver, Plaintiff entered into an Agreement with Quality.  Plaintiff also entered into a contract with Winsome to lease (with the option to purchase) his truck.  In 2019, Plaintiff was injured and stopped working and making payments on his truck.  Winsome repossessed his truck and Quality terminated his then-current Agreement when it learned that Plaintiff no longer had the truck identified in the Agreement.

## B.    The Independent Contractor Driver Agreements

---

[1]  Winsome does not have any common employees or ownership with either Quality or Quality Distribution.

[2]  Winsome has operated the South Gate terminal since February 2009 and the Richmond terminal since 2004.  Winsome opened the Stockton terminal in January 2020 after Winsome purchased the assets of two California trucking companies, Bulk Transportation ("Bulk") and DTI Associates, LLC ("DTI").

[3]  Prior to becoming an employee driver for Winsome, Plaintiff was an employee driver for Quality for approximately six months (beginning in 2007 and ending in 2008) before Quality withdrew its direct involvement in California operations and entered into its contract with Winsome to manage its operations.

As a FMCSA-registered motor carrier, Quality is statutorily obligated to comply with certain regulations promulgated by the DOT.  49 U.S.C. § 13902(a)(1); 49 C.F.R. § 367.7.  A primary goal of this regulatory scheme is to prevent large motor carriers from taking advantage of independent contractor drivers.  *Owner Operator Independent Drivers Ass'n, Inc. V. Swift Transp. Co., Inc. (AZ)*, 367 F.3d 1108 (9th Cir. 2004).  For example, the regulatory scheme authorizes DOT to require that all leases between motor carriers and independent contractor drivers must be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the independent contractor driver.  49 U.S.C. § 14102(a); *see* 49 C.F.R. § 376.11(a) (requiring written leases), § 376.12(b) (requiring that leases "specify the time and date   . . . on which the lease begins and ends"), and § 376.12(d) (requiring that the amount to be paid to the owner-operator be "clearly stated on the face of the lease").  In order to comply with this regulatory scheme, Quality required every Independent Contractor Driver to sign an Agreement.  Quality's Agreement with its Independent Contractor Drivers provides that Quality will lease commercial motor vehicles from the Independent Contractor Drivers for the purpose of hauling bulk commodities on behalf of Quality and its customers.  The Agreement also provides that the Independent Contractor Drivers will provide the necessary labor to transport, load, unload, and perform other transportation-related services on behalf of Quality and its customers.[4]

During the period that Plaintiff was an Independent Contractor Driver, Quality used three different versions of its Agreement – the "2015 Agreement," the "2016 Agreement," and the "2018 Agreement."[5]  Each version contained several similar provisions.  Specifically, each version reserved to the Independent Contractor Driver the right to control the "manner and means" used to provide transportation services to Quality and Quality's customers, including the unconditional right to decline any load of freight offered by the dispatchers for any reason.  *See* 2015 Agreement, § 6 ("[Quality] has no right to, and will not, control the manner nor prescribe the method used by INDEPENDENT CONTRACTOR to perform the Services"); 2016 Agreement, § 1 ("The manner and means of reaching such results, however, are within the sole discretion of the CONTRACTOR, and no officer or employee of [Quality] shall have the authority to impose any term or condition on CONTRACTOR or on CONTRACTOR's continued operation that is contrary to this understanding"); 2018 Agreement, § 1 (same language as 2016 Agreement).

---

[4]  For example, Quality's 2015 Agreement provides in relevant part that:

[Quality] is for-hire interstate motor carrier of property, registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT"), and INDEPENDENT CONTRACTOR is willing to lease the following commercial motor vehicles (the "Equipment") to [Quality], and to perform personally or through others, as an independent contractor, services related to the operation of the Equipment, for the purpose of hauling bulk commodities on behalf of [Quality] . . .

INDEPENDENT CONTRACTOR agrees to use the Equipment, together with all necessary labor, which INDEPENDENT CONTRACTOR shall furnish at its sole cost and expense, to transport, load, unload, and perform other transportation-related services (the "Services") on behalf of [Quality] and its customers.

