Christopher C. McNatt, Jr. (SBN 174559)
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP
2 North Lake Avenue, Suite 560
Pasadena, CA 91101
P: 626-795-4700
F: 626-795-4790

Christopher J. Eckhart (SBN 331414)
ceckhart@scopelitis.com
E. Ashley Paynter (SBN 333428)
apaynter@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
P: 317-637-1777
F: 317-687-2414

Attorneys for Defendants,
Quality Carriers, Inc. and Quality Distribution, Inc.

(additional counsel listed on next page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON SALTER, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUALITY CARRIERS, INC., an Illinois Corporation; QUALITY DISTRIBUTION, INC., a Florida Corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 2:20-cv-00479-JFW-JPR<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: October 4, 2021<br>Time: 1:30 pm<br>Courtroom: 7A<br>Judge: Hon. John F. Walter |

Jared S. Kramer, admitted *Pro Hac Vice*
jskramer@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
30 West Monroe Street, Suite 1600
Chicago, IL 60603
P: 312-255-7200
F: 312-422-1224

Andrew R. Brehm, admitted *Pro Hac Vice*
abrehm@scopelitis.com
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
330 E. Kilbourn Avenue, Suite 827
Milwaukee, WI 53202
P: 414-219-8500
F: 414-278-0618

Attorneys for Defendants,
Quality Carriers, Inc. and Quality Distribution, Inc.

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ....................................................................................3

      A.   Quality's Business Model ........................................................3

      B.   Clayton Salter ..........................................................................4

      C.   Salter's Independent Contractor Agreements ........................5

      D.   Salter's Claims and Procedural History .................................6

III.  ARGUMENT ........................................................................................7

      A.   Legal Standard .........................................................................7

      B.   Salter's Meal and Rest Break Claims are Preempted Based on Two Sources of Federal Law ...............................................8

           1.   Salter's meal and rest break claims are preempted under the Hazmat Safety Administration's September 21, 2018 preemption determination. ...........................................8

           2.   California's meal and rest break rules cannot be applied to Salter as a driver of property-carrying commercial motor vehicle who was subject to the Motor Carrier Safety Administration's hours of service regulations. ........................11

      C.   Salter's Minimum Wage Claim Fails as a Matter of Law .................13

      D.   The Federal Leasing Regulations Preempt Salter's Claims for Unlawful Deductions and Unreimbursed Business Expenses ...........14

      E.   Salter's Claim Alleging That Quality Took Unlawful Deductions From His Pay Must Be Dismissed For The Additional Reason That The Deductions Are Authorized Under California Labor Code § 224...................................................................................19

      F.   There is No Private Right of Action for Salter's Unlawful Deduction Claim...................................................................20

      G.   Salter Cannot Recover Costs He Incurred To Furnish A Truck Used To Provide Delivery Services Under The Terms Of His Agreements With Quality.....................................................21

      H.   Salter's Claim For Waiting Time Penalties Fails Because He Does Not Have Any Viable Claims For Late Paid Wages............................22

IV.   CONCLUSION.......................................................................................24

i

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
447 U.S. 242 (1986) ....................................................................................7

*Animal Legal Defense Fund v. Mendes*,
160 Cal. App. 4th 136 (2008) ...................................................................20

*Ayala v. U.S. Xpress Enterprises, Inc.*,
No. EDCV 16-137-GW(KKX), 2019 WL 1986760 (C.D. Cal. May 2,
2019)..........................................................................................................13

*Cal. Arch. Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*,
818 F.2d 1466 (9th Cir. 1987) ....................................................................8

*Carpenter v. Dep't of Trans.*,
13 F.3d 313 (9th Cir. 1994).......................................................................10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................................7, 8

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ..................................................................................17

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) ....................................................................8

*Estrada v. FedEx Ground Package System, Inc.*,
64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007) ..........................................3, 4, 21, 22

*Garybo v. Bros.*,
No. 115CV01487DADJLT, 2020 WL 2765661 (E.D. Cal. May 28, 2020).........24

*Gatdula v. CRST Int'l, Inc.*,
No. LACV111285VAPOPX, 2017 WL 11093975 (C.D. Cal. Mar. 3, 2017)..2, 20

*Gunawan v. Howroyd-Wright Emp't Agency*,
997 F. Supp. 2d 1058 (C.D. Cal. 2014) ........................................20, 21

*Henry v. Central Freight Lines, Inc.*,
No. 216CV00280JAMEFB, 2019 WL 2465330 (E.D. Cal. June 13, 2019) ..13, 18

*Henryhand v. Digital Sys. LLC*,
LACV1302735JAKAGRX, 2014 WL 11728721 (C.D. Cal. May 19, 2014) ......23

*In re Work Unif. Cases*,
133 Cal. App. 4th 328, 34 Cal. Rptr. 3d 635 (2005)..............................24

*Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*,
986 F.3d 841 (9th Cir. 2021)..........................................................2, 4, 11

*Jones v. Spherion Staffing LLC*,
No. LACV11-06462 JAK, 2012 WL 3264081 (C.D. Cal. Aug. 7, 2012)...........23

*Kamath v. Robert Bosch LLC*,
No. 2:13-CV-08540-CAS, 2014 WL 2916570 ....................................20

*Kirby v. Immoos Fire Protection, Inc.*,
53 Cal. 4th 1244 (2012) ............................................................23

*Lane v. Francis Capital Mgmt., LLC*,
224 Cal. App. 4th 676 (2014) ....................................................23

*Lease and Interchange of Vehicles*,
131 M.C.C. 286, 1978 WL 10541, (I.C.C. 1978) .......................19

*Ling v. P.F. Chang's China Bistro, Inc.*,
200 Cal. Rptr. 3d 230 (Cal. App. 6th Dist. 2016) .....................23

*Miranda v. Pacer Cartage, Inc.*,
No. D069425, 2017 WL 3725521 (Cal. Ct. App. Aug. 30, 2017).......................22

*Mouchati v. Bonnie Plants, Inc.*,
2014 WL 1661245 (C.D. Cal. Mar. 6, 2014) ............................20

*Naranjo v. Spectrum Security Servs., Inc.*,
40 Cal. App. 5th 444 (2019), rev. granted 455 P.3d 704 (Cal. 2020) .................23

*Olin Corp. v. F.T.C.*,
986 F.2d 1295 (9th Cir. 1993) ..................................................10

*Oman v. Delta Air Lines, Inc.*,
9 Cal. 5th 762 (2020) ...................................................2, 13, 14, 15

*Owner-Operator Independent Drivers Ass'n, Inc. v. Landstar*,
622 F.3d 1307 (11th Cir. 2010) ................................................19

*Patton v. Midwest Constr. Servs., Inc.*,
No. CV 19-8580-JFW(MAX), 2021 WL 2982277 (C.D. Cal. June 11, 2021)............................................................................12

*Remington v. J.B. Hunt Transp., Inc.*,
No. CV 15-10010-RGS, 2016 WL 4975194 (D. Mass. Sept. 16, 2016)..16, 17, 18

*Robinson v. Chefs' Warehouse, Inc.*,
No. 15-CV-05421-RS, 2019 WL 4278926 (N.D. Cal. Sept. 10, 2019)..........12, 13