[5]  Plaintiff signed each version of the Agreement.

Each version of the Agreement also permitted the Independent Contractor Driver to hire drivers to operate the equipment identified in the Agreement.  For example, the 2015 Agreement, § 7 provides in part:

> INDEPENDENT CONTRACTOR shall furnish sufficient drivers, helpers and other workers as INDEPENDENT CONTRACTOR deems necessary for the performance of the obligations of INDEPENDENT CONTRACTOR under the terms of this Agreement ("Employees").  Any and all Employees furnished by INDEPENDENT CONTRACTOR shall be an Employee of INDEPENDENT CONTRACTOR and shall be hired, directed, paid, controlled and discharged solely by INDEPENDENT CONTRACTOR.

*See also* 2016 Agreement, § 4.01 (providing in part that "CONTRACTOR shall provide competent drivers who meet [Quality's] minimum driver qualification standards and all of the requirements of the U.S. DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations"); 2018 Agreement, § 4.01 (same language as 2016 Agreement).

In addition, each version of the Agreement set forth the terms of each Independent Contractor Driver's compensation, including use of the Independent Contractor Driver's equipment and the services that the Independent Contractor Driver was to provide to Quality.  For example, the 2015 Agreement, § 4 provides in part:

> [Quality] agrees to pay and INDEPENDENT CONTRACTOR agrees to accept as full and complete payment for use of the Equipment and for performance of the Services, compensation as set forth on Schedule A hereof, as amended from time to time.

*See also* 2016 Agreement, § 6 (providing in part that "[t]he rates and charges payable to CONTRACTOR for Services rendered under this Agreement are set forth in the attached Section I of Schedule A, subject to the deductions authorized in this Agreement, Section II of Schedule A, Schedule A-3 and/or any other agreement(s) which may authorize settlement deductions"); 2018 Agreement, § 6 (same language as 2016 Agreement).

Moreover, each version of the Agreement identified which party – Quality or the Independent Contractor Driver – was responsible for certain expenses, and it authorized Quality to take certain deductions from the Independent Contractor Driver's settlement payments.  *See* 2015 Agreement, § 4; 2016 Agreement, Schedule A; 2018 Agreement, Schedule A.

The three versions of the Agreement also contained several important distinctions.  Specifically, each version had different term and termination provisions.  *See* 2015 Agreement, § 22; 2016 Agreement, § 10; 2018 Agreement, § 10.  In addition, the 2016 and 2018 Agreements specifically stated that the Independent Contractor Driver could use the Independent Contractor Driver's equipment to provide transportation services to a different motor carrier.  For example, the 2016 Agreement provides in part that "[n]othing contained herein shall restrict or limit the right of CONTRACTOR to enter into the same contract or similar contract with other motor carriers for the same type of services."  2016 Agreement, § 3.07; *see also* 2018 Agreement, § 3.07.

**C.     Procedural History**

Initials of Deputy Clerk _sr_

On October 3, 2019, Plaintiff filed a Class Action Complaint in Los Angeles Superior Court. On January 16, 2020, Defendants filed a Notice of Removal, alleging that this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"). On March 12, 2020, the Court granted Plaintiff's Motion to Remand, and remanded this action to Los Angeles Superior Court ("March 12, 2020 Order"). Defendants appealed the Court's March 12, 2020 Order, and on September 8, 2020, the Ninth Circuit vacated the Court's March 12, 2020 Order and remanded this action to this Court.