*Robles v. Schneider Nat'l Carriers, Inc.*,
No. EDCV162482JGBKKX, 2017 WL 8231051 (C.D. Cal. Feb. 10, 2017).......20

*Rodriguez v. Caliber Holdings Corp.*,
No. 221CV03351RGKAFM, 2021 WL 2567995 (C.D. Cal. June 23, 2021) ......24

*Rodriguez v. RWA Trucking Co., Inc.*,
238 Cal. App. 4th 1375 (Ct. App. 2013), *as modified* (Sept. 20, 2013),
publication ordered, 352 P.3d 881 (Cal. 2015) .........................16, 17, 18

*Schroeder v. Envoy Air, Inc.*,
No. CV 16-04911-MWF-KS, 2016 WL 11520388 (C.D. Cal. Sept. 27, 2016)..........................................................................20

iii

*Smeltzer v. Slater*,
   93 F. Supp. 2d 1095 (C.D. Cal. 2000) ......................................................... 10

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
   537 U.S. 51 (2002) ........................................................................................ 18

*Summers v. Teichert & Son, Inc.*,
   127 F.3d 1150 (9th Cir. 1997) ........................................................................ 8

*Taylor v. United Road Services, Inc.*,
   No. BCV-17-100222 TSC, 2019 WL 2479792 (Cal. Super. May 20, 2019) ....... 13

*Valadez v. CSX Intermodal Terminals, Inc.*,
   No. 15-cv-5433, 2017 WL 1416883 (N.D. Cal. Apr. 10, 2017) ..................... 2, 16

*Valiente v. Swift Transportation Co. of Arizona, LLC*,
   No. 219CV04217VAPKKX, 2021 WL 1799808 (C.D. Cal. Apr. 5, 2021) ......... 11

*Vikco Ins. Servs., Inc. v. Ohio Indem. Co.*,
   70 Cal. App. 4th 55 (1999) ........................................................................... 20

*Villalpando v. Exel Direct Inc.*,
   No. 12-CV-04137-JCS, 2015 WL 5179486 (N.D. Cal. Sept. 3, 2015) ............... 22

**Statutes**

28 U.S.C. § 1332 ................................................................................................. 7

49 U.S.C. § 31141 ............................................................................................. 11

49 U.S.C. § 5101 ................................................................................................. 8

49 U.S.C. § 5103 ................................................................................................. 8

49 U.S.C. § 5125 ............................................................................................. 8, 9

49 U.S.C. § 5127 ............................................................................................... 10

Cal Lab. Code § 225 ......................................................................................... 20

Cal. Bus. & Prof. Code § 17200 ........................................................................ 7

Cal. Lab. Code § 1194 ........................................................................................ 7

Cal. Lab. Code § 1197 ........................................................................................ 7

Cal. Lab. Code § 200 .................................................................................... 23, 24

Cal. Lab. Code § 201 ......................................................................................... 22

Cal. Lab. Code § 202 .................................................................................... 7, 22

Cal. Lab. Code § 203 ............................................................................ 7, 22, 23, 24

Cal. Lab. Code § 221 .......................................................... 2, 7, 16, 18, 20, 21

iv

Cal. Lab. Code § 224 ..................................................................................3, 19

Cal. Lab. Code § 226 ...................................................................................7, 24

Cal. Lab. Code § 2802 ...............................................7, 16, 18, 21, 22, 24

Cal. Lab. Code § 510 ........................................................................................7

Cal. Lab. Code § 512 ........................................................................................7

## Rules

Fed. R. Civ. P. 56 .............................................................................................7

## Regulations

49 C.F.R. § 1.87 ..............................................................................................11

49 C.F.R. § 1.97 ................................................................................................8

49 C.F.R. § 172.101 ........................................................................1, 5, 10, 16

49 C.F.R. § 177.800 ..........................................................................................9

49 C.F.R. § 376 .................................................................................................6

49 C.F.R. § 376.11 ..........................................................4, 6, 15, 16, 17, 19

49 C.F.R. § 383 .................................................................................................5

67 Fed. Reg. 59386 (Sept. 20, 2002) ............................................................9

83 Fed. Reg. 47961-01, 2018 WL 4504680 (Sept. 21, 2018)...................1

83 Fed. Reg. 67470-01, 2018 WL 6809341 (Dec. 28, 2018) ..............1, 11

83 Fed. Reg. at 47962 .....................................................................................9

83 Fed. Reg. at 47965 .....................................................................................9

83 Fed. Reg. at 47966 .....................................................................................9

83 Fed. Reg. at 47967 ...................................................................................10

83 Fed. Reg. at 67480 ...................................................................................12

## Other Authorities

DLSE Bulletin No. 84-7 ................................................................................21

DLSE Opinion Ltr. 1991................................................................................21

DLSE Opinion Ltr. 1994................................................................................21

DLSE Opinion Ltr. 1998................................................................................21

Defendants, Quality Carriers, Inc. (Quality) and Quality Distribution, Inc. (Quality Distribution) (collectively, Defendants), respectfully submit this Memorandum of Points and Authorities in Support of their Motion for Partial Summary Judgment.

## I.    INTRODUCTION

Plaintiff, Clayton Salter (Salter), agreed to provide transportation services as an independent contractor for Quality when he entered into three separate Independent Contractor Agreements (Agreements) with Quality over the course of approximately four years. Through this lawsuit, Salter seeks to re-write each of those agreements, claiming he was an employee of both Quality and Quality Distribution, and asserting various claims under California's Labor Code and Unfair Competition Law. Regardless of whether Salter can succeed in his misclassification allegation, several of Salter's Labor Code claims fail as a matter of law.

Salter's meal and rest break claims must be dismissed because they are preempted by two sources of federal law. First, the Pipeline and Hazardous Materials Safety Administration (Hazmat Safety Administration) has determined that California's meal and rest break rules may not be applied to drivers transporting hazardous materials. *Hazardous Materials: California Meal and Rest Break Requirements*, 83 Fed. Reg. 47961-01, *47961, 2018 WL 4504680 (Sept. 21, 2018). Throughout his entire relationship with Quality, Salter hauled sodium hypochlorite (commonly known as liquid bleach)—a hazardous material. *See* Defendants' Statement of Uncontroverted Facts and Conclusions of Law (*SUF*), ¶ 24; 49 C.F.R. § 172.101, App. A. Next, the Federal Motor Carrier Safety Administration (Motor Carrier Safety Administration), exercising the authority the United States Secretary of Transportation delegated to it, also concluded California's break rules are preempted and may not be applied to property-carrying commercial motor vehicle drivers covered by the Motor Carrier Safety Administration's hours of service regulations. *See California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers;*

*Petition for Determination of Preemption*, 83 Fed. Reg. 67470-01, *67480, 2018 WL 6809341 (Dec. 28, 2018). Salter unequivocally testified that he was subject to the hours of service regulations. The Motor Carrier Safety Administration's preemption determination, which the Ninth Circuit has affirmed, also requires dismissal of Salter's meal and rest break claims. *See Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 858 (9th Cir. 2021).

Salter's minimum wage claim fails as a matter of law because Salter has not identified any work for which he was not paid at least the minimum wage, nor can he. Salter's Agreements provided that he was to be paid on a percentage of revenue basis in exchange for Quality's use of the equipment he provided and the labor required to "transport, load, unload, and perform other transportation-related services." *SUF*, ¶¶ 30-31. Salter has not proffered any evidence of work he performed for which he was not paid under the terms of his Agreements. His minimum wage claim must be dismissed. *See Oman v. Delta Air Lines, Inc.*, 9 Cal. 5th 762, 781 (2020). For the same reason, Salter's claim for penalties for the late payment of wages must also be dismissed.