On November 30, 2020, Plaintiff filed a First Amended Complaint ("FAC"), alleging causes of action for: (1) failure to provide required meal periods in violation of California Labor Code §§ 226.7, 510, 512, 1194, and 1197, and IWC Wage Order No. 9-2001, § 11; (2) failure to provide required rest periods in violation of California Labor Code §§ 226.7 and 512 and IWC Wage Order No. 9-2001, § 12; (3) failure to pay minimum wages in violation of California Labor Code §§ 1194 and 1197, and IWC Wage Order No. 9-2001, § 4; (4) failure to pay all wages due to discharged or quitting employees in violation of California Labor Code §§ 201, 202, and 203; (5) failure to provide accurate itemized wage statements in violation of California Labor Code § 226 and IWC Wage Order No. 9-2001, § 7; (6) failure to indemnify employees for necessary expenditures incurred in discharge of duties in violation of California Labor Code § 2802; (7) unlawful wage deductions in violation of California Labor Code §§ 221, 223, and 400-410, and IWC Wage Order No. 9-2001, § 8; and (8) unfair and unlawful business practices in violation of California Business & Professions Code §§ 17200, *et seq.*

## II.  Legal Standard

### A.  Class Certification

Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Federal Rule of Civil Procedure 23. *Zinser v. Accufix Research Institute, Inc.*. 253 F. 3d 1180, 1186 (9th Cir. 2001), *as amended*, 273 F.3d 1266 (9th Cir. 2001). The party seeking class certification bears the burden of demonstrating that the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) have been satisfied. *Id.*

Under Rule 23(a), a class action is only proper if:

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of the class.

 Fed. R. Civ. Proc. 23(a).

If the Rule 23(a) prerequisites are met, the Court must decide if certification is appropriate under Rule 23(b). In this case, Plaintiff seeks certification of the Class under Rule 23(b)(3), which

authorizes certification if:

> [T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A)   the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)   the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  "When considering class certification under Rule 23, district courts are not only at liberty to, but must perform 'a rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (*quoting Wal-Mart*, 564 U.S. 338). "In many cases, 'that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.'"  *Id.*

### B.   Test for Determining If a Worker Qualifies As an Employee or an Independent Contractor Under California Law

During the proposed class period (October 2015 to present), there were two different tests applied to determine if a worker was an employee or an independent contractor in California: (1) the *Bordello* test; and (2) the "ABC" test.

In *S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989), the California Supreme Court set forth the general common law test for determining whether an employment relationship exists for the purposes of California labor law.  Under *Borello*, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired[.]"  *Id.* at 350 (internal quotation marks omitted).  In applying the *Borello* test, courts consider the following secondary factors: (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the

services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.  *Id.* at 351.

In *Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 956–57 (2018), the California Supreme Court adopted the "ABC test," which was later codified in California Labor Code § 2750.3 (effective January 1, 2020).[6]  Under the "ABC" test, it is presumed that all workers are employees unless the putative employer can demonstrate:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

*Id.* at 957.

## III.    Discussion

### A.    The Proposed Class

In his Motion, Plaintiff seeks to certify the following class: "All current and former drivers of the defendants who were domiciled at the defendants' California terminals and were classified as independent contractors and drove under the defendants' authority within four years prior to, and up until the resolution of, this lawsuit" (the "Class").  Motion, 6:17-21.

### B.    Rule 23(a) Requirements

#### 1.    Numerosity

To satisfy the numerosity requirement of Rule 23(a), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "Joinder need not be impossible so long as potential class members would suffer a strong litigation hardship or inconvenience if joinder were required."  *Rannis v. Recchia*, 2010 WL 2124096, at *3 (9th Cir. May 27, 2010) (citing *Harris v. Palms Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964)).  Courts routinely find the numerosity requirement satisfied when the class consists of 40 or more members. *See EEOC v. Kovacevich "5" Farms*, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007).

In this case, it is undisputed that the numerosity requirement has been satisfied for the proposed Class.  Accordingly, the Court concludes that Plaintiff has satisfied the numerosity requirement with respect to the proposed Class.

#### 2.    Commonality

---

[6]  California Labor Code § 2750.3 was repealed effective September 3, 2020.

Initials of Deputy Clerk _sr_

In his Motion, Plaintiff argues that the threshold question of whether Quality misclassified its drivers as independent contractors instead of employees is common to the Class.  In their Opposition, Defendants do not dispute that this threshold question is common to the Class.  *See* Opposition, 9:4-14.