Salter's expense reimbursement and unlawful deductions claims must also be dismissed for several, independent reasons. First, they are preempted by the Federal Leasing Regulations (Leasing Regulations). The Leasing Regulations, which governed the Parties' relationship, expressly permit the allocation of business expenses between motor carriers (such as Quality) and Contractors (such as Salter). Salter's claims, which seek to apply the California Labor Code to prohibit the contractual freedom afforded under the Leasing Regulations, must be dismissed. *See Valadez v. CSX Intermodal Terminals, Inc.*, No. 15-cv-5433, 2017 WL 1416883, at *11 (N.D. Cal. Apr. 10, 2017).

Preemption aside, no private right of action exists for Salter's unlawful deductions claim under California Labor Code section 221. *Gatdula v. CRST Int'l, Inc.*, No. LACV111285VAPOPX, 2017 WL 11093975, at *3 (C.D. Cal. Mar. 3,

2017).

Salter's unlawful deductions claim fails for yet another reason. California Labor Code section 224 (Section 224) permits employers to make deductions from pay where they are "empowered so to do by state or federal law." Cal. Lab. Code § 224. As stated above, the Leasing Regulations expressly permit the Parties to allocate expenses in the manner contemplated by Salter's Agreements. They also permit those expenses to be deducted from Contractors' pay, just as the deductions Salter now seeks to recover were. The deductions at issue are permitted under Section 224, and Salter's claim to the contrary must be dismissed.

Finally, Salter cannot pursue his expense reimbursement and unlawful deductions claims to recover costs he incurred to furnish the truck he used to provide delivery services under the terms of his Agreements. The longstanding position of the California Department of Labor Standards and Enforcement (DLSE) to that effect, which has since been adopted by multiple courts, requires dismissal of Salter's claims on those grounds. *See Estrada v. FedEx Ground Package System, Inc.*, 64 Cal. Rptr. 3d 327, 347 (Cal. Ct. App. 2007).

For these reasons, and those explained more fully below, Defendants request that the Court enter judgment in their favor on the first through fourth, sixth and seventh causes of action asserted by Salter in his First Amended Complaint (*FAC*). Dkt. No. 51.

## II. BACKGROUND

### A. Quality's Business Model

Quality is a for-hire motor carrier authorized by the Motor Carrier Safety Administration, an agency of the U.S. Department of Transportation, to provide transportation services to the shipping public. *SUF*, ¶ 1. Quality specializes in providing transportation and logistics services related to the transportation of chemicals—primarily in liquid form—on behalf of its customers throughout North America. *SUF*, ¶ 2. It was previously a subsidiary of Quality Distribution, which

operated as a holding company and did not have any employees, equipment, or customers. *SUF*, ¶ 3.[1]

Since 2008, Quality has not had any employees or operated any facilities in California. *SUF*, ¶ 4. Instead, Quality has contracted with a separate company, Winsome Enterprises, Inc. (Winsome), to coordinate and manage the transportation of Quality's customers' freight throughout California. *SUF*, ¶ 5. Quality and Winsome have never shared any common ownership or employees. *SUF*, ¶ 6. Quality Distribution and Winsome have also never shared any common ownership or employees. *Id.* Winsome owns its own trucks and employs its own drivers. *SUF*, ¶ 7. But unlike Quality, Winsome does not have motor carrier operating authority from the Motor Carrier Safety Administration. *Id.* Therefore, to operate legally under federal law, Winsome maintains a contractual relationship with Quality that allows it to provide transportation services on behalf of and under the authority of Quality to Quality's customers. *SUF*, ¶ 8; 49 C.F.R. § 376.11(a). In return for the services Winsome provides, Quality pays Winsome a portion of the amounts charged to customers and provides back-office settlement processing services from Quality's headquarters in Tampa, Florida. *SUF*, ¶ 9. Winsome operates three main terminals in South Gate, Richmond, and Stockton, California; each of which operates separately. *SUF*, ¶ 10.

## B. Clayton Salter

Quality also contracts with independent contractor drivers (Contractors), like Salter, to deliver product on behalf of its customers throughout California. *SUF*, ¶ 11. These Contractors must be qualified to operate a Commercial Motor Vehicle under regulations promulgated by the Federal Motor Carrier Safety Administration. *SUF*, ¶ 12. In addition, as required by the Federal Leasing Regulations, the Contractors contract with Quality to operate under Quality's operating authority. *SUF*, ¶ 13. They

---

[1] On July 1, 2021, Quality was acquired by CSX Corporation. *Id.*

4

sign Independent Contractor Agreements (Agreements), which set forth the terms under which they agree to provide the equipment (*i.e.*, a commercial motor vehicle) and a DOT-qualified driver in order to provide transportation services. *SUF*, ¶ 14. Though Salter is one such Contractor, he began his relationship with Quality as an employee driver in 2007. *SUF*, ¶ 15. In 2008, Quality withdrew its direct involvement in California operations but continued to operate under its contract with Winsome. *SUF*, ¶ 16. At that time, Salter became a Winsome employee driver. *SUF*, ¶ 16.

In 2015, Salter voluntarily ended his employment relationship with Winsome, decided to lease the truck he had been driving from Winsome with the option to purchase it at the conclusion of the lease, and made the business decision to enter into an Agreement with Quality to operate under Quality's operating authority. *SUF*, ¶ 19. Salter signed three separate Agreements; one in 2015, one in 2016 and one in 2018. *SUF*, ¶ 20. In 2019, he was injured and stopped working and making payments on his truck. *SUF*, ¶ 21. Winsome repossessed Salter's truck and Quality terminated his then current Agreement when it learned that Salter no longer had the equipment identified in the Agreement. *SUF*, ¶ 22.

For the entire time that he hauled loads under Quality's motor carrier authority, Salter worked primarily for one customer—Olin Corporation (Olin)—hauling bleach. *SUF*, ¶ 24. During that entire time period, Salter did not attend any meetings Winsome or Quality held. *SUF*, ¶ 23. Bleach, also known as sodium hypochlorite, is a hazardous material, as that term is defined by federal hazardous materials regulations promulgated by the U.S. DOT. 49 C.F.R. § 172.101, App. A (listing chemical name for bleach, sodium hypochlorite, as a hazardous substance subject to federal hazardous materials regulations). Salter also admitted his work as a driver was subject to the federal hours of service regulations, 49 C.F.R. §§ 383.3; 383.5. *SUF*, ¶ 25.