The commonality requirement is satisfied "if there are questions of fact and law which are common to the class."  Fed. R. Civ. P. 23(a)(2).  "The Supreme Court has recently emphasized that commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'"  *Mazza v. Am. Honda Motor* Co., 666 F.3d 581, 588 (9th Cir. 2012) (*quoting Wal-Mart*, 564 U.S. 338) (internal alteration omitted).  "What matters to class certification is not the raising of common 'questions' – even in droves – but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. 338 (quotations and citations omitted).  "This does not, however, mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'"  *Abdullah v. U.S. Security Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza*, 666 F.3d at 589).

"Courts have frequently found the commonality requirement satisfied based on the common issue of whether class members were misclassified as independent contractors instead of employees."  *Moreno v. JCT Logistics, Inc.*, 2019 WL 3858999, *8 (C.D. Cal. May 29, 2019); *see also Rowe v. Ulta Salon, Cosmetics and Fragrance, Inc.*, 2019 WL 6998780, *3 (C.D. Cal. Aug. 30, 2019) (holding that "[b]ecause the misclassification question can be resolved on a classwide basis, it . . . .satisfies the commonality requirement"); *Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 477 (N.D. Cal. 2017) ("Plaintiffs satisfy the commonality requirement because whether Defendants misclassified its distributors as independent contractors under California law is a common question that is capable of common resolution for the class based on the Distributor Agreements that all putative class members signed."); *Alfred v. Pepperidge Farm, Inc.*, 322 F.R.D. 519, 538-39 (C.D. Cal. 2017) ("There is a common question presented in this action.  It is whether the SDAs are independent contractors or employees of Defendant.").

In this case, the Court concludes that Plaintiff has presented a common question.  Because the misclassification question can be resolved on a classwide basis, it satisfies the commonality requirement.  Although the parties disagree as to whether the *Borello* test or ABC test applies to Plaintiff's claims, "[t]he Court sees no reason why the applicability of different tests to different claims would defeat commonality, as long as those tests apply equally to all class members."  *Moreno*, 2019 WL 3858999, at *8.  Accordingly, the Court concludes that the commonality requirement has satisfied.[7]

### 3.   Typicality

Typicality exists when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class

---

[7] However, as discussed below, Plaintiff has not satisfied the more exacting predominance requirement.

members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998), *overruled on other grounds by Wal-Mart*, 564 U.S. at 338.  "Although the claims of the purported class representative need not be identical to the claims of other class members, the class representative 'must be part of the class and possess the same interest and suffer the same injury as the class members.'"  *Lymburner v. U.S. Financial Funds, Inc.*, 263 F.R.D. 534, 540 (N.D. Cal. 2010) (quoting *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)).  To assess whether or not the representative's claims are typical, the Court examines "'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal. 1985)).  In addition, "class certification is inappropriate where the putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Id.* (citing cases).

The Court concludes that Plaintiff is not typical of the other members in the proposed Class.  As Plaintiff concedes, during the entire period of time that Plaintiff delivered products on behalf of Quality's customers[8] he was dispatched from the South Gate terminal and "99 percent" of the time he transported bleach for Quality's customer, Olin Corporation ("Olin"), from Olin's facility in Santa Fe Springs, California.  In order to transport Olin's products, Plaintiff had to strictly comply with Olin's specific requirements – some of which Plaintiff has relied on as evidence of the level of control Quality exercised over him – which do not apply to putative Class members who hauled loads of freight for other customers.  Indeed, Plaintiff was trained by an Olin employee on Olin's detailed procedures for loading a trailer on site, and Plaintiff testified that it took him approximately four to six weeks to learn Olin's processes and systems.  These unique circumstances give rise to unique defenses, including that much of the control Plaintiff cites as a basis for his misclassification resulted from Olin's, and not Quality's, requirements.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("Here, Hanon's unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class").  In addition, resolution of Plaintiff's claim will require the trier of fact to consider the impact that Olin's processes had on Plaintiff's ability to take breaks and the business expenditures necessary to meet Olin's requirements – issues that are irrelevant to class members who hauled different kinds of freight for different customers and operated out of different terminals.  *See, e.g., Roberts v. Trimac Transportation Servs. (W.), Inc.*, 2013 WL 4647223, at *2 (N.D. Cal. Aug. 28, 2013) (holding that "an employee must show that the employer impeded or discouraged the employee from taking breaks").