### C. Salter's Independent Contractor Agreements

In each of the Agreements Salter entered with Quality, he agreed to provide the equipment (*i.e.*, a commercial motor vehicle) and a federally qualified driver to

provide transportation services. 49 C.F.R. § 376.11(a); *SUF*, ¶ 26. The Leasing Regulations, 49 C.F.R. Part 376, govern the relationship between motor carriers and independent contractors and require such "a written lease [between the motor carrier and the owner of the equipment] granting the use of the equipment and meeting the requirements contained in § 376.12." *Id.*, § 376.11(a). Quality used three different forms of its Agreement during the relevant period, the "2015 Agreement," the "2016 Agreement," and the "2018 Agreement." *SUF*, ¶ 27. Salter executed each version of the Agreement. *SUF*, ¶ 28. Each Agreement Salter entered set forth the basis of his compensation, including compensation for both Quality's use of Salter's equipment and the transportation services that Salter was to provide to Quality. *SUF*, ¶ 29. Specifically, Salter's Agreements provided generally that, "CONTRACTOR agrees to use the Equipment, together with all necessary labor, which CONTRACTOR shall furnish at its sole cost and expense, to transport, load, unload, and perform other transportation-related services (the "Services") on behalf of CARRIER and its customers." *SUF*, ¶ 30. In exchange for the equipment and Services Salter agreed to perform under the terms of his Agreements, Quality promised to provide him a percentage of the adjusted gross revenue for each load that he agreed to haul. *SUF*, ¶ 31.

Salter testified that he understood the payment he received under the Agreements was for all the transportation services he provided to Quality, including loading, unloading, completing paperwork, waiting at shippers and receivers, fueling and pre- and post-trip inspections. *SUF*, ¶ 32. Salter's Agreements also identified which party, as between Quality and Salter, was responsible for certain expenses, and it authorized Quality to take certain deductions from the Salter's settlement payments. *SUF*, ¶¶ 33-34.

### D. Salter's Claims and Procedural History

Salter filed his original Class Action Complaint in Los Angeles Superior Court on October 3, 2019. On January 16, 2020, Defendants removed the case to this Court

on grounds that this Court has jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1332(d). On November 30, 2020, Salter filed a First Amended Complaint (FAC), alleging causes of action for: (1) failure to provide required meal periods in violation of California Labor Code §§ 226.7, 510, 512, 1194, and 1197, and IWC Wage Order No. 9-2001, § 11; (2) failure to provide required rest periods in violation of California Labor Code §§ 226.7 and 512 and IWC Wage Order No. 9-2001, § 12; (3) failure to pay minimum wages in violation of California Labor Code §§ 1194 and 1197, and IWC Wage Order No. 9-2001, § 4; (4) failure to pay all wages due to discharged or quitting employees in violation of California Labor Code §§ 201, 202, and 203; (5) failure to provide accurate itemized wage statements in violation of California Labor Code § 226 and IWC Wage Order No. 9-2001, § 7; (6) failure to indemnify employees for necessary expenditures incurred in discharge of duties in violation of California Labor Code § 2802; (7) unlawful wage deductions in violation of California Labor Code §§ 221, 223, and 400-410, and IWC Wage Order No. 9-2001, § 8; and (8) unfair and unlawful business practices in violation of California Business & Professions Code §§ 17200, *et seq*. Dkt. No. 51. On February 26, 2021, Salter filed a Motion for Class Certification. Dkt. No. 54-1. The Court denied that motion on April 9, 2021. Dkt. No. 76. This matter is set for trial on December 14, 2021.

## III. ARGUMENT

### A. Legal Standard

Summary judgment is appropriate on any claim that presents "no genuine dispute as to any material fact" for which the plaintiff bears the burden of persuasion at trial. Fed. R. Civ. P. 56(a). Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 250 (1986). To demonstrate the insufficiency of evidence

supporting a nonmovant's claim, the moving party need only point to the absence of evidence through argument. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). If the moving party meets this objective, the burden shifts to the nonmoving party to produce some "significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Mere disagreement about a material issue of fact cannot suffice to prevent summary judgment. *See Cal. Arch. Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A nonmoving party must instead demonstrate that evidence supports his dispute with the movant's rendition of the facts, and that that evidence is of such a nature that the subject of the dispute may "reasonably be resolved in favor of either party." *Id.* Failure to produce sufficient evidence to satisfy this standard for an essential claim warrants the entry of summary judgment for the moving party. *Celotex Corp.*, 477 U.S. at 322.

**B.** **Salter's Meal and Rest Break Claims are Preempted Based on Two Sources of Federal Law**

**1.** **Salter's meal and rest break claims are preempted under the Hazmat Safety Administration's September 21, 2018 preemption determination.**

In order to "protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce," Congress vested central authority over hazardous material regulations (Hazmat Regulations) in the U.S. DOT. 49 U.S.C. §§ 5101, 5103. Congress also authorized the U.S. DOT to make preemption determinations relating to hazardous materials, with the exception of highway routing. 49 U.S.C. § 5125(d)(1). The Secretary of Transportation delegated that authority to the Hazmat Safety Administration. 49 C.F.R. § 1.97(b)(3).

On September 21, 2018, the Hazmat Safety Administration published its Determination concluding that the Hazmat Regulations preempt California's meal and

rest break rules for all drivers of motor vehicles that are transporting hazardous materials. 83 Fed. Reg. at 47962. In doing so, the Hazmat Safety Administration analyzed the Hazmat Regulations, including 49 C.F.R. § 177.800(d), which requires "[a]ll shipments of hazardous materials [by motor vehicle] must be transported without unnecessary delay, from and including the time of commencement of the loading of hazardous material until its final unloading at destination." 83 Fed. Reg. at 47965.

The determination cites previous decisions of the Hazmat Safety Administration that found that delay in the transportation of hazardous materials "is incongruous with safe transportation," including the "important safety aspect . . . that the time between loading and unloading be minimized." Id. at 47966 (quoting 44 Fed. Reg. 75566, 75571 (Dec. 20, 1979)). Accordingly, any "State and local requirements likely to cause unnecessary delays are preempted." Id. (citing 67 Fed. Reg. 59386 (Sept. 20, 2002)). The Hazmat Safety Administration applied these principles to the California meal and rest break rules, finding that "it is clear that the delays caused by [California meal and rest break rules] are unnecessary," citing the example that "in the course of an 11-hour shift, California will often require drivers to pull over and take a break at least four separate times." 83 Fed. Reg. at 47966. Moreover, "the amount of delay caused by these multiple required stops far exceeds the sum of the required break times" due to "the shortage of parking and safe havens, deviations from routes, [and] congested traffic" that can impact "the scheduling of subsequent pickups and deliveries, and causing even more delays." Id. Under the Hazmat Safety Administration's standards, "cumulative delays of this type cannot be considered 'minimal.'" Id. California meal and rest break rules "make it impossible to comply with 49 C.F.R. § 177.800(d), and are an obstacle to accomplishing and carrying out that regulation." Id. at 47966-67. As a result, the Hazmat Safety Administration determined that the California meal and rest break rules "are preempted by 49 U.S.C. § 5125(a)(1) and 49 U.S.C. § 5125(a)(2) with respect to all drivers of motor vehicles

that are transporting hazardous materials." 83 Fed. Reg. at 47967.