Accordingly, the Court concludes that the typicality requirement has not been met.

### 4.     Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  To satisfy constitutional due process concerns, "absent class members must be afforded adequate representation before entry of a judgment which binds them."  *Hanlon*, 150 F.3d at 1020 (*citing Hansberry v. Lee*, 311 U.S. 32, 42-3 (1940)).

---

[8]  This includes the period that Plaintiff was an employee driver for Quality, an employee driver for Winsome, and an Independent Contractor Driver for Quality.

"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).

In this case, it is undisputed that Plaintiff and his counsel satisfy the adequacy of representation requirement with respect to the proposed Class.  Accordingly, the Court concludes that the adequacy of representation requirement has been satisfied for the proposed Class.

**C.**   **Plaintiffs Have Failed to Satisfy the Requirements of Rule 23(b)(3) That Common Issues Predominate.**

A class may be certified under Rule 23(b)(3) if a court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Proc. 23(b)(3).  "[T]o meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof.'"  *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001); *see, also, Jiminez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 251 (C.D. Cal. 2006) ("The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (internal quotation omitted).  A Rule 23(b)(3) action is inappropriate where "the main issues in a case require the separate adjudication of each class member's individual claim or defense."  *Zinser*, 253 F.3d at 1189.  "To determine whether common issues predominate, this Court must first examine the substantive issues raised by [a plaintiff] and second inquire into the proof relevant to each issue."  *Jiminez*, 238 F.R.D. at 251.

The Court has already determined that Plaintiff has raised a common question as to whether Quality had an unlawful practice of misclassifying its drivers as independent contractors rather than employees.  Under either the *Borello* test or the ABC test, Plaintiff will have to establish that Quality exercised the necessary degree of control over the drivers' working conditions.[9]  In this case, the Court concludes that Plaintiff has failed to demonstrate that common questions predominate on the issue of control.  Plaintiff primarily relies on Quality's Agreements and driver training materials to demonstrate the degree of control that Quality exercised over its drivers. According to Plaintiff, Quality's Agreements permitted Quality to control its drivers by establishing common policies: (1) requiring its drivers "to sign a sublease with the company and lease a truck" (Motion, 8:26-27); (2) refusing to allow its drivers "to use the truck as they see fit" (Motion, 9:4-5); (3) requiring the drivers to use pre-approved facilities for maintenance and making them pay for the maintenance; (4) requiring Quality's logo on their trucks and other equipment while the drivers were hauling freight for Quality's customers; (5) requiring its drivers to use specific communications and tracking technology; (6) allowing Quality to gather information from that technology; (7)

---

[9]  At this stage of the litigation, the Court does not need to reach the merits and decide whether Plaintiff and the other putative Class members were employees of Quality or were improperly classified as independent contractors by Quality.  Instead, the only issue this Court must decide at the class certification stage is whether the question of worker classification predominates across all class members.

Initials of Deputy Clerk  _sr_

requiring certain minimum training for its drivers; (8) controlling when and how its drivers received payment; (9) the expenses the drivers were required to pay; (10) the duration of each Agreement; and (11) Quality's early termination rights.  In addition, Plaintiff argues that Quality's driver training materials demonstrate even more extensive company-wide policies of control, including "very specific procedures" on: (1) the loading and unloading of freight; (2) the procedure for picking up and dropping off loads; (3) the routes that the drivers had to take to deliver freight; (4) the order of delivery; (5) the parking of the drivers' trucks; (6) the maximum speed limit of 65 miles per hour; (7) the drivers' appearance and dress; and (8) the breaks available to the drivers.