As with the Federal Motor Carrier Safety Administration's preemption determination, only a court of appeals may set aside or alter the Hazmat Safety Administration's Determination. 49 U.S.C. § 5127(a)–(c) (vesting exclusive jurisdiction to review a preemption determination with federal courts of appeal). More than 60 days have run since the Hazmat Safety Administration's Determination and no appeal has been filed. In other words, every tribunal is bound by the determination. *See id.* Consequently, this Court does not have jurisdiction to review the Order and is bound by its terms. *See Carpenter v. Dep't of Trans.*, 13 F.3d 313, 316-17 (9th Cir. 1994) (concluding that "[s]pecific grants of exclusive jurisdiction to the courts of appeals override general grants of jurisdiction to district courts"); *Smeltzer v. Slater*, 93 F. Supp. 2d 1095, 1101-1102 (C.D. Cal. 2000) (dismissing a claim for among other things, lost wages, and holding that the Hobbs Act strips the district court of jurisdiction to entertain an attack on rules the Secretary promulgated under the Omnibus Transportation Employee Testing Act of 1991).

Throughout his relationship with Quality, Salter hauled liquid bleach for one Quality's customer's (Olin Corp.)—he was always hauling hazardous materials during that time period. *SUF*, ¶ 24. In fact, Salter estimated that between 2008 and the end of his relationship with Quality in 2019, he hauled a total of just ten loads that were not placarded as hazardous material. *Id.* The chemical compound commonly known as liquid bleach is sodium hypochlorite. *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1296 (9th Cir. 1993). Sodium hypochlorite is a hazardous material, as that term is defined by federal hazardous materials regulations promulgated by the U.S. DOT. 49 C.F.R. § 172.101, App. A. Accordingly, the Hazmat Safety Administration's determination preempts Salter's meal and rest break claims.

## 2. California's meal and rest break rules cannot be applied to Salter as a driver of property-carrying commercial motor vehicle who was subject to the Motor Carrier Safety Administration's hours of service regulations.

On December 21, 2018, the Motor Carrier Safety Administration ruled that California's meal and rest break rules are preempted and may not be applied to property-carrying commercial motor vehicle drivers covered by the Motor Carrier Safety Administration's hours of service regulations. *See California's Meal and Rest Break Rules for Commercial Motor Vehicle Drivers; Petition for Determination of Preemption*, 83 Fed. Reg. 67470-01, *67480, 2018 WL 6809341 (Dec. 28, 2018). The preemption determination was promulgated under 49 U.S.C. § 31141. *See id.* Under that section, the Secretary of Transportation is authorized to make a determination that state laws meeting certain criteria are preempted and may not be enforced. 49 U.S.C. § 31141. The Secretary of Transportation's authority to make such determinations has been delegated to the Motor Carrier Safety Administration's Administrator. *See* 49 C.F.R. § 1.87(f) (2016). Under Section 31141, judicial review of a DOT preemption determination may only be conducted by a circuit court. *See* 49 U.S.C. § 31141(f). In *Int'l Bhd. of Teamsters*, the Ninth Circuit undertook such a review and, in doing so, affirmed the validity of the Motor Carrier Safety Administration's preemption determination. 986 F.3d at 858. As a result, "commercial motor vehicle drivers subject to [the Motor Carrier Safety Administration's] hours-of-service regulations may not bring claims under California's meal and rest break rules." *Valiente v. Swift Transportation Co. of Arizona, LLC*, No. 219CV04217VAPKKX, 2021 WL 1799808, at *2 (C.D. Cal. Apr. 5, 2021).

There is no dispute that the Motor Carrier Safety Administration's preemption determination is valid under binding Ninth Circuit precedent. *Teamsters*, 986 F.3d 841, 858. Nor is there any dispute that Salter was subject to the Motor Carrier Safety Administration's hours-of-service regulations. *See SUF*, ¶ 25 (citing *Salter Dep.* at

183:11-14) (Q: "So as a professional driver, you had to comply with the federal hours of service rules; is that correct?" A: "Yes."). Whether Salter is subject to a subset of the federal hours of service rules directed toward so-called "short haul" drivers is of no moment. The language of the determination is unambiguous: "California may no longer enforce the [meal and rest break] Rules with respect to *drivers of property-carrying [commercial motor vehicles] subject to [Motor Carrier Safety Administration's hours of service] rules*." 83 Fed. Reg. at 67480 (emphasis added).[2] The Motor Carrier Safety Administration was intentional in defining the scope of its decision. It noted that the determination specifically "does not apply to drivers of passenger-carrying CMVs in interstate commerce." *Id.*, n. 1. However, the determination contains no such exclusion for short haul drivers. Simply put, "property-carrying commercial motor vehicle drivers covered by the FMSCA's hours of service regulations" includes both short and long-haul drivers. *See Robinson v. Chefs' Warehouse, Inc.*, No. 15-CV-05421-RS, 2019 WL 4278926, at *4 (N.D. Cal. Sept. 10, 2019) ("Plaintiffs suggest Prado's claims may not be preempted if he qualified as a 'short haul' driver, and that CW has failed to establish as a factual matter he was not a such a driver at any relevant point in time. Plaintiffs have not shown, however, that the Order excludes short haul drivers, even assuming there otherwise was a factual question as to Prado's status during any particular period.").

Finally, Salter cannot credibly argue that the Motor Carrier Safety Administration's preemption determination does not apply to his claims that arose prior to its issuance. As this Court recently held, "the Court currently has no authority to enforce the regulations under which Plaintiff brings his claims. Therefore, the issue of retroactive effect is irrelevant." *Patton v. Midwest Constr. Servs., Inc.*, No. CV 19-

---

[2] *See also id.* at 67470 ("the [Motor Carrier Safety Administration] grants the petitions insofar as the provisions at issue apply to drivers of property-carrying CMVs subject to the [Motor Carrier Safety Administration's] hours of service regulations.").

8580-JFW(MAX), 2021 WL 2982277, at *3 (C.D. Cal. June 11, 2021) (internal quotations and citation omitted); *see also Ayala v. U.S. Xpress Enterprises, Inc.*, No. EDCV 16-137-GW(KKX), 2019 WL 1986760, at *2 (C.D. Cal. May 2, 2019); *Robinson*, 2019 WL 4278926, at *4; *Henry v. Central Freight Lines, Inc.*, No. 216CV00280JAMEFB, 2019 WL 2465330, at *4 (E.D. Cal. June 13, 2019); *Taylor v. United Road Services, Inc.*, No. BCV-17-100222 TSC, 2019 WL 2479792, at *1 (Cal. Super. May 20, 2019). Salter was indisputably subject to the Motor Carrier Safety Administration's hours of service regulations. His meal and rest break claims are preempted and should be dismissed.

## C. Salter's Minimum Wage Claim Fails as a Matter of Law

Salter claims that certain tasks he performed in connection with the Agreements were uncompensated. Specifically, in the parties' meet and confer on this motion, Salter represented that "even if Quality paid or exceed[ed] minimum wage for Mr. Salter's time spent actually delivering cargo, it is Plaintiff's view that a jury could find that he was not paid at all for any other activities. For example, he was required to wash the trailer, which was owned by Defendants, attend meetings, and conduct inspections but was not paid for the time it took to accomplish these duties." ECF No. 85 at 5:18-26. Salter's argument is a take on the well-worn idea that drivers whose pay is calculated using a formula with a mileage component are being paid only for driving time. But it ignores both (1) recent developments in the law and (2) the facts of this case.