      To the extent the Agreements and driver training materials do provide for uniform policy among the drivers, "[t]he existence of some uniform control . . . does not automatically signify that common issues predominate."  *Martinez v. Flower Foods, Inc.*, 2016 WL 10746664, at *12 n.3 (C.D. Cal. Feb. 1, 2016).  In addition, as Quality points out, each version of the Agreement specifically states that Quality did not have the right to control the "manner and means" of how any Independent Contractor Driver performed transportation services.  In fact, the Agreements only required that the Independent Contractor Drivers perform their contractual obligations in a "safe and prudent manner" with "reasonable diligence, speed and care."  These standards are "immensely broad" and do not "actually mandate any specific behavior."[10]  *Id.*, at *11.  Instead, these standards "merely set forth a general framework within which variations abound depending on the practical reality in a given situation."  *Id.* ("Defendants very well could have governed some drivers with an iron fist and dictated the specific details of their operation.  At this stage, however, the Court merely asks whether Plaintiffs have produced enough evidence to show that the question of control is amenable to class-wide proof").

      In addition, despite Plaintiff's argument to the contrary, Quality's driver training materials and driver training actually demonstrate that common issues do not predominate on the issue of control.  During the proposed Class period, Quality used two different sets of PowerPoint slides to facilitate the classroom portion of instruction at the driver orientations, and the second set contained several key differences, including the removal of a company-wide policy setting a maximum speed limit of 65 miles per hour and updated information regarding the new termination policy provided for in the then-current Agreement.  Moreover, following the driver's orientation, Quality provided the drivers additional, hands-on training, which varied from several days to multiple weeks, depending on the driver's level of experience and the requirements of specific customers.  For example, Plaintiff received approximately four to six weeks of training following his orientation.  However, putative Class member Omar Jones ("Jones"), who was an independent contractor driver with Ventura before entering into an Agreement with Quality, received an additional one to two days of hands-on

---

      [10]  In addition, several examples of control cited by Plaintiff are directly contradicted by the Agreements and are merely illusory.  For example, Plaintiff states in his declaration that, despite the Agreements' provision giving drivers the freedom to choose the loads of freight that they hauled, he believed that if he declined a load of freight, he would have no work for at least a day.  However, during his deposition, Plaintiff conceded that his belief was "just speculation," and he was never told that he could not refuse to haul a load offered to him.  In contrast, Thomas testified that he refused loads on multiple occasions.  He also testified that whether there were consequences for his refusal depended on which dispatcher had offered the load of freight.

Initials of Deputy Clerk  _sr_

training after orientation.[11]  Plaintiff's hands-on training took several weeks, in part, because of the training specifically required by Olin.  A different customer, Nalco Water, required that the drivers hauling its products complete several different training modules.

Furthermore, "[w]hile any written contract is a necessary starting point . . . the rights spelled out in a contract may not be conclusive if other evidence demonstrates a practical allocation of rights at odds with the written terms."  *Id.,* at *12 (*quoting Ayala*, 327 P.3d at 174).  In this case, there is persuasive evidence that the Agreements and policies set forth in the driver training materials were not strictly or uniformly enforced and that the supervision of each driver varied.[12] For example, although Plaintiff argues that Quality's Agreements established a common policy requiring the drivers to lease specific trucks and provided for the deduction of the lease payments from the compensation they received from Quality, that argument is not supported by the evidence. Although Plaintiff and Thomas leased trucks from Winsome, Jones leased his truck from Crossroads, a third party not associated with Winsome or Quality, and Jones purchased his truck at the end of his lease.  In addition, although Plaintiff, Jones, and Thomas all authorized Quality to deduct their truck lease payments from the payments they received from Quality, approximately 73 of the putative Class members never had a truck payment deducted from their payments from Quality because they either already owned a truck at the time they entered into an Agreement with Quality or they leased it from a third party (and did not authorize Quality to deduct their lease payments).  Declaration of Cliff Dixon (Docket No. 58-1), ¶ 9; Declaration of Don Benoit, ¶ 20.