In *Oman v. Delta Air Lines, Inc.*, 9 Cal. 5th 762 (2020), the California Supreme Court clarified that what courts had previously thought of as a prohibition on "wage averaging" was "more accurately characterized as wage borrowing." *Id.* at 779. Specifically, "[s]tate law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage." *Id.* at 781. The Court further confirmed

that "compensation owed employees is a matter determined primarily by contract . . . . [c]onsistent with general contract interpretation principles, the unit for which the pay is promised should be determined based on the 'mutual intention of the parties as it existed at the time of contracting.'" *Id.* at 782. Accordingly, the Court's first task in assessing the validity of Plaintiff's minimum wage theory is determining what work the parties contractually agreed Salter's compensation covered.

In this case, the Agreements answer that question. Generally, they provide that "CONTRACTOR agrees to use the Equipment, together with all necessary labor, which CONTRACTOR shall furnish at its sole cost and expense, to transport, load, unload, and perform other transportation-related services (the "Services") on behalf of CARRIER and its customers." *SUF*, ¶ 30. In exchange for those Services, Salter was entitled to earn a percentage of the adjusted gross revenue for each load tendered to him. *SUF*, ¶ 31. The schedule of the agreement that provides how compensation under the agreement is calculated explains that Quality did not pay Salter a mileage rate; rather, Quality paid Salter a percentage of the adjusted gross revenue of each load he hauled for his provision of "Services," including transport of goods, loading, unloading, and other transportation-related services. *SUF*, ¶¶ 30-31.

Salter has not proffered any evidence that he engaged in a single activity for Quality that was not a "transportation-related service." And that makes good sense. As a party to an express contract, Salter knew exactly what he had to do in order to receive money from Quality. He had no incentive to do anything "unpaid." His testimony is consistent with this notion. He understood that under the Agreements, he was being paid for the provision of his services as a "class A driver," including loading, unloading, fueling, completing pre- and post-trip inspections, paperwork, and waiting at shippers and receivers. *SUF*, ¶ 32.

### D. The Federal Leasing Regulations Preempt Salter's Claims for Unlawful Deductions and Unreimbursed Business Expenses

The Federal Leasing Regulations (Leasing Regulations) authorize a federally

authorized motor carrier like Quality to provide transportation services to its customers with equipment it does not own only when the motor carrier enters a written lease for the use of the equipment with the equipment's owner. 49 C.F.R. § 376.11(a). Each of the Agreements Salter entered with Quality constitute such a lease. The Leasing Regulations outline the requirements for those Agreements and expressly give the parties the freedom to contractually allocate operational costs such as those associated with fuel, taxes, permits, tolls, licenses and insurance. *See* 49 C.F.R. § 376.12(e) and (j). The Leasing Regulations also expressly permit the parties to agree that the motor carrier will deduct such costs, as well as costs related to the purchase or lease of vehicles used to provide the transportation services, from the Contractor's compensation. 49 C.F.R. § 376.12(h), (i) and (j).[3]

Salter entered three Agreements with Quality. In those Agreements, Salter agreed to provide equipment (trucks) and drivers to transport bulk commodities under Quality's motor carrier operating authority. *SUF*, ¶¶ 26-29. Consistent with the Leasing Regulations, the Agreements each provided that Salter would assume the operating costs associated with his vehicles, including maintenance, fuel, tires, permits and licenses, taxes and insurance, and that certain of those costs would be deducted from Plaintiffs' compensation. *SUF*, ¶ 34.

Despite the terms of his Agreements, which are expressly authorized by the

---

[3] The Leasing Regulations require a written and compliant "lease" anytime an "authorized carrier" performs "transportation in equipment it does not own." 49 C.F.R. § 376.11. The applicability of those rules is not limited to relationships between motor carries and independent contractors but also extends to employees, provided the employee furnishes the use of the truck. Accordingly, while Defendants deny employing Salter, even if Salter were an employee, the Leasing Regulations would still apply. *See* 49 C.F.R. § 376.11 (regulations apply when a motor carrier performs "authorized transportation in equipment it does not own"); 49 C.F.R. § 376.12(c)(4) ("Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee.").

Leasing Regulations, Salter now contends that Cal. Lab. Code § 2802 required Quality to reimburse all business-related expenses and that the deductions he authorized were taken from his compensation in violation of California law. *FAC*, ¶¶ 55-67. Because the Leasing Regulations expressly provide the parties the freedom to allocate certain operational costs to Contractors and to deduct those costs from their compensation, Salter's claims that California law prohibits such agreements are preempted. *See, e.g., Valadez v. CSX Intermodal Terminals, Inc.*, No. 15-cv-5433, 2017 WL 1416883, at *11 (N.D. Cal. Apr. 10, 2017 ("[Plaintiffs'] claims are also preempted if the California Labor Code prohibits activities that the [Leasing Regulations] permit.");[4] *Remington v. J.B. Hunt Transp., Inc.*, No. CV 15-10010-RGS, 2016 WL 4975194, at *4 (D. Mass. Sept. 16, 2016) (granting motion to dismiss claims of owner-operators seeking reimbursement for expenses under state law due to having been misclassified as contractors because "[w]hat is explicitly permitted by federal regulations cannot be forbidden by state law"); *cf. Rodriguez v. RWA Trucking Co., Inc.*, 238 Cal. App. 4th 1375, 1393 (Ct. App. 2013), *as modified* (Sept. 20, 2013), publication ordered, 352 P.3d 881 (Cal. 2015) (preemption barred enforcement of California insurance laws that prohibited chargebacks to owner-operators for insurance premiums because "49 C.F.R. section 376.12 permits motor carriers to charge back liability insurance costs to its drivers").

Here, as in *Valadez*, Salter seeks reimbursement for the expenses related to acquiring and maintaining his truck, which are preempted vehicle acquisition and maintenance expenses under the Leasing Regulations. *See* 49 C.F.R. § 376.12(c)(1)

---

[4] In *Valadez*, truck drivers alleged they were misclassified as independent contractors and entitled to recover unlawfully deducted business expenses under Cal. Lab. Code § 2802, as well as damages for unlawful deductions under Cal. Lab. Code § 221. On summary judgment, the court found the plaintiffs' claims under those statutes preempted because "where the [Leasing Regulations] *explicitly permit* a particular arrangement, state laws cannot prohibit parties from negotiating that arrangement." Valadez, 2017 WL 1416883, at *8 (emphasis in original).

("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease."); *Id.* § 376.12(d) ("The compensation stated on the lease . . . may apply to equipment and driver's services either separately or as a combined amount.").

Salter's claim for reimbursement of fuel and maintenance costs are likewise preempted by 49 C.F.R. § 376.12(d), which permits carriers and owner-operators to enter agreements that allocate those expenses to the owner-operator. *Id.* § 376.12(e) ("The lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portion of such items."). The Leasing Regulations also preempt Salter's claims to the extent they seek reimbursement of insurance costs. *See* 49 C.F.R. § 376.12(j)(l) ("The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage .... If the authorized carrier will make a charge back to the [contractor] for any of this insurance, the lease shall specify the amount which will be charged-back to the [contractor]."); *see also Rodriguez,* 238 Cal. App. 4th at 1393-94 (claims for reimbursement of charge-backs for liability insurance preempted by Leasing Regulations). Finally, Salter's claim is preempted to the extent it seeks reimbursement of cargo and property damage payments. *See* 49 C.F.R. § 376.12(j)(3) (permitting agreements between motor carriers and owner-operators to specify the conditions under which deductions for cargo and property damages may be made from settlement payments). "What is explicitly permitted by federal regulations cannot be forbidden by state law." *Remington,* 2016 WL 4975194, at *4; *see also Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 376 (2000). The Leasing Regulations expressly permit carriers to lease equipment from individuals like Salter and for individuals like Salter to contractually agree to bear the costs he now seeks to recover through his claims for unlawful deductions and unreimbursed expenses. The claims are preempted by the Leasing Regulations and Defendants are entitled to summary judgment on those

claims.