Similarly, although Plaintiff argues that the driver training material set forth strict requirements related to the drivers' dress and that Plaintiff was required to wear a Quality uniform along with the personal protective equipment provided to him, his argument is in direct conflict with not only the testimony of Jones and Thomas, but his own testimony.  Jones testified that he was given a hard hat and t-shirts bearing Quality's logo, but he was never told that he had to wear them.  When asked if he had to wear a uniform, Thomas said "no" and stated that although he was given a hard hat bearing the Quality logo, he could have worn his own hard hat.  Plaintiff testified that although Quality provided him with a rubber chemical suit, he purchased his own Gore-Tex chemical suit and that he typically wore it because it was lighter.  Moreover, although Plaintiff argues that the driver training materials set forth a strict "universal policy" that limited all drivers to one thirty minute break per eight hour of work, Plaintiff, Jones, and Thomas all testified that Quality

---

[11]  In support of his Motion, Plaintiff offers his own declaration as well as the declarations of Jones and another putative Class member, Fred Thomas ("Thomas").

[12]  Plaintiff, Jones, and Thomas all operated out of the South Gate Terminal.  Thus, there is no testimony or evidence related to supervision and control experienced at the Richmond and Stockton terminals.  In addition, even though Plaintiff, Jones, and Thomas all operated out of the same terminal, their day-to-day experiences were significantly different.  For example, Plaintiff delivered bleach for Olin "99 percent" of the time he hauled products for Quality and, as a result, generally began and ended his day at Olin's facility in Santa Fe Springs, California.  In contrast, Jones delivered bleach eighty to ninety percent of the time for a variety of customers in California and, as a result, generally began and ended his day at the South Gate terminal.  Finally, Thomas delivered a variety of chemicals for customers in his early days as a driver for Quality, but eventually began delivering bleach for various customers approximately seventy-five percent of the time on a route from Santa Fe Springs, California to Nevada.

Initials of Deputy Clerk _sr_

never told them they were not allowed to take a meal or rest break. *Roberts v. Trimac Transportation Servs. (W.), Inc.*, 2013 WL 4647223, at *2 (N.D. Cal. Aug. 28, 2013) (holding that "[p]roof an employer had knowledge of employees working through meal periods will not alone subject the employer to liability," but "[r]ather, an employee must show that the employer impeded or discouraged the employee from taking breaks") (*citing Brinker Restaurant Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1040 (2012)); *see also Cole v. CRST Van Expedited, Inc.*, __ Fed. Appx. __, 2021 WL 1235182 (9th Cir. Apr. 1, 2021) (holding that the district court did not abuse its discretion in decertifying a meal and rest period subclass where the plaintiff was unable to satisfy the predominance requirement because there were a "multitude of reasons" individuals may or may not have taken their meal and rest periods and there was no evidence the company had instructed its drivers not to take their breaks). Thus, there will be significant differences from terminal to terminal, customer to customer, and Class member to Class member, and the Court will be forced to engage in individual inquiries to resolve the common question of misclassification. *See, e.g., Martinez*, 2016 WL 10746664, at *11 (denying class certification because no predominance where "numerous driver declarations indicate that their schedules varied based on specific territories and customer expectations").

Accordingly, the Court concludes that Rule 23(b)(3)'s predominance requirement has not been met.[13]

## IV.   Conclusion

For all the foregoing reasons, Plaintiff's Motion is **DENIED**.

IT IS SO ORDERED.

---

[13]   Plaintiff also argues that common issues predominate as to the substantive labor code violations alleged in the FAC. However, the Court need not reach the issue of whether common questions predominate as to the substantive labor code violations because, as Plaintiff concedes, the threshold issue for all of Plaintiff's claims is whether Plaintiff and the putative Class members are employees. *See* Motion, 16:25-27 ("As explained above, the central question here is whether Quality illegally classified its employees as independent contractors. All of the plaintiffs' other claims depend entirely on the answer to that question").

Initials of Deputy Clerk __sr__