The fact that compliance with both sets of regulations is possible does not change the analysis, despite some courts ruling to the contrary.[5] Conflict preemption is not a narrow, mechanical test. It applies when compliance with both federal and state law is impossible *and* when state law stands as an obstacle to federal law. *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp*., 537 U.S. 51, 65 (2002). Obstacle preemption does not require the impossibility of compliance; rather it exists "whe[n] state law prohibits something permitted (but not required) by federal law, thus standing as an obstacle to accomplishing the purposes of the federal law." *Rodriguez*, 190 Cal. Rptr. 3d at 676. That is precisely the situation here, as the courts in *Valadez* and *Remington* recognized. Put differently, Salter's expense reimbursement and unlawful deductions claims invoke California law in an attempt to "dictate contract terms when federal law provides the freedom to negotiate," *Remington*, 2016 WL 4975194 at *5. The Leasing Regulations expressly permit lessors to pay the costs of some business expenses. According to Quality, California state law requires that the motor carrier pay these same business expenses.[6] Allowing state law to prohibit this arrangement would stand as an obstacle to federal regulation which allows them. Salter's claims under Sections 221 and 2802 are therefore preempted by federal law. To the extent Salter's UCL claim is based on the same theories, Defendants are entitled to summary judgment on that claim as well.

---

[5] *See, e.g. Henry v. Cent. Freight Lines, Inc.*, No. 216CV00280JAMEFB, 2019 WL 2465330, at *6 (E.D. Cal. June 13, 2019).

[6] As discussed below, Quality contends that even absent preemption, California law does not require it to indemnify Salter for certain costs and permits Quality to take certain deductions.

1        **E.      Salter's Claim Alleging That Quality Took Unlawful Deductions From**
2                **His Pay Must Be Dismissed For The Additional Reason That The**
3                **Deductions Are Authorized Under California Labor Code § 224**

4        In enacting its deduction statute, the California legislature codified the
5    unremarkable principle that employers are not prohibited from withholding
6    deductions where they are "empowered so to do by state or federal law." Cal. Lab.
7    Code § 224.

8        The Leasing Regulations empower Quality to take the deductions Salter targets
9    in this suit. They were drafted with an understanding that (i) "owner-operators pay for
10   their expenses at the time the load is transported," (ii) that compensation the motor
11   carrier pays the owner-operator covers more than labor for driving services, and
12   (iii) the motor carrier could agree to "bear various expenses" of the owner-operator,
13   which the motor carrier would then charge-back (i.e., deduct) from the compensation
14   paid. *Lease and Interchange of Vehicles*, 131 M.C.C. 286, 1978 WL 10541, at *8, 9,
15   23, (I.C.C. 1978); *see also Owner-Operator Independent Drivers Ass'n, Inc. v.*
16   *Landstar*, 622 F.3d 1307, 1310-11 (11th Cir. 2010) (addressing written lease
17   requirement and history of motor carrier "charge-backs" (i.e., deductions) from
18   owner-operator compensation under the Federal Leasing Regulations). The plain text
19   of the Leasing Regulations makes clear that Quality may establish an arrangement
20   with Salter permitting the deduction of expenses so long as the agreement meets
21   certain regulatory requirements. *See* 49 C.F.R. § 376.12(h) (providing that lease
22   agreements "shall clearly specify all items that may be initially paid for by the
23   authorized carrier, but ultimately deducted from the lessor's compensation at the time
24   of payment or settlement."); 49 C.F.R. § 376.12(i) (authorizing deductions for truck
25   purchase or rental payments); 49 C.F.R. § 376.12(j)(1),(3) (authorizing deductions for
26   insurance premiums); 49 C.F.R. § 376.12(k)(6) (providing that at the time of the
27   return of an escrow fund specified in the lease, "the authorized carrier may deduct
28   monies for those obligations incurred by the lessor which have been previously

specified in the lease."). Because Quality was empowered by the Leasing Regulations to make the deductions that Salter complains of, Quality did not violate Cal. Lab. Code § 221.

**F. There is No Private Right of Action for Salter's Unlawful Deduction Claim**

Salter's claim under California Labor Code § 221 fails as a matter of law because Section 221 does not provide for a private right of action. *Gatdula v. CRST Int'l, Inc.*, No. LACV111285VAPOPX, 2017 WL 11093975, at *3 (C.D. Cal. Mar. 3, 2017); *Robles v. Schneider Nat'l Carriers, Inc.*, No. EDCV162482JGBKKX, 2017 WL 8231051, at *9 (C.D. Cal. Feb. 10, 2017); *Schroeder v. Envoy Air, Inc.*, No. CV 16-04911-MWF-KS, 2016 WL 11520388, at *12 (C.D. Cal. Sept. 27, 2016); *Kamath v. Robert Bosch LLC*, No. 2:13-CV-08540-CAS, 2014 WL 2916570, at *5 (C.D. Cal. June 26, 2014; *Gunawan v. Howroyd-Wright Emp't Agency*, 997 F. Supp. 2d 1058, 1068 (C.D. Cal. 2014); *Mouchati v. Bonnie Plants, Inc.*, 2014 WL 1661245, at *7-8 (C.D. Cal. Mar. 6, 2014). Under California law, "[a]doption of a regulatory statute does not automatically create a private right to sue for damages resulting from violations of the statute. Such a private right of action exists only if the language of the statute or its legislative history clearly indicates the Legislature intended to create such a right to sue for damages." *Vikco Ins. Servs., Inc. v. Ohio Indem. Co.*, 70 Cal. App. 4th 55, 62 (1999). "If [the court] determin[es] the Legislature expressed no intent on the matter either way, directly or impliedly, there is no private right of action." *Animal Legal Defense Fund v. Mendes*, 160 Cal. App. 4th 136, 172 (2008). Section 221 prohibits an employer from collecting or receiving from any employee any part of wages that the employer has paid to the employee. Cal. Lab. Code § 221. It does not, on its face, provide an express private remedy to enforce its provisions. Rather Labor Code Section 225 makes violations of the provision a misdemeanor, and Labor Code Section 225.5 provides a statutory penalty scheme that is expressly limited to actions brought by the Labor Commissioner. *See* Cal. Lab. Code § 225.5. The

inclusion of such specific provisions for both criminal and agency enforcement of the provision demonstrates that the Legislature did not intend to create a private right of action under Section 221. *See Gunawan v. Howroyd-Wright Employment Agency, 997 F. Supp. 2d 1058, 1068 (C.D. Cal. 2014)*. The Court should grant summary judgment to Defendants on Salter's claim for unlawful deductions for this additional reason.

### G. Salter Cannot Recover Costs He Incurred To Furnish A Truck Used To Provide Delivery Services Under The Terms Of His Agreements With Quality

As a matter of California law, Salter is barred from recovering money he paid to own or lease the vehicle he used to provide delivery services under the terms of his Agreements with Quality.

The California Department of Labor Standards Enforcement (DLSE) concluded that although costs of operating a motor vehicle in the course of employment may be covered by Labor Code § 2802, the costs of furnishing the vehicle itself are not. In Bulletin No. 84-7, the Labor Commissioner reasoned that "neither an automobile nor a truck is considered a tool within the meaning of [Labor Code § 2802], and an applicant for employment may be required, as a condition of employment, to furnish his . . . own automobile or truck to be used in the course of employment, regardless of the amount of wages paid." Interpretive Bulletin No. 84-7 (Jan. 8, 1985). The DLSE has consistently followed this guidance in opinion letters. DLSE Opinion Ltr. 1991.02.25-1 (Feb. 25, 1991); DLSE Opinion Ltr. 1991.08.30 (Aug. 30, 1991); DLSE Opinion Ltr. 1994.08.14 (Aug. 14, 1994); DLSE Opinion Ltr. 1998.11.05 (Nov. 5, 1998). And it still enforces this rule in the current version of its Enforcement Policies and Interpretations Manual. DLSE Manual § 29.2.3.2 ("As the Labor Commissioner opined in 1984, an automobile is not the type of equipment contemplated in the IWC orders.").

The California Court of Appeal adopted the DLSE's position in *Estrada v.*

*FedEx Ground Package System, Inc.*, 154 Cal. App. 4th 1 (2007). *Estrada* involved a group of pick-up and delivery drivers allegedly misclassified as independent contractors. *Id.* at 4. Defendant argued the drivers were barred from seeking reimbursement for expenses "related 'to purchasing or leasing a vehicle….'" *Id.* at 22. The Court of Appeal affirmed the trial court's finding that plaintiffs "were not entitled to reimbursement for expenses related 'to purchasing or leasing a vehicle for the purpose of performing pick-up and delivery services' because 'employers … can require as a condition of employment that their drivers, at their own expense, purchase or lease a truck to the employer's specifications.'" *Id.* Other courts have since followed suit. *See Villalpando v. Exel Direct Inc.*, No. 12-CV-04137-JCS, 2015 WL 5179486, at *38 (N.D. Cal. Sept. 3, 2015) ("the *Estrada* decision provides strong support for [the employer's] contention that class members are not entitled to be reimbursed for their truck lease payments."); *Miranda v. Pacer Cartage, Inc.*, No. D069425, 2017 WL 3725521, at *12 (Cal. Ct. App. Aug. 30, 2017) ("Based on the factual similarities between this case and the circumstances in *Estrada*, we find *Estrada*'s holding on point. Thus, we conclude the trial court erred in awarding Plaintiffs their lease payments."). Salter may not recover the costs he incurred in acquiring the vehicles he used to provide services to Quality. To the extent his claims under Labor Code sections 2802 and 221 seek recovery of those costs, they must be dismissed for that independent reason.

## H. Salter's Claim For Waiting Time Penalties Fails Because He Does Not Have Any Viable Claims For Late Paid Wages

Salter's fourth cause of action alleges that Quality willfully failed to pay wages owed to him at the time of his discharge as required by Cal. Lab. Code §§ 201-202. *FAC*, ¶¶ 44-50. He claims that as a result, he is entitled to "waiting time penalties," provided under Cal. Lab. Code § 203. *Id.* ¶ 47. Labor Code section 201 requires that employers pay all wages due to an employee immediately when the employer discharges the employee. Cal. Lab. Code § 201(a).

As discussed above, Salter's minimum wage and unlawful deduction claims fail and, as a result, Salter has no viable underlying claim for unpaid wages. As a result, Quality is entitled to summary judgment on Salter's Section 203 claim as well. *See supra* Sections III(C)-(G).

To the extent Salter's waiting time penalties claim is predicated on his expense reimbursement and meal/rest break claims, it also fails. First, all three of those underlying claims are preempted. *See supra* Sections III(B), (D). And even if they were not, none of those claims can serve as the predicate for the imposition of penalties under Cal. Lab. Code § 203. *See Naranjo v. Spectrum Security Servs., Inc.*, 40 Cal. App. 5th 444, 474 (2019), rev. granted 455 P.3d 704 (Cal. 2020). That is because Section 203 is only triggered where "an employer willfully fails to pay … any *wages* of an employee who is discharged or quits." Cal. Lab. Code § 203 (emphasis added). "Wages are accorded a special status under California law." *Naranjo*, 40 Cal. App. 5th at 463 (quotations omitted). They are defined as "all 'amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.'" *Id.* at 464 (quoting Cal. Lab. Code § 200(a)). An action seeking meal and rest break penalties "is not, in fact, an action for the collection of due and unpaid wages, but one for a failure to provide mandated meal or rest breaks." *Lane v. Francis Capital Mgmt., LLC*, 224 Cal. App. 4th 676 (2014); *see also Kirby v. Immoos Fire Protection, Inc.*, 53 Cal. 4th 1244, 1256-57 (2012). Consequently, it cannot support a claim for unpaid wages under California Labor Code § 203. *Ling v. P.F. Chang's China Bistro, Inc.*, 200 Cal. Rptr. 3d 230, 244 (Cal. App. 6th Dist. 2016), *review denied* (July 13, 2016); *Jones v. Spherion Staffing LLC*, No. LACV11-06462 JAK, 2012 WL 3264081, at *8 (C.D. Cal. Aug. 7, 2012) (holding violations of Section 226.7 could not support Section 203 penalties); *Henryhand v. Digital Sys. LLC*, LACV1302735JAKAGRX, 2014 WL 11728721, at *13 (C.D. Cal. May 19, 2014) ("With respect to the second argument, Plaintiff cannot advance claims for noncompliant wage statements or

failure to pay wages due upon termination based solely on alleged violations of Section 226.7.").[7]

The same is true for Salter's unreimbursed expenses claim, which seeks indemnification for expenses, rather than compensation for "labor performed." *See* Cal. Lab. Code 200(a); *In re Work Unif. Cases*, 133 Cal. App. 4th 328, 341, 34 Cal. Rptr. 3d 635, 645 (2005) (describing "the usual application of section 2802, as an *indemnification* statute, not an attempt to require indemnification for an item that is properly characterized as a component of employee compensation.") (emphasis added).

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion in its entirety and enter judgment in its favor on Salter's first through fourth, sixth and seventh causes of action.

Dated: September 3, 2021                    Respectfully submitted,

                                            */s/ Christopher J. Eckhart*
                                            Christopher J. Eckhart

                                            Attorney for Defendants, Quality Carriers, Inc. and Quality Distribution, Inc.

4835-0771-0200, v. 15

---

[7] *See also Rodriguez v. Caliber Holdings Corp.*, No. 221CV03351RGKAFM, 2021 WL 2567995, at *3 (C.D. Cal. June 23, 2021) ("[A]n employee cannot base a claim for waiting time penalties on missed premium payments alone, as waiting time penalties pertain to earned and unpaid wages, and not to unpaid penalty payments."); *Garybo v. Bros.*, No. 115CV01487DADJLT, 2020 WL 2765661, at *8 (E.D. Cal. May 28, 2020) ("[B]ecause Plaintiffs base their Fifth and Sixth Claims for Relief upon the failure to pay penalties under Section 226.7, Plaintiffs fail to show they are entitled to the derivative penalties under Sections 203 and 226.").