# EXHIBIT 5

## To Declaration of Don Benoit

Clayton Salter's Independent Contractor Agreement
Dated, June 21, 2018

## QUALITY CARRIERS, INC.
## INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT is made and entered into on 6/21/2018 | 5:52:26 AM PDT (the "Effective Date"), by and between Quality Carriers, Inc., an Illinois corporation with its principal place of business at 1208 East Kennedy Boulevard, Suite 132, Tampa, Florida 33602 ("CARRIER") and SALTER, CLAYTON M. ("CONTRACTOR").

**WHEREAS**, CARRIER engages in the business of transporting various products, including but not limited to bulk liquid chemical, petroleum products, freight and other commodities (collectively "Cargo");

**WHEREAS**, CONTRACTOR is the owner or lawful possessor of and is authorized to contract the motor vehicle equipment described herein, which may be utilized to transport the Cargo; and

**WHEREAS**, CARRIER desires to engage the services of CONTRACTOR for the transport of Cargo;

NOW, THEREFORE in consideration of the mutual covenants herein contained and pursuant to the Federal Leasing Regulations (49 C.F.R. Part 376), CARRIER and CONTRACTOR hereby enter into this lease agreement, including any and all attachments and schedules (the "Agreement"), as follows:

## 1.     RELATIONSHIP AND INTENTION OF THE PARTIES:

The intention of the parties is to (1) create a contract to facilitate CARRIER's compliance with federal law as a federally licensed motor carrier, and (2) create a vendor/vendee relationship between CONTRACTOR and CARRIER through which CONTRACTOR, as an independent business person, has the potential and expectation to realize a profit or loss by:

- providing a truck tractor power unit to CARRIER via the leasing arrangement established in this Agreement;

- rendering certain transportation services as required by CARRIER's customers and requested by CARRIER; and

- conducting and considering himself as either (i) a self-employed individual vendor for all purposes, or (ii) the authorized representative of a business entity that is an unrelated vendor to CARRIER.

This Agreement sets forth the mutual business objectives of the two parties intended to be served by this Agreement; the obligations of each party; and the results CONTRACTOR agrees to accomplish. The manner and means of reaching such results, however, are within the sole discretion of the CONTRACTOR, and no officer or employee of CARRIER shall have the authority to impose any term or condition on CONTRACTOR or on CONTRACTOR's

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

continued operation that is contrary to this understanding. CONTRACTOR shall exercise independent discretion and business judgment to fulfill its contractual obligations under this Agreement. CARRIER may, however, issue reasonable and lawful directives regarding the results to be accomplished by CONTRACTOR as contemplated by this Agreement, and failure to accomplish such results shall be a breach of this Agreement by CONTRACTOR.

**CONTRACTOR NOT EMPLOYEE OF CARRIER.** CONTRACTOR, if an individual, agrees and acknowledges that it is not an employee of CARRIER and does not hereby wish to or intend to enter into an employment relationship. Further, neither CONTRACTOR, nor any employee or agent of CONTRACTOR, shall be considered to be an employee of CARRIER or any of CARRIER's customers at any time, under any circumstances, for any purpose whatsoever, and nothing in this Agreement shall be construed as inconsistent with that relationship. It is further expressly understood that CONTRACTOR, as a vendor, will not receive, and has no claim to, any benefits or compensation currently paid by, or made available through CARRIER to its employees or hereafter declared by CARRIER for the benefit of its employees. CONTRACTOR's compensation is defined solely and specifically in this Agreement and shall consist, in its entirety, of the payments to which he is entitled as a vendor as referenced in Section 6 below and set forth in Section I of the attached Schedule A, which is part of this Agreement.

It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement. CONTRACTOR agrees to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorneys' fees, in protecting CARRIER's interests, brought by CONTRACTOR, CONTRACTOR's employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment or the providing of driver services under this Agreement. CONTRACTOR also agrees to provide necessary documentation and apply for certification of its independent contractor status where mandated by applicable state law. For the purposes of this section, the term CONTRACTOR refers to the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner. As required by law, CARRIER agrees to file information tax returns (Form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

**CARRIER does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, to furnish any specified number of shipments to CONTRACTOR or to guarantee any amount of revenue to CONTRACTOR. CONTRACTOR is not obligated to accept any specific shipment offered by CARRIER. CONTRACTOR retains the right (subject to the terms of Section 3.07 below) to provide services for other motor carriers or for himself and CARRIER likewise retains the right to engage other parties of its own choosing for any part or all of its work.**

2. **EQUIPMENT AND SERVICES:**

**2.01 CONTRACTOR'S Equipment.** CARRIER is a for-hire interstate motor carrier of property, registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("U.S. DOT"), and CONTRACTOR is willing to lease the truck tractor power unit(s) described below (the "Equipment") to CARRIER, and to perform

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

personally or through others, as an independent contractor, services related to the operation of the Equipment, for the purpose of hauling bulk commodities on behalf of CARRIER:

| Year | Make | V.I.N. | Unit # |
|------|------|--------|--------|
| 2012 | FREIGHTLINER CORP. | 1FUJGEBG7CSBJ5867 | Q1201 |
|  |  |  |  |
|  |  |  |  |

CONTRACTOR represents that: (i) it is either the person to whom title to the Equipment has been issued, or who, without the title, has the right to exclusive use of the Equipment, or who has lawful possession of the Equipment registered and licensed in any state in the CONTRACTOR's name, and that it has full authority to enter into this Agreement; (ii) the Equipment is complete with all required equipment and accessories; (iii) it meets all the requirements of all the applicable federal, state and municipal laws and regulations applicable to the operation of for-hire commercial motor vehicles (collectively "Legal Requirements"); and (iv) the Equipment is in good, safe, and efficient operating condition and shall be so maintained at CONTRACTOR's expense throughout the duration of this Agreement.

In accordance with Legal Requirements, a receipt identifying the Equipment and the date and time of commencement of this Agreement will be delivered from CARRIER to CONTRACTOR on the commencement date, and CONTRACTOR will deliver a similar receipt to CARRIER upon termination; provided, however, that this Agreement and CARRIER's obligations thereunder shall expire as provided in Section 10.02 below regardless of whether CONTRACTOR submits the receipt required by this provision.

**2.02 Services**. CONTRACTOR agrees to use the Equipment, together with all necessary labor, which CONTRACTOR shall furnish at its sole cost and expense, to transport, load, unload, and perform other transportation-related services (the "Services") on behalf of CARRIER and its customers. CONTRACTOR agrees that cargo tendered to and accepted by CONTRACTOR shall be delivered to the consignee with reasonable diligence, speed and care. CONTRACTOR shall be responsible for any claims resulting from cargo loss, spills, damage, delays or shortages, occurring while such cargo is under CONTRACTOR's care, custody or control to the extent that CARRIER is responsible for such loss, damage or delay under the terms of any applicable tariff or agreement.

**2.03 Vehicle Identification**. From the commencement date until termination of this Agreement, (i) the Equipment will be identified in accordance with the requirements of 49 C.F.R Part 390 and with the FMCSA or any other regulatory agency ("Agency" or "Agencies"), and (ii) CONTRACTOR will keep a copy of this Agreement with the Equipment. CARRIER shall furnish, at CARRIER's expense, decals to be affixed to the truck tractor power unit as required by federal regulations.

**2.04 CARRIER Trailers and Other CARRIER Equipment.** CARRIER may provide a CARRIER-furnished trailer or an interchanged trailer / container equipment under a valid interchange agreement along with necessary accessories (the "CARRIER Trailer" or "Trailer")

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

to CONTRACTOR to perform the Services. Additionally, CARRIER may make available to CONTRACTOR other equipment or accessories, including but not limited to safety equipment, pumps and compressors, hoses and/or fittings ("CARRIER Equipment") for use by CONTRACTOR in the performance of this Agreement. To the extent CONTRACTOR utilizes any CARRIER Equipment, the description of the specific equipment and the terms governing its use shall be dealt with in greater detail in the accompanying Communications System and Services Agreement and Accessorial Equipment Agreement, included with this Agreement as Exhibits 1 and 2.

CONTRACTOR will assume responsibility, up to a maximum of $2,000 per occurrence, for loss or damage to any CARRIER-provided Trailer which may occur while the CARRIER-provided Trailer is in the care, custody and control of CONTRACTOR; provided, however, that such maximum limit shall not apply to any loss, damage, or claim arising from CONTRACTOR's gross negligence or intentional misconduct, as determined by CARRIER in its reasonable discretion, and such shall be the complete and total responsibility of CONTRACTOR. In addition, CONTRACTOR will assume full responsibility for repairs or improvements (including tires) made to the CARRIER-provided Trailer without the written consent of CARRIER. CONTRACTOR will return the CARRIER-provided Trailer in the same condition as when received, reasonable wear and tear excepted.

**2.05 Security.** CONTRACTOR represents and warrants that any CARRIER Trailer provided for use by CONTRACTOR (either directly or indirectly) shall be used by CONTRACTOR only to transport shipments tendered to CONTRACTOR by CARRIER and CONTRACTOR shall use its best efforts to prevent the unauthorized use or control of the CARRIER Trailer for any other purpose. CONTRACTOR shall inform CARRIER dispatch regarding the specific location of any CARRIER Trailer when in CONTRACTOR's possession and at CARRIER's request.

### 3. OPERATION OF THE EQUIPMENT:

**3.01 General.** CONTRACTOR shall direct the operation of the Equipment at all times in a safe and prudent manner and determine the method, manner, and means of performing the contractual obligations under this Agreement in all respects including, but not limited to, such matters as: (i) the acceptance or rejection of dispatches offered by CARRIER; (ii) the days and times CONTRACTOR will operate the Equipment; (iii) the proper care of the cargo; (iv) the routes traveled; (v) parking sites/rest areas; (vi) the selection of insurance providers; and (vii) the selection of maintenance points, service and fuel locations, provided that CONTRACTOR shall fully and efficiently perform its obligations under this Agreement.

Unless required by law to be held by CARRIER, CONTRACTOR shall hold all authorizations, permits, licenses, orders and approvals required by governmental entities which are material to the business of CONTRACTOR and to the transactions contemplated by this Agreement. **CONTRACTOR is not required to purchase or lease any products, equipment or services from CARRIER as a condition of entering into this Agreement.** However, if CONTRACTOR chooses to purchase or lease products, equipment or services from CARRIER, an appropriate independent, stand-alone agreement will be entered into between the parties evidencing the transaction.

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

**3.02    Tank Washes**.    CONTRACTOR will not have CARRIER Trailers washed, either externally or internally, unless required to do so by CARRIER, and will only have CARRIER Trailers washed at facilities pre-approved by CARRIER.    CONTRACTOR will not be responsible for authorized tank wash charges for CARRIER Trailers.

**3.03    Product Disposal**.    CONTRACTOR shall be responsible for ensuring that the entire product is unloaded at the consignee's facility.    Unless specifically directed otherwise by CARRIER or CARRIER's agent, CONTRACTOR agrees to pay one hundred percent of all charges assessed by any tank wash facility resulting from the disposal of product in all instances where the amount of product in the tank exceeds three gallons.

**3.04    Passengers**.    As required by 49 C.F.R. § 392.60, no passenger, other than an authorized and U.S. DOT co-driver qualified by CARRIER, shall be permitted in the Equipment while the Equipment is under dispatch, operating under the CARRIER's authority and/or displaying the CARRIER's name, U.S. DOT Number, and logo or a United Nations Hazmat placard, unless specifically authorized in advance in writing by CARRIER's Vice President of Safety.    Any such authorization will be in the sole discretion of CARRIER, and subject to such requirements and procedures as it may prescribe.

**3.05    CONTRACTOR Not Employee of CARRIER.**    It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.    CONTRACTOR agrees to defend, indemnify and hold CARRIER harmless for any claims, suits, or actions, including reasonable attorneys' fees in protecting CARRIER's interests, brought by CONTRACTOR, CONTRACTOR's employees, any union, the public, or state or federal agencies, arising out of the operation of the Equipment or the providing of driver services under this Agreement.    CONTRACTOR also agrees to provide necessary documentation and apply for certification of its independent contractor status where mandated by applicable state law.    CONTRACTOR hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, wages and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation, adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of CONTRACTOR's use or employment of drivers and laborers, and any and all other employees or agents of CONTRACTOR that CONTRACTOR may provide or use to perform any aspect of this Agreement.    CONTRACTOR shall be solely responsible for complying with any and all state and federal laws, rules and regulations that may be applicable to the terms and conditions of employment of CONTRACTOR's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the CONTRACTOR purchases its license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and other required withholdings for CONTRACTOR's employees.    CONTRACTOR's performance of these responsibilities shall be considered proof of its status as an independent contractor in fact.    Proof of such control and responsibility shall be submitted by CONTRACTOR to CARRIER as required by CARRIER and may include, but not be limited to, proof of highway use tax being currently paid, proof of income tax being currently paid, and proof of payment of payroll tax for CONTRACTOR's drivers.    For the purposes of this section, the term CONTRACTOR refers to

Defendants' Motion for Partial Summary Judgment Exhibit 5

the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner. As required by law, CARRIER agrees to file information tax returns (Form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

**3.06    Communications / Electronic Logging Device ("ELD") Equipment.** CONTRACTOR agrees to make all arrangements to obtain (and install, if applicable), at CONTRACTOR's sole expense, a communications system ELD and/or satellite-tracking device ("Communications Equipment") for Equipment leased to CARRIER under this Agreement. Such Communications Equipment must be compatible with the communications / satellite tracking system utilized by CARRIER and outlined more fully in Exhibit 1.

**3.07    Alternative Equipment Use.** Because of the limitations of 49 C.F.R. §§ 376.12(c)(1) and (2), CONTRACTOR may operate the Equipment for another motor carrier or entity during the Agreement only with the prior written consent of CARRIER pursuant to this subsection. At CONTRACTOR's request, CARRIER may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of CARRIER only under the terms and conditions set forth in this subsection. The other uses may consist of (together, "Alternative Uses of Equipment"): (i) Sublease – CARRIER subleases the Equipment (including services furnished by CONTRACTOR's driver) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; (ii) CONTRACTOR Motor Carriage – CONTRACTOR uses CONTRACTOR's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this subsection relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and (iii) Exempt Motor Carriage – CONTRACTOR, lacking motor carrier operating authority of CONTRACTOR's own but possessing a validly issued DOT Number, lawfully provides for hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker). In the event CONTRACTOR enters into a contract with another motor carrier or independent contractor, CONTRACTOR shall not be authorized or entitled to use any CARRIER equipment as described in Section 2.04, or any other CARRIER-provided equipment in fulfilling any responsibilities under such contract. Additionally, in the event CONTRACTOR intends to use the Equipment as described in Section 2.01 for any non-CARRIER use and, since dispatches are generally scheduled three days in advance, to provide the level of service required by shippers, CONTRACTOR agrees that at least 72 hours prior to such use he shall (i) notify CARRIER of such intended use, (ii) remove or temporarily cover all CARRIER identification and permit markings bearing CARRIER's name or logo and U.S. DOT number, and (iii) confirm that appropriate insurance coverage is in place and in effect. CONTRACTOR specifically agrees that CONTRACTOR shall relinquish control over any of CARRIER's property in CONTRACTOR's possession and temporarily return all such property to CARRIER (including, but not limited to any CARRIER Trailer, the permit pouch, the base plate, CARRIER communication equipment and the CARRIER fuel card, if applicable) prior to any non-CARRIER use of the Equipment.

**3.08**   In the event that CONTRACTOR will not be available to provide services to CARRIER under this Agreement for any period exceeding seven calendar days, CONTRACTOR shall provide CARRIER with at least 72 hours advance notice of such unavailability.

## 4.   COMPLIANCE WITH PERTINENT LAWS, REGULATIONS AND POLICIES BY CONTRACTOR:

**4.01   Drivers.**   CONTRACTOR shall provide competent drivers who meet CARRIER's minimum driver qualification standards and all of the requirements of the U.S. DOT, including but not limited to, familiarity and compliance with state and federal motor carrier safety laws and regulations.   The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified pursuant to federal or state law, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers.

CONTRACTOR shall furnish, at CONTRACTOR's expense, drivers (including himself, as the case may be) for the Equipment who: (1) hold a valid commercial driver's license with a valid tank vehicle and hazardous materials endorsements; (2) meet all driving requirements and qualification standards (i) imposed by the Legal Requirements and (ii) as may be established by CARRIER's insurer(s); (3) are trained and qualified under Agency regulations to drive commercial motor vehicles hauling Hazardous Materials as that term is used in the Hazardous Materials Transportation Act, 119 U.S.C. § 5101 et seq., as amended; and (4) are knowledgeable of and compliant with applicable federal motor carrier safety laws and regulations, particularly the FMCSA Compliance, Safety, Accountability ("CSA") Program.   CONTRACTOR shall promptly furnish to CARRIER for each of CONTRACTOR's drivers (including himself, if applicable) evidence and documents that CARRIER is required to maintain by its insurance provider or by the Legal Requirements.   In order to fulfill this compliance requirement, CONTRACTOR acknowledges and agrees that he and his driver(s) shall attend (without compensation from CARRIER) CARRIER-sponsored safety meetings and trainings and comply with other safety-related obligations from time to time, which may include on-line or web-based training. Any driver, including CONTRACTOR, who is not in compliance with CARRIER's safety policies and procedures shall be prohibited from operating any vehicle (the Equipment or otherwise) in the service of CARRIER.

**4.02   Paperwork Requirements.**   CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction), DOT medical cards, physical examination certificates, accident reports, maintenance and repair records for the Equipment, and any other required data, documents and reports required by the Legal Requirements or CARRIER's policy.

**4.03   Shipping Documents.**   CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.   CONTRACTOR agrees to complete trip and delivery authorization documents and other documents needed to accurately bill customers.

**4.04  Drug and Alcohol Testing.**  CONTRACTOR and its drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.

Any driver, helper or other worker provided by CONTRACTOR who is performing a safety sensitive function for CARRIER will be subject to testing for use of controlled substances and misuse of alcohol as required under Title 49 Part 382 of the U.S. Code of Federal Regulations ("Regulations").  Pre-employment, post-accident, random and reasonable suspicion testing will be required as provided in the Regulations.

**CONTRACTOR agrees that it will comply with the terms of the Policy, as communicated to CONTRACTOR by CARRIER, with respect to any driver, helper or other worker provided by CONTRACTOR who has been found to be in violation of the Regulations. Violation of the Policy by CONTRACTOR will be a default by CONTRACTOR under the Agreement requiring immediate termination of the Agreement for material breach.**

Further details concerning this Policy are available from the CARRIER's Supervisor of Motor Carrier Compliance at CARRIER's Safety Department.

**4.05  Safe Operations.**  CONTRACTOR agrees to operate the Equipment in a safe and prudent manner at all times in accordance with the laws of the various jurisdictions in which the Equipment will be operated and pursuant to the operating authorities of CARRIER, and in accordance with all rules related to traffic safety, highway protection and road requirements. CONTRACTOR also agrees to operate the Equipment in accordance with CARRIER's safe operating procedures, including but not limited to its speeding policy.  Moreover, CONTRACTOR agrees that all drivers and/or workers employed by CONTRACTOR will comply with the terms of this Agreement, including the requirement of safe operations, while operating the Equipment on behalf of CONTRACTOR.

**4.06  Safety and Operating Policies and Procedures.**  CONTRACTOR agrees that any driver utilized by CONTRACTOR will comply with CARRIER's safety and operating policies and procedures, as dictated by legal and/or customer-driver requirements, and any subsequent revisions thereto. Pursuant to applicable law, CARRIER is committed to a policy of ensuring a drug and alcohol-free transportation environment and to reduce accidents, injuries and fatalities. **Accordingly, CONTRACTOR agrees that any violation of CARRIER's Policy on Drug and Alcohol Abuse or corresponding applicable U.S. DOT regulations shall be deemed a material breach of this Agreement and may result in immediate termination of this Agreement without recourse by CONTRACTOR.**  CONTRACTOR acknowledges that it has read, and is familiar with, CARRIER's current applicable safety and operating policies, which are posted and maintained on CARRIER's website www.qualitydistribution.com at http://driver.qualitydistribution.com/sop.aspx and are also available from CARRIER in written form upon request.

**4.07  Honesty and Fair Dealing**.  CONTRACTOR agrees that the submission of a falsified driver qualification application, logs, mileage reports, maintenance reports, or fuel receipts shall result in immediate termination of this Agreement without recourse by CONTRACTOR.

Defendants' Motion for Partial Summary Judgment Exhibit 5

**4.08    California Truck and Bus Regulation.**    CONTRACTOR agrees that the Equipment shall, for the purposes of compliance with Title 13 California Code of Regulations Section 2025 (hereinafter "Section 2025"), be considered in CONTRACTOR's fleet for the duration of this Agreement. CONTRACTOR agrees that the Equipment utilized to perform services under this Agreement shall, at CONTRACTOR's expense, comply with the standards set forth at Section 2025. All compliance obligations set forth in Section 2025 concerning the Equipment shall be the obligation of CONTRACTOR. CONTRACTOR shall, upon request from CARRIER, provide to CARRIER written confirmation that CONTRACTOR has reported the Equipment to the California Air Resources Board as included in CONTRACTOR's fleet. CONTRACTOR shall maintain a copy of this Agreement in the Equipment at all times and shall present it to enforcement officers upon request.

## 5.    RESPONSIBILITY FOR OPERATING COSTS AND EXPENSES:

**5.01    General Application.**    CONTRACTOR will be responsible for all:

(a)    Cost and expenses associated with the operation and maintenance of the Equipment, including but not limited to fuel, tires, tire chains (if necessary), empty miles, tolls, fines, detention and assessorial services;

(b)    All ferry, bridge and highway tolls, and associated device and toll administration charges;

(c)    All taxes, premiums, assessments, and fees associated with the operation of the Equipment, including fuel taxes, property taxes, sales and use taxes, highway use taxes, payroll taxes, unemployment taxes, and income taxes;

(d)    Overweight / overdimension fines or penalties, except as provided for in Section 5.06;

(e)    Costs associated with obtaining necessary permits, including those for fuel, mileage, weight and distance; and

(f)    The items specifically outlined in this section of the Agreement or otherwise specifically provided for in other sections of this Agreement.

**5.02    Maintenance and Inspection.**    CONTRACTOR, at CONTRACTOR's expense, shall equip and continuously maintain the Equipment in good and safe operating condition to meet all requirements imposed by any Legal Requirements. CONTRACTOR agrees to: (i) conduct maintenance inspections of the Equipment at pre-trip and post-trip, through quarterly inspection reports, and annually as required by the Federal Motor Carrier Safety Regulations; (ii) maintain the appropriate records of such inspections and any resultant findings; (iii) complete motor vehicle maintenance reports; and (iv) provide CARRIER with said records as may be requested by CARRIER or as CARRIER is required to maintain by the Legal Requirements or by its insurance provider's requirements. Notwithstanding the foregoing, if at any time the Equipment is found to be deficient under any Legal Requirements, the Equipment shall be removed from service until it is, at CONTRACTOR's expense, brought into compliance. In addition, the

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

Equipment shall be maintained in a clean and presentable fashion free from body damage, in accordance with standards of the industry.

**5.03    Fuel Card Option.**  CARRIER shall provide CONTRACTOR with the opportunity to participate in CARRIER's fuel program and be issued a fuel card that CONTRACTOR may use for all fuel purchases.  Should CONTRACTOR choose to accept the fuel card from CARRIER, it shall be used only for fuel purchases made in conjunction with CONTRACTOR providing Services under this Agreement.  All fuel charges and state fuel taxes will be charged back to CONTRACTOR, together with any transaction fees assessed by the fuel card provider. CONTRACTOR will not be entitled to any volume purchasing incentives, rebates or other discounts from CARRIER's vendors.

**5.04    Fuel Tax and Road/Mileage Taxes.**  Fuel and mileage taxes are operating expenses of CONTRACTOR and the liability for payment also remains with CONTRACTOR.  For the purpose of computing and paying all state fuel taxes owed for the Equipment, the following provisions will apply:

(a)    If CONTRACTOR chooses to participate in CARRIER's fuel program, for the purposes of computing and paying all state fuel and mileage taxes owed for the Equipment, CARRIER shall issue CONTRACTOR a fuel card to be used for all fuel purchases.  CARRIER shall report and pay all quarterly and monthly fuel taxes on behalf of CONTRACTOR, and CONTRACTOR agrees to cooperate fully with CARRIER by providing CARRIER with all necessary information and documentation needed to complete such filings.  Any net fuel or mileage tax owed at that time with respect to CONTRACTOR's operations in all taxing jurisdictions combined will be deducted from CONTRACTOR's compensation at the next settlement.  Any net fuel or mileage tax due back to CONTRACTOR with respect to CONTRACTOR's operations will be added to CONTRACTOR's next settlement.

(b)    In the event that CONTRACTOR declines to participate in CARRIER's fuel program, CONTRACTOR agrees to: (1) indemnify, defend, and hold CARRIER harmless against all claims arising out of or relating to such fuel tax reporting and payment; and (2) provide CARRIER with evidence reasonably satisfactory to CARRIER that CONTRACTOR has secured his or her own fuel tax permit and has timely filed all required tax returns and other filings related to fuel taxes, and paid in full any fuel taxes due.

**5.05    Registration / License Plates / Base Plates, including apportioned or prorated base plates.**  CONTRACTOR has an option with respect to the registration and the base plating of the Equipment.  In the event CONTRACTOR owns his own base plate for the Equipment, CONTRACTOR shall be responsible for the registration of the Equipment in his own name or the name of the business entity under contract to CARRIER.  CONTRACTOR may, however, request that CARRIER obtain a base plate under CARRIER's IRP Permit for use by CONTRACTOR, the cost of which shall be deducted from amounts otherwise payable to CONTRACTOR under this Agreement.  CONTRACTOR shall remove and return such plate to CARRIER after termination of this Agreement and, in the event CONTRACTOR fails or refuses to do so, CARRIER shall, and is hereby authorized to, deduct in full the cost of the plate from CONTRACTOR's final settlement and/or Reserve Fund.  If CARRIER receives a refund or credit for an IRP plate registered in the name of CARRIER or such plate is authorized by

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

CONTRACTOR to be resold by CARRIER to another owner-operator, CARRIER shall refund to CONTRACTOR a pro-rata share of the amount received by CARRIER, if CONTRACTOR returns the base plate to CARRIER. However, CONTRACTOR shall not be entitled to any reimbursement for any unused portion of a base plate unless CARRIER is able to reuse or resell the plate to another owner-operator.

If base plates are supplied by CONTRACTOR, CONTRACTOR must supply CARRIER with the base plate registration initially when leasing and annually upon renewal, and the CARRIER'S USDOT number must be listed on the registration.

**5.06    Fines and Penalties.** CONTRACTOR shall have the duty to determine whether a load is in compliance with the size and weight laws of all states through which the Equipment will travel and to notify CARRIER of the need for any overweight / overdimension permits before commencing the haul. CARRIER will provide for any overweight / overdimension permits where required. Except when a violation results from the acts or omissions of CONTRACTOR, CARRIER will assume the risks and costs of fines for overweight of oversize trailers when the trailer is preloaded or sealed, or the load is containerized, or when the trailer or lading is otherwise outside the control of CONTRACTOR.

**5.07    U.S. DOT Leasing Regulations.** The Equipment shall be for CARRIER's exclusive possession, control, and use for the duration of this Agreement. As such, CONTRACTOR shall not operate the Equipment for any other motor carrier or entity during the term of this Agreement without prior written consent from CARRIER pursuant to Section 3.07 of this Agreement. CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement. This subparagraph is set forth solely to conform with DOT regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER. Nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or its drivers are an independent contractor or an employee of CARRIER. As provided by 49 C.F.R. § 376.12(c)(4), "an independent contractor relationship may exist when a carrier complies with 49 U.S.C. § 14102 and attendant administrative requirements."

## 6.    RATES, CHARGES AND PAYMENT:

**6.01    Rates and Charges.** The rates and charges payable to CONTRACTOR for Services rendered under this Agreement are set forth in the attached Section I of Schedule A, subject to the deductions authorized in this Agreement, Section II of Schedule A, Schedule A-3 and/or any other agreement(s) which may authorize settlement deductions. If there are any additional charges related to a load for which CONTRACTOR seeks payment, it is CONTRACTOR's responsibility to: (i) inform CARRIER of such charges; (ii) obtain from CARRIER written verification of an agreement with such charges; and (iii) only thereafter, include the charge on an invoice to CARRIER.

In the event CONTRACTOR is not operating its business under a non-Social Security number Federal Taxpayer Identification Number ("TIN") and through a sole proprietorship or business entity (such as an LLC) as of the Effective Date of this Agreement, CONTRACTOR agrees to obtain such TIN and form a sole proprietorship or business entity within ninety (90)

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

days of the Effective Date. CONTRACTORS who have been contracting continuously with CARRIER prior to August 1, 2016 will not be required to form a business entity or obtain a non-Social Security number TIN but are strongly encouraged to do so.

Where CARRIER's tariff or other agreements with its customers require that accessorial services, including, but not limited to, loading and/or unloading, be performed by CARRIER, CONTRACTOR shall perform such services for compensation as specified in Section I of Schedule A.

**6.02 Advances.** CARRIER, on occasion, may (but is not obligated to) advance CONTRACTOR monies while CONTRACTOR is in service with CARRIER. Absent a written agreement between CARRIER and CONTRACTOR to the contrary, repayment of any advance (including those applicable to cancelled or voided trips) will be deducted from the next settlement payable by CARRIER to CONTRACTOR. Advances transferred by wire to CONTRACTOR by CARRIER shall be deemed received by CONTRACTOR upon CARRIER's receipt of an electronic acknowledgment of a successful transfer.

**6.03 Time and Manner of Payment.** CARRIER shall settle with and pay the required compensation as set forth in Schedule A-1 of this Agreement to CONTRACTOR with respect to services provided under this Agreement within fifteen (15) days after CONTRACTOR's submission to CARRIER of properly completed driver logs required by FMCSA and those documents necessary for CARRIER to secure payment from CARRIER's customers, including the signed freight bill, delivery receipt, or bill of lading (provided that CONTRACTOR need not submit a bill of lading to which no exceptions have been taken), concerning a trip in the service of CARRIER under this Agreement. CARRIER further requires that CONTRACTOR submit to CARRIER, but not as a condition of settlement and payment, all other documents and records relating to the use of the Equipment and the services provided under this Agreement (including, but not necessarily limited to original fuel receipts, toll receipts, maintenance reports, weight tickets, etc.).

**6.04 CONTRACTOR's Right to Review Compensation-Related Documents.** CONTRACTOR shall have the right to examine copies of any documents which are necessary to determine the accuracy of the calculation of the compensation and/or validity of any deductions from CONTRACTOR's settlement. If CONTRACTOR's compensation is based upon a percentage of the revenue for a particular shipment, CARRIER agrees to provide CONTRACTOR, before or at the time of settlement, a copy of the rated freight bill or a computer-generated document containing the same information. In addition, CONTRACTOR shall have the right to examine copies of CARRIER's tariffs, freight bills, or other documents to the extent needed to confirm compensation owed to CONTRACTOR; provided, however, that CARRIER may delete the names of shippers, consignees and other confidential or proprietary information contained in such documents.

**6.05 Final Determination of Settlements.** CONTRACTOR acknowledges that it is his or her responsibility to timely review and verify the accuracy of all settlements. Further, CONTRACTOR agrees that all settlements shall be final, and that CONTRACTOR will not make any claim or bring any action against CARRIER for additional settlement monies unless

CONTRACTOR notifies CARRIER in writing of any discrepancies or additional claims within 45 days of CARRIER issuing said settlement payment.

**6.06    Non-Compensable Items.**  CARRIER shall not pay any amounts to CONTRACTOR other than the amounts specified in Section I of Schedule A of this Agreement.  Specifically, CARRIER shall not pay any mileage or empty mileage fees, any costs of operating the Equipment, any personnel costs of CONTRACTOR, or any other costs incurred by CONTRACTOR, except as specifically provided in this Agreement.

**6.07    Filing and Reporting Responsibilities.**  CARRIER shall report payments made to CONTRACTOR pursuant to this Agreement as required by law, but shall not withhold any amounts for taxes on behalf of CONTRACTOR except as otherwise required by law. **CONTRACTOR shall be solely responsible for the payment of any federal, state, provincial, or local income taxes, payroll taxes, employment taxes, self-employment taxes, or other charges occasioned by CONTRACTOR's status of an independent contractor, and the filing of any federal, state, provincial, or local returns with respect to such taxes. CARRIER shall not be responsible for the payment of any local, state, provincial, or federal employment, or income taxes with respect to CONTRACTOR or CONTRACTOR's employees.**

7.    <u>INSURANCE:</u>

**7.01    CARRIER'S Insurance Obligations.**  It shall be CARRIER's responsibility, pursuant to U.S. DOT regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, to provide public liability (including bodily injury and property damage) insurance at all times while the Equipment is being operated on behalf of CARRIER.

**7.02    Accident Reporting Responsibilities.**  CONTRACTOR shall immediately report any accident or potential claim to CARRIER involving the operation of the Equipment, the discovery of loss or damage to cargo or the malfunction of the Equipment, and/or any property of CARRIER or property of others.  CONTRACTOR agrees to make such report via CARRIER's "Skytank" system or other procedure established by CARRER.  CONTRACTOR agrees to comply with CARRIER's accident/loss protocol as it pertains to photographs, reports, exchange of insurance information, etc.  Further, in the event of a vehicular accident, CARRIER reserves the authority, in its discretion, to download information from an event data recorder, to remove from the Equipment and preserve the event data recorder and any related device, and to immobilize the Equipment for a reasonable amount of time for the purpose of downloading and/or removing the event data recorder.  In the event of a vehicular accident, CONTRACTOR agrees to take affirmative steps to preserve any data stored on an event data recorder until CARRIER has notified CONTRACTOR of its decision to download, preserve or discard such information, and to immediately notify CARRIER of any requests by law enforcement or a government entity to either download or preserve the information on the event data recorder.

CONTRACTOR and its drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's sole expense,

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

provide written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle or litigate any accident, claim or potential claim by or against CARRIER.

**7.03    CONTRACTOR'S Insurance Obligations.** CONTRACTOR shall maintain, at its sole cost and expense, and in form and content satisfactory to CARRIER, the following minimum insurance coverages during this Agreement:

(a)    Non-Trucking (Bobtail / Deadhead) Liability Insurance: CONTRACTOR shall procure, carry, and maintain bodily injury liability and property damage liability insurance which shall provide coverage to CONTRACTOR whenever the Equipment is not being operated on behalf of CARRIER in a combined single limit of not less than One Million Dollars ($1,000,000) for injury or death to any person or for damages to property in any one occurrence. In addition, such coverage shall be primary to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

(b)    Workers' Compensation Insurance: CARRIER hereby advises CONTRACTOR that the laws of certain states may require CONTRACTOR to acquire and maintain workers' compensation insurance. CONTRACTOR understands and acknowledges that it is the sole responsibility of CONTRACTOR to review and comply with, at CONTRACTOR's expense, each state's laws relevant to CONTRACTOR's business pertaining to workers' compensation insurance. To the extent required by the workers' compensation statute applicable to CONTRACTOR's place of domicile, CONTRACTOR agrees to obtain workers' compensation insurance acceptable to CARRIER covering CONTRACTOR and all employees of CONTRACTOR who operate the leased equipment under this Agreement. Such policy shall contain a waiver of subrogation endorsement, waiving any right of subrogation against CARRIER, its affiliated corporations, and the respective directors, officers, employees and agents of the CARRIER and its affiliated corporations, and include an alternative employer endorsement, indemnity of CARRIER or similar provisions acceptable to CARRIER.

Workers' compensation insurance is available for purchase through CARRIER and CONTRACTOR may elect to obtain workers compensation through CARRIER, with the understanding that this is solely to facilitate payment to a third-party workers compensation insurance provider and that CONTRACTOR will not be part of CARRIER'S workers compensation insurance program for its employees.

(c)    Occupational Accident Insurance: In the event subparagraph 7.03(b) is not applicable to the CONTRACTOR and to the extent not prohibited by law, the CONTRACTOR shall obtain occupational accident insurance within his place of domicile which coverage shall include an alternative employer endorsement, indemnity of CARRIER or similar provisions acceptable to CARRIER. Occupational Accident Insurance is intended to cover the CONTRACTOR and any persons not included in the coverage described in the immediately preceding subparagraph but otherwise utilized by the CONTRACTOR in the performance of services under this Agreement.

Occupational Accident Insurance is available for purchase through CARRIER and CONTRACTOR may elect to obtain occupational accident insurance through CARRIER. Also, as an alternative method of complying with the insurance requirement outlined in subparagraph 7.03(a) (Non-Trucking), CONTRACTOR may elect to obtain the non-trucking liability protection made available by CARRIER

(d)    Other Insurance:   In addition to the insurance coverages required under this Agreement, it is CONTRACTOR's responsibility to procure, carry and maintain any fire, theft, uninsured and/or underinsured motorist, and physical damage (collision), or other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's health care or other needs.  As provided in this Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment or other CONTRACTOR property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment or other property.  CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive and reject no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under Florida law (or such other state law where the Equipment is principally garaged), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.

**7.04    Requirements Applicable to all of CONTRACTOR's Insurance Coverages.** CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are A.M. Best "A" rated, and CONTRACTOR shall not operate the Equipment under this Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld).  CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR's insurance carriers showing that all insurance coverages required above have been procured from A.M. Best "A" rated insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid.  Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

**7.05    CONTRACTOR'S Liability If Required Coverages Are Not Maintained.**    If CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required in subsections 7.03(a)-(c) above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct from CONTRACTOR's settlement compensation amounts reflecting all of CARRIER's expense in obtaining and administering such coverage.

Notwithstanding whether CARRIER obtains such insurance, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by this Agreement.  Further, CONTRACTOR, on behalf of its insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's

insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

## 8.    INDEMNIFICATION:

**8.01    In General.** CONTRACTOR agrees to defend, indemnify and hold harmless CARRIER and CARRIER's affiliates, subsidiaries, officers, agents, and employees from any loss, damage, delay, fine, civil penalty, including reasonable attorneys' fees and costs of litigation, action, claim for injury to persons (including to CARRIER's employees or agents), including death, damage to property, environmental response or restoration expense, cargo loss or damage, loss of or damage to CARRIER's Trailer or CARRIER's other real or personal property, injunctive obligations, or other expense that CARRIER pays or otherwise incurs arising out of or in connection with CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions (together, "CARRIER Damages"). CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to this Agreement any amounts due CARRIER under this Section 8. CARRIER shall furnish CONTRACTOR with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made. If CONTRACTOR operates the Equipment for any purpose other than the carriage of CARRIER's lading, CONTRACTOR shall hold CARRIER harmless and indemnify CARRIER for any damage (including attorneys' fees) arising from this use. This Section shall remain in full force and effect both during and after the termination of this Agreement.

**8.02    Indemnity Limits.** CONTRACTOR's indemnity obligation under Section 8.01 shall be limited – except as expressly provided otherwise in other provisions of this Agreement – to paying the following portion of the total amount CARRIER paid or otherwise incurred in connection with the claim:

- two thousand dollars ($2,000) for any bodily-injury, physical-damage, or environmental restoration claim;

- one thousand dollars ($1,000) for any cargo loss-or-damage claim; or

- two thousand dollars ($2,000) for any claim of loss of or damage to CARRIER's Trailer or CARRIER's other real or personal property;

provided that in no event shall CONTRACTOR's indemnity obligation under Subsection (a) of this Section exceed three thousand dollars ($3,000) in combination where multiple claims of any and all kinds arise out of any one occurrence. None of these dollar limits shall apply to any loss or damage resulting from accidents or other causes whenever the Equipment is not being operated on behalf of CARRIER. In addition, this Subsection's indemnity limits shall apply only to CONTRACTOR's indemnification obligation to CARRIER under Section 8.01 of this Section and thus shall not limit in any way the losses, damages, attorneys' fees, or other expenses that CONTRACTOR may sustain as a result of an injured third party's assertion of a claim directly against CONTRACTOR.

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

**8.03   CARRIER's Coverages.**   CARRIER has secured certain insurance policies and coverages directly relevant to certain risks and liabilities for which CONTRACTOR has agreed to indemnify CARRIER under this Section (for example, automobile liability, general liability, and cargo liability arising out of or in connection with CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions). These policies are expressly for the benefit of CARRIER and incidentally may benefit CONTRACTOR. Terms of the policies may change (for example, higher or lower deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). CONTRACTOR has neither any obligations under the policies nor any right to change the terms of coverages.

**8.04   Claims by CONTRACTOR or Other Contractors.**   Notwithstanding Section 8.01 and not subject to the limits of Section 8.02, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any claim by CONTRACTOR of loss of or damage to CONTRACTOR's Equipment or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of CONTRACTOR or any other contractor of CARRIER (including agents or employees of CONTRACTOR or any other contractor of CARRIER, respectively); and from any claim by any other contractor of CARRIER of loss of or damage to the other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of CONTRACTOR (including CONTRACTOR's agents or employees).

**8.05   Reclassification.**   THE TERMS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER. IN LIGHT OF THIS FACT AND INTENT: Notwithstanding Section 8.01 and not subject to the limits of Section 8.02, CONTRACTOR agrees to indemnify and hold CARRIER harmless from all reasonable attorneys' fees and litigation expenses CARRIER incurs in defending against any claims, suits, actions, or administrative proceedings brought by CONTRACTOR, CONTRACTOR's owner (if any), or any employees or other personnel engaged by CONTRACTOR to perform services under this Agreement – or, at CONTRACTOR's instance or with CONTRACTOR's consent, by any union or other private organization or member of the public – that allege that CONTRACTOR or any of CONTRACTOR's workers is an employee of CARRIER, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision holding the allegation to be true.

## 9.   ESCROW FUND:

CONTRACTOR will maintain an Escrow Fund with CARRIER in the minimum amount of $3,000.00.

(a)   CONTRACTOR may, at its option, (a) deposit the Escrow Fund with CARRIER in cash at the Commencement Date, or (b) authorize CARRIER to deduct from CONTRACTOR's settlement $50.00 per Settlement Period until the full Escrow Fund has been

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

deposited. CARRIER may draw upon the Escrow Fund for the purpose of settling amounts that CONTRACTOR owes CARRIER under this Agreement, including, but not limited to, any expense incurred by CARRIER that is CONTRACTOR's responsibility under this Agreement. CARRIER will describe each transaction involving the Escrow Fund in writing to CONTRACTOR. Amounts withdrawn from the Escrow Fund to the extent the Escrow Fund drops below $3,000 will immediately be replaced by CONTRACTOR or CARRIER will resume withdrawing such amounts from CONTRACTOR's settlement (up to $50.00 per Settlement Period) until the full Escrow Fund has been restored. CONTRACTOR may request an accounting of the Escrow Fund in writing at any time, and such accounting will be provided within seven days from CARRIER's receipt of that request.

(b)     If CONTRACTOR leases more than one tractor under this Agreement, CONTRACTOR will maintain an additional amount of $2,000.00 above $3,000.00 in the Escrow Fund for each additional tractor, which amount is to be deducted from CONTRACTOR's compensation at $50.00 every week beginning on the second week of services provided by CONTRACTOR under the Agreement. If, at any time, the principal amount in escrow falls below $3,000.00 plus the additional $2000.00 for each additional tractor, CONTRACTOR authorizes CARRIER to deduct from CONTRACTOR's compensation a maximum amount of $50.00 per week per tractor until the full escrow amount is replenished. CONTRACTORS who have been contracting continuously with CARRIER prior to August 1, 2016 will be required to maintain an additional amount of $1,000.00 above $3,000 in the Escrow Fund for each additional tractor.

(c)     While the Escrow Fund is in the control of CARRIER, CARRIER will pay interest on the average daily balance of Escrow Fund on at least a quarterly basis at a rate equal to the average yield on 91-day, 13-week treasury bills, as established in the weekly auction by the U. S. Department of Treasury, determined on the first day of the calendar quarter for which such interest payment is made. For purposes of calculating the balance of the Escrow Fund on which interest will be paid, CARRIER may, at its election, first deduct a sum equal to the average advance (including all chargebacks and other deductions) made to CONTRACTOR during the period of time for which interest is paid.

(d)     Final settlement of the Escrow Fund will be made no later than 45 days from termination of the agreement. Disbursement of the Escrow Fund will be accompanied by an accounting of all final deductions. If the Escrow Fund is insufficient to satisfy CONTRACTOR's outstanding obligations to CARRIER, CONTRACTOR shall pay CARRIER in full upon ten days written notice from CARRIER. If CONTRACTOR fails to timely comply with such notice, CARRIER shall be entitled to charge CONTRACTOR a monthly late fee equal to the lesser of 1.5% of the outstanding balance or the maximum amount allowed by law. In addition, CONTRACTOR shall be liable for any and all costs and expenses incurred by CARRIER in collecting CONTRACTOR's unpaid debt, including, but not limited to, collection agent and attorneys' fees.

## 10.     **TERM AND TERMINATION:**

**10.01  Term**. This Agreement is effective until December 31, 2021.

**10.02 Termination.** Notwithstanding Section 10.01 above, this Agreement may be terminated as follows:

    a)     At any time, by mutual agreement of CONTRACTOR and CARRIER;

    b)     Immediately by either CONTRACTOR or CARRIER for material breach of the Agreement. Material breach of the Agreement includes, but is not limited to, any act or omission by CONTRACTOR and its employees or agents which exposes CARRIER to liability for personal injury or property damage; results in a customer's or a shipper's service requirements not being met; involves the violation of CARRIER's policies; or results in a violation of federal, state, local or foreign law or regulation.

    c)     Immediately, in the event a qualified driver under this Agreement is prohibited by operation of law to perform safety sensitive functions;

    d)     Immediately, in the event the Leased Equipment is substantially damaged or otherwise inoperable and a replacement acceptable to CARRIER has not been provided within ten (10) days;

    e)     Immediately, in the event CONTRACTOR participates in any discriminatory, harassing, threatening or violent conduct or conduct that violates an individual's rights under federal, state or common law;

    f)     Immediately, in the event CONTRACTOR, directly or indirectly, participates in any dishonest or bad act including, but not limited to, fraud, theft, impeding an ongoing investigation or making false statements to CARRIER's personnel or any third party;

    g)     Immediately, upon the death of CONTRACTOR, in the event he is a sole proprietor;

    h)     By either party, by giving written notice to the other party at least thirty (30) days prior to the effective termination date; or

    i)     When the parties execute a new independent contractor agreement.

Unless otherwise agreed to by CONTRACTOR and CARRIER, the place of termination of this Agreement shall be Tampa, Florida.

**10.03 CONTRACTOR's Obligations upon Termination.**

    (a)     CONTRACTOR will, within 72 hours from the time this Agreement is terminated, return all of CARRIER's property to CARRIER's nearest facility (or other location as authorized by CARRIER) including the motor carrier identification placards, all permits, signed off lease, cab cards, license plates, CARRIER Trailers, CARRIER-owned accessorial equipment (as applicable), and logs current to the date of termination. With respect to final settlement upon termination of this Agreement, the failure on the part of CONTRACTOR to remove and return to CARRIER all identification devices of CARRIER, or a letter certifying their removal if lost or stolen, shall entitle CARRIER to withhold any payments owed to

Defendants' Motion for Partial Summary Judgment Exhibit 5

CONTRACTOR until such obligation is met. If the identification is painted directly on the Equipment, CONTRACTOR will permanently cover such identification to the satisfaction of CARRIER.

(b)     In the event CONTRACTOR for any reason fails to comply with Subsection 10.03(a) above, CONTRACTOR agrees to reimburse CARRIER, and be liable for all reasonable expenses, and costs incurred by CARRIER in obtaining and returning its equipment and/or property. CONTRACTOR agrees that in the event it should be deemed necessary by CARRIER to enter upon private property and/or remove CARRIER property in order to obtain possession of, and return its equipment and/or property, CONTRACTOR does hereby irrevocably grant CARRIER, or its duly authorized agents, permission to do so, and further agrees to save, and hold harmless, CARRIER, or it is duly authorized agents, from any form of liability whatsoever in connection with such repossession.

(c)     Additionally, if CONTRACTOR fails to return CARRIER's property to CARRIER within 72 hours after the termination of this Agreement, CONTRACTOR agrees to reimburse CARRIER for all costs incurred by CARRIER related to repositioning any CARRIER Trailer.

(d)     Any reseat costs associated with a third party lease purchase program including, but not limited to, transportation costs related to repossession, financing fees to rewrite the lease, interior cleaning and mattress replacement, mechanical repairs to meet trade requirement standards, interior and exterior repairs to return the truck to the condition it was in when CONTRACTOR assumed possession of the Equipment, and oil service or other maintenance, will be charged to CONTRACTOR.

**10.04 Termination in Transit.** Unless otherwise excused by the terms of Section 11.10 (Force Majeure), if CONTRACTOR has accepted a dispatch and is legally able to fully perform under this Agreement after dispatch but fails to perform, and/or abandons the shipment in transit, CONTRACTOR shall receive no compensation for the services performed on said activity; this Agreement shall be terminated immediately; and CARRIER shall have the right to (i) temporarily take physical possession of the Equipment and complete the transport of the cargo to destination or (ii) substitute the Equipment with other equipment to complete delivery of the shipment or any part thereof. Any expenses incurred by CARRIER related to such substitution or related to actions taken by CARRIER to complete the required services (including costs associated with cargo transfers) that exceed the expenses CARRIER would otherwise incur in paying CONTRACTOR to perform such services are agreed to be expenses chargeable to and deductible from amounts that would otherwise be due CONTRACTOR. In the event CARRIER takes possession of the Equipment, it will be returned to the possession of CONTRACTOR at a CARRIER facility.

## 11.     PROVISIONS OF GENERAL APPLICABILITY:

**11.01 Severability and Savings**. If any individual term or provision of this Agreement is contrary to or in conflict with any requirement of applicable law, then that term or provision shall be severed from this Agreement and the remainder of this Agreement shall be binding on the Parties.

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

**11.02  Breach**.  As set forth in Section 10.02 above, the non-breaching party may terminate this Agreement immediately upon any material breach of this Agreement by the other party. If, in CARRIER's reasonable judgment, CONTRACTOR has subjected CARRIER to liability through the breach of this Agreement because of CONTRACTOR's acts or omissions, CARRIER may take possession of the lading entrusted to CONTRACTOR and complete performance.  In such event, CONTRACTOR shall waive any recourse against CARRIER for such action and CONTRACTOR shall reimburse CARRIER for all direct or indirect costs, expenses, or damages (including reasonable attorneys' fees) incurred by CARRIER as a result of CARRIER's taking possession of the lading and completing performance.

**11.03  Successorship; Assignment.**  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.  CARRIER shall have the right to assign this Agreement at any time without CONTRACTOR's consent.  CONTRACTOR shall not have the right to assign this Agreement without CARRIER's prior written consent, which consent may be granted or withheld at CARRIER's sole discretion.

**11.04  Applicable Law; Venue; Waiver**.  Except as noted below, CARRIER and CONTRACTOR understand and agree that this Agreement shall be governed by and construed under the laws of the State of Florida, without regard to the choice of law provisions thereof.  Except for actions brought by CARRIER against CONTRACTOR for unpaid arrears at the termination of the Agreement, the exclusive venue for any action arising from, or brought to enforce, this Agreement shall be Hillsborough County, Florida and the state and federal courts located therein.  The parties irrevocably submit to the personal and subject matter jurisdiction of said courts.  CONTRACTOR waives its right to a jury trial to resolve any lawsuit it may ever bring against CARRIER, and agrees that any such lawsuit will be tried by a judge without a jury.  CONTRACTOR also waives its right to participate as a member in any class action lawsuit against CARRIER or act as a representative of a class of similarly situated persons in any lawsuit against CARRIER.

Notwithstanding the above, venue for any action brought by CARRIER against CONTRACTOR for unpaid arrears at the termination of the Agreement shall be in CONTRACTOR's domiciled jurisdiction.

**11.05  Confidentiality**.

(a)    All information, including, but not limited to, customer lists, trade secrets, forms, processes, developments, sales and promotional systems, prices and operations, which is disclosed to CONTRACTOR or which CONTRACTOR observes or comes into contact with during the term of this Agreement or the rendition of any services to CARRIER, whether generated by CARRIER or a customer or contractor of CARRIER, shall be deemed "Confidential Information" and the sole and exclusive property of CARRIER.  CONTRACTOR shall take all reasonable measures to maintain the confidentiality of said Confidential Information.  CONTRACTOR shall not use the Confidential Information for any purposes other than to perform its obligations under this Agreement and shall not disclose any Confidential Information to any third party without CARRIER's prior written consent.  CONTRACTOR acknowledges that all right, title, and interest in and to Confidential Information, including the right to produce, extract, or exhibit to any third party, and any intellectual property rights, are

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

vested exclusively in CARRIER. CONTRACTOR shall return any Confidential Information in its possession or control promptly upon the termination of this Agreement. CONTRACTOR expressly agrees that CARRIER shall be entitled to an injunction in any court of competent jurisdiction to prevent or otherwise restrain a breach of this Section. Nothing in this Section shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR.

(b)     To the extent the Confidential Information constitutes "trade secrets" under 18 U.S.C. § 1839(3), CARRIER provides the following notice to CONTRACTOR pursuant to 18 U.S.C. § 1833(b)(3): An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

**11.06  Right of Set Off**. CARRIER shall be entitled to set off against any debt from any amounts (i) otherwise payable by CARRIER to CONTRACTOR under this Agreement and/or (ii) held in the Escrow Fund set forth in Section 9 above, any amounts due from CONTRACTOR and the amount of any losses, damages or expenses (including all court costs, attorneys' fees or collection expenses incurred by CARRIER to enforce the terms of this Agreement) suffered or incurred by CARRIER as a result of CONTRACTOR's breach of any of the provisions of this Agreement or as a result of any negligent, fraudulent or illegal activities of CONTRACTOR or its employees or agents. The right of set off shall survive the termination of this Agreement. CONTRACTOR shall remain liable for any remaining indebtedness, which may exceed amounts which CARRIER may set off against.

**11.07  Entire Agreement; No Waiver**. This Agreement, together with all schedules and attachments, constitutes the sole and entire agreement between the parties and supersedes all prior agreements and undertakings, oral and written, expressed or implied, or practices, between the parties, and expresses all obligations and restrictions imposed on each of the respective parties during its term. This Agreement may not be amended or changed except by written agreement signed by CARRIER and CONTRACTOR. Either party's failure to insist upon strict performance of any provision of this Agreement or exercise any right under this Agreement shall not be construed as a waiver of such provision or right, nor shall such failure excuse the other party from future performance.

**11.08  Language**. The use of any gender in this Agreement shall include all other genders and the singular shall include the plural and the plural shall include the singular. The headings herein are for convenience only and shall not be construed as interpretive or as a substantive part of this Agreement.

**11.09  Notices.**   All notices under this Agreement shall be in writing and effective when delivered in person, by certified or registered mail (return receipt requested), or by prepaid express delivery service to the relevant undersigned party at its address provided below, or at such other address as such party may from time to time specify in writing.

**11.10  Force Majeure.**   The performance of the obligations of this Agreement on the part of CONTRACTOR or CARRIER shall be excused by reasons of acts of God, natural disasters, civil commotion, governmental interference, regulations, or similar contingencies beyond the control of the affected party.

**IN WITNESS WHEREOF,** CARRIER and CONTRACTOR hereby sign this CONTRACTOR Agreement as of the date first stated above.   CARRIER and CONTRACTOR acknowledge that this Agreement includes attached Schedules A, A-1, A-2 and A-3 (pertaining to Compensation), Exhibit 1 (Communications System and Services Agreement) and Exhibit 2 (Accessorial Equipment Agreement).

AGREED:

**CARRIER:  Quality Carriers, Inc.**         **CONTRACTOR**

Signature:  *Tracy LaGrone*
BD85DF4972364A3...
Name Printed:  Tracy LaGrone

Title:   License & Permit Manager

Date:   6/21/2018 | 5:52:26 AM PDT

Address:  1208 East Kennedy Boulevard, Suite 132, Tampa, Florida  33602

Signature:
585A978ADE864EA...
Name Printed:   CLAYTON M SALTER

Title:  Mr Clayton salter.

Address:  6754 ORIZABA AVE

LONG BEACH CA 90805-1935

Phone:  5625297999

Alt. Phone:

TIN/SSN:  /550412253

Date:  6/20/2018 | 4:35:34 PM PDT

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

**SCHEDULE A**
**RATES AND CHARGES**
**AND**
**AUTHORIZED DEDUCTIONS**

This Schedule A is attached to and made a part of the Independent Contractor Agreement on [DATE] 6/21/2018 | 5:52:26 AM PDT ("Agreement") by and between Quality Carriers, Inc. ("CARRIER") and SALTER, CLAYTON M. ("CONTRACTOR"), and shall continue in effect throughout the term of the Agreement, unless amended or revised by both parties in writing.

**I.  RATES AND CHARGES**

1.  CALCULATION METHODS:  CARRIER agrees to compensate CONTRACTOR for carriage of loads tendered by CARRIER by utilizing the PERCENTAGE BASED method set forth in Schedule A-1, which is attached to and made a part of this Schedule A.

2.  FUEL SURCHARGE:  CONTRACTOR's compensation shall <u>not</u> include any Fuel Surcharge (or portion thereof) billed to, or collected from, CARRIER's customers.

3.  FUEL STABILIZATION:  CARRIER shall provide additional compensation to CONTRACTOR for fuel costs in excess of $1.25 per gallon based on the following:

    (a)  Fuel stabilization compensation ("FSC") shall be provided by CARRIER to CONTRACTOR when National Average Diesel Fuel Prices ("NADFP") are in excess of $1.25 per gallon.

    (b)  FSC will be paid for all approved dispatched "Practical Miles" (as defined by the most recent edition of <u>Rand McNally Practical Miles</u> in effect at the time of dispatch) recorded in the CARRIER's dispatch system.

    (c)  Schedule A-2, which is attached to and made a part of this Schedule A, represents the FSC rate per approved dispatched Practical Mile for various NADFP ranges.

    (d)  CARRIER will notify CONTRACTOR of changes to the NADFP via electronic communication or via published report on CARRIER's website (www.qualitydistribution.com).

    (e)  CARRIER reserves the right to modify Schedule A-2 from time to time, and will notify CONTRACTOR of any modifications via electronic communication or via published report on CARRIER's website (www.qualitydistribution.com).

(f) NADFP is based on the United States average retail on-highway diesel prices, as published by the Energy Information Administration, a provider of official energy statistics from the United States government.

4. <u>EXPENSES</u>: Expense items, including, but not limited to, scale tickets and tolls that are incurred by CONTRACTOR and billed to and collected from a customer separately by CARRIER will be paid to CONTRACTOR at a rate of 100%. CONTRACTOR must provide documentation of expense items to receive reimbursement.

## II. <u>AUTHORIZED DEDUCTIONS</u>

<u>DEDUCTIONS GENERALLY</u>: In addition to any other items specified in this Agreement, CARRIER shall have the right to deduct from CONTRACTOR's compensation (or CONTRACTOR's Escrow Fund, if CONTRACTOR's compensation is insufficient) to recover costs expended on behalf of CONTRACTOR. If monies in the applicable settlement or Escrow Fund are insufficient to cover the sum due CARRIER from CONTRACTOR, then CONTRACTOR will on demand pay to CARRIER all sums remaining due CARRIER.

CARRIER shall deduct from CONTRACTOR at the time of payment or settlement, any liability or expense CARRIER has incurred or paid that, under this Agreement or any addendum to this Agreement, CONTRACTOR is obligated to bear.

CONTRACTOR hereby agrees to allow and hereby authorizes CARRIER from time to time as necessary to deduct the charges set forth in this Section II of Schedule A from the amounts otherwise paid by CARRIER to CONTRACTOR pursuant to Section 6 of the Agreement as well as to deduct from the Escrow Fund established pursuant to Section 9 of this Agreement. CONTRACTOR acknowledges that unless the amount of the charges specifically itemized or otherwise described in the Agreement or any Schedule or Appendices to the Agreement which may include an administrative fee or mark-up over and above the actual cost or expense incurred by CARRIER (which, if applicable, shall be disclosed to CONTRACTOR in this Agreement), the amount shall be (i) the retail prices established by the vendor of such goods or services, or (ii) the amount required by an underlying taxing/licensing authority, or (iii) the amount of cost incurred by CARRIER related to such occurrence.

Charges to be deducted include any amounts which were incurred and paid for by CARRIER on CONTRACTOR's behalf for which CONTRACTOR is financially responsible pursuant to the Agreement, which are enumerated in Schedule A-3, Deductions Table, of this Agreement.

At CONTRACTOR's request, CARRIER will provide CONTRACTOR with copies of those documents necessary to determine the validity of the deductions.

CONTRACTOR hereby waives any objection to any deduction specified above or elsewhere in this Agreement unless CONTRACTOR notifies CARRIER in writing of CONTRACTOR's objection within thirty (30) days of the deduction.

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

Accepted and agreed to this Schedule A on [DATE] 6/21/2018 | 5:52:26 AM PDT ,
by and between the parties set forth below.

**CARRIER: Quality Carriers, Inc.**                **CONTRACTOR**

Signature: _Tracy LaGrone_                          Signature: _____
           BD85DF4972364A3...                                   585A978ADE864EA...

Name Printed: Tracy LaGrone                         Name Printed: CLAYTON M SALTER

Title: License & Permit Manager                     Title: Mr Clayton salter.

Date: 6/21/2018 | 5:52:26 AM PDT                    Date: 6/20/2018 | 4:35:34 PM PDT

## SCHEDULE A – 1
## PERCENTAGE BASED COMPENSATION

1.  <u>PERCENTAGE BASED COMPENSATION</u>: For carriage of loads tendered by CARRIER, CARRIER shall pay CONTRACTOR ___62___ **% OF ADJUSTED GROSS REVENUE** (as defined below) ("AGR").

2.  <u>AGR</u>: AGR is defined as GR (defined in Section 4 below) **LESS**: (i) revenue billed by CARRIER for all "Accessorial" fees addressed in Schedule A and this Schedule A-1; (ii) incentives, discounts, fees, including those for loading or unloading services provided by CARRIER's customer either directly or through third parties, including but not limited to CARRIER's customer or an affiliate of CARRIER (together, "Third Parties"), or commissions that CARRIER gives CARRIER's customer with respect to a shipment; (iii) other amounts CARRIER paid to Third Parties in relation to movement of the shipment if not covered by a charge separately stated on CARRIER's invoice to CARRIER's customer, including but not limited to fees or commissions (including commission recoveries) paid to brokers, freight forwarders, interline or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, freight payment-processing fees consisting of the actual cost incurred by CARRIER for the shipment if CARRIER's customer or a third-party payer makes deductions from CARRIER's freight charges related to electronically-transmitted billing and payment account use, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading services, amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to CONTRACTOR, and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; (iv) charges separately stated on CARRIER's invoice to CARRIER's customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), administrative services surcharges, environmental and/or regulatory surcharges, insurance surcharges, charges for Third-Party contract services, freight payment processing fees, detention charges, charges for escorts, charges for overweight, overdimensional, or other permits, charges for special loading and/or unloading services, excess-value charges or high-value freight charges, "truck ordered but not used" charges, or surcharges for special security measures furnished or paid for by CARRIER; and (v) any portion of the amount billed to CARRIER's Customer and <u>not</u> covered by a charge separately stated on CARRIER's invoice to CARRIER's customer that CARRIER allocates and identifies as a fuel surcharge (or fuel or other cost adjustment or special fuel charge), crossing charge, washing and/or cleaning charge, administrative services surcharge, environmental and/or regulatory surcharge, insurance surcharge, customer rebate, repair charge, freight payment processing fee, finance charge, charge for overweight, overdimensional or other permits, charge for trailer preparation, trailer transfer charge, customer terminal fee, or charge for other customer preparation measures.

3.  For the avoidance of doubt, CONTRACTOR acknowledges in no event shall CONTRACTOR be entitled under any provision of this Agreement to receive any percentage or any portion of any amount received from a shipper, consignee, consignor, broker, logistics company, freight forwarder, other carrier or customer not expressly addressed in Schedule A and this Schedule A-1 and, for the avoidance of doubt, in no event shall CONTRACTOR be entitled to any portion of any administrative, environmental, regulatory, per invoice, or other fee

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

established by CARRIER and treated as charged to a shipper, consignee, consignor, broker, logistics company, freight forwarder, other carrier or customer, however identified or whether or not separately stated on the invoice to such third party.

    4.    <u>GROSS REVENUE</u>: Gross Revenue ("GR") shall mean all revenue – billed by CARRIER to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "CARRIER's Customer" throughout this Agreement) in connection with shipments CONTRACTOR hauls under this Agreement – for linehaul transportation, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges.

    5.    <u>ACCESSORIAL CHARGES</u>:  CONTRACTOR shall be paid 100% of customer accessorial charges related to tolls, compressors, air, pumps, blowers, vacuums and scales, unless the equipment used by CONTRACTOR to provide the service generating the accessorial charge is owned by CARRIER or an affiliated partner, in which case CONTRACTOR shall not be entitled to such compensation.  All other accessorial charges shall be paid to CONTRACTOR based upon the same percentage of AGR specified in Section 1 of this Schedule A-1.  CONTRACTOR must provide CARRIER with signature documentation (from the customer) of accessorial charges to receive compensation for such charges.

    6.    CHANGES IN COMPENSATION:

    (a)    Temporary Change.  CARRIER and CONTRACTOR may make a temporary change in CONTRACTOR's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement, CARRIER by both parties' signing (either manually or, as indicated in Subsection (ii) below, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply.  CONTRACTOR shall be under no obligation to accept the change in compensation by signing such an addendum, and CARRIER shall not terminate this Agreement for CONTRACTOR's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in this event, CARRIER is hereby authorized not to assign CONTRACTOR loads covered by the change in the meantime.  The temporary change shall not be effective for more than fifteen (15) days.

    (b)    Ongoing Change.  If any aspect of CONTRACTOR's compensation will be changing on an ongoing basis, CARRIER shall provide CONTRACTOR a proposed addendum containing the change at least fifteen (15) days in advance by hand, fax, overnight delivery or U.S. First Class Mail.  If CONTRACTOR wishes to continue operating on CARRIER's behalf, CONTRACTOR shall, by the effective date and time shown on the addendum, consent to the change by either manually signing the addendum and delivering it to CARRIER by hand, fax, overnight delivery or U.S. First Class Mail.  If CONTRACTOR does not take one of these actions consenting to the change within the time indicated on the addendum, the addendum shall operate as a notice of termination under Section 10.02(a) of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in this event, CONTRACTOR shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

7.    EARNINGS ADJUSTMENTS:

(a)    Billing Error.  If CARRIER discovers and corrects an error in, or in CARRIER's sole judgment decides to retroactively increase or decrease, the amount of any item billed to CARRIER's customer on a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated pursuant to a percentage of AGR, CARRIER shall credit to, or deduct from, CONTRACTOR's gross compensation at the next settlement a share – corresponding to the percentage of the revenue normally payable to CONTRACTOR for the shipment – of the additional amount CARRIER actually collects or refunds in remedying the error.  Such adjustment will be noted in the applicable settlement statement and supporting documents are available to CONCTRACTOR pursuant to Section 6.04 of this Agreement.

(b)    CARRIER reserves the right to subsequently offset and/or deduct from CONTRACTOR's compensation, within 180 days following preliminary settlement pursuant to Section 6.03 of the Agreement, the difference between expected linehaul revenue paid to CONTRACTOR in the preliminary settlement and actual linehaul revenue collected by CARRIER from its customer.

(c)    CARRIER may, either by its own choice or at the direction of a customer, bill customer(s) by specifying linehaul and separate charges or bill in a lump sum amount. Notwithstanding the form of the bill and how the charges are broken out (separately or in a lump sum), the form of the bill shall not affect the rights and obligations outlined herein.

Accepted and agreed to this Schedule A-1 on [DATE] 6/21/2018 | 5:52:26 AM PDT, by and between the parties set forth below.

**CARRIER:  Quality Carriers, Inc.**          **CONTRACTOR**

Signature: _Tracy LaGrone_                Signature: _____

Name Printed: Tracy LaGrone               Name Printed: CLAYTON M SALTER

Title: License & Permit Manager           Title: Mr Clayton salter.

Date: 6/21/2018 | 5:52:26 AM PDT          Date: 6/20/2018 | 4:35:34 PM PDT

Defendants' Motion for Partial Summary Judgment Exhibit 5

## SCHEDULE A – 2
## FUEL STABILIZATION TABLE

| NADFP | | Paid to Owner Operator | | | NADFP | | Paid to Owner Operator | | |
|---|---|---|---|---|---|---|---|---|---|
| From | To | Mileage > 101 Mi | Mileage 51 - 100 Mi | Mileage 1 - 50 Mi | From | To | Mileage > 101 Mi | Mileage 51 - 100 Mi | Mileage 1 - 50 Mi |
| | | 5.8 MPG | 4.8 MPG | 3.8 MPG | | | 5.8 MPG | 4.8 MPG | 3.8 MPG |
| $1.250 | $1.299 | $0.00 | $0.01 | $0.01 | $3.650 | $3.699 | $0.42 | $0.51 | $0.64 |
| $1.300 | $1.349 | $0.01 | $0.02 | $0.02 | $3.700 | $3.749 | $0.43 | $0.52 | $0.65 |
| $1.350 | $1.399 | $0.02 | $0.03 | $0.03 | $3.750 | $3.799 | $0.44 | $0.53 | $0.66 |
| $1.400 | $1.449 | $0.03 | $0.04 | $0.05 | $3.800 | $3.849 | $0.44 | $0.54 | $0.68 |
| $1.450 | $1.499 | $0.04 | $0.05 | $0.06 | $3.850 | $3.899 | $0.45 | $0.55 | $0.69 |
| $1.500 | $1.549 | $0.05 | $0.06 | $0.07 | $3.900 | $3.949 | $0.46 | $0.56 | $0.70 |
| $1.550 | $1.599 | $0.06 | $0.07 | $0.09 | $3.950 | $3.999 | $0.47 | $0.57 | $0.72 |
| $1.600 | $1.649 | $0.06 | $0.08 | $0.10 | $4.000 | $4.049 | $0.48 | $0.58 | $0.73 |
| $1.650 | $1.699 | $0.07 | $0.09 | $0.11 | $4.050 | $4.099 | $0.49 | $0.59 | $0.74 |
| $1.700 | $1.749 | $0.08 | $0.10 | $0.12 | $4.100 | $4.149 | $0.50 | $0.60 | $0.76 |
| $1.750 | $1.799 | $0.09 | $0.11 | $0.14 | $4.150 | $4.199 | $0.50 | $0.61 | $0.77 |
| $1.800 | $1.849 | $0.10 | $0.12 | $0.15 | $4.200 | $4.249 | $0.51 | $0.62 | $0.78 |
| $1.850 | $1.899 | $0.11 | $0.13 | $0.16 | $4.250 | $4.299 | $0.52 | $0.63 | $0.80 |
| $1.900 | $1.949 | $0.12 | $0.14 | $0.18 | $4.300 | $4.349 | $0.53 | $0.64 | $0.81 |
| $1.950 | $1.999 | $0.12 | $0.15 | $0.19 | $4.350 | $4.399 | $0.54 | $0.65 | $0.82 |
| $2.000 | $2.049 | $0.13 | $0.16 | $0.20 | $4.400 | $4.449 | $0.55 | $0.66 | $0.84 |
| $2.050 | $2.099 | $0.14 | $0.17 | $0.22 | $4.450 | $4.499 | $0.56 | $0.67 | $0.85 |
| $2.100 | $2.149 | $0.15 | $0.18 | $0.23 | $4.500 | $4.549 | $0.56 | $0.68 | $0.86 |
| $2.150 | $2.199 | $0.16 | $0.19 | $0.24 | $4.550 | $4.599 | $0.57 | $0.69 | $0.87 |
| $2.200 | $2.249 | $0.17 | $0.20 | $0.26 | $4.600 | $4.649 | $0.58 | $0.70 | $0.89 |
| $2.250 | $2.299 | $0.18 | $0.21 | $0.27 | $4.650 | $4.699 | $0.59 | $0.71 | $0.90 |
| $2.300 | $2.349 | $0.19 | $0.22 | $0.28 | $4.700 | $4.749 | $0.60 | $0.72 | $0.91 |
| $2.350 | $2.399 | $0.19 | $0.23 | $0.30 | $4.750 | $4.799 | $0.61 | $0.73 | $0.93 |
| $2.400 | $2.449 | $0.20 | $0.24 | $0.31 | $4.800 | $4.849 | $0.62 | $0.74 | $0.94 |
| $2.450 | $2.499 | $0.21 | $0.26 | $0.32 | $4.850 | $4.899 | $0.62 | $0.76 | $0.95 |
| $2.500 | $2.549 | $0.22 | $0.27 | $0.34 | $4.900 | $4.949 | $0.63 | $0.77 | $0.97 |
| $2.550 | $2.599 | $0.23 | $0.28 | $0.35 | $4.950 | $4.999 | $0.64 | $0.78 | $0.98 |
| $2.600 | $2.649 | $0.24 | $0.29 | $0.36 | $5.000 | $5.049 | $0.65 | $0.79 | $0.99 |
| $2.650 | $2.699 | $0.25 | $0.30 | $0.37 | $5.050 | $5.099 | $0.66 | $0.80 | $1.01 |
| $2.700 | $2.749 | $0.25 | $0.31 | $0.39 | $5.100 | $5.149 | $0.67 | $0.81 | $1.02 |
| $2.750 | $2.799 | $0.26 | $0.32 | $0.40 | $5.150 | $5.199 | $0.68 | $0.82 | $1.03 |
| $2.800 | $2.849 | $0.27 | $0.33 | $0.41 | $5.200 | $5.249 | $0.69 | $0.83 | $1.05 |
| $2.850 | $2.899 | $0.28 | $0.34 | $0.43 | $5.250 | $5.299 | $0.69 | $0.84 | $1.06 |
| $2.900 | $2.949 | $0.29 | $0.35 | $0.44 | $5.300 | $5.349 | $0.70 | $0.85 | $1.07 |
| $2.950 | $2.999 | $0.30 | $0.36 | $0.45 | $5.350 | $5.399 | $0.71 | $0.86 | $1.09 |
| $3.000 | $3.049 | $0.31 | $0.37 | $0.47 | $5.400 | $5.449 | $0.72 | $0.87 | $1.10 |
| $3.050 | $3.099 | $0.31 | $0.38 | $0.48 | $5.450 | $5.499 | $0.73 | $0.88 | $1.11 |
| $3.100 | $3.149 | $0.32 | $0.39 | $0.49 | $5.500 | $5.549 | $0.74 | $0.89 | $1.12 |
| $3.150 | $3.199 | $0.33 | $0.40 | $0.51 | $5.550 | $5.599 | $0.75 | $0.90 | $1.14 |
| $3.200 | $3.249 | $0.34 | $0.41 | $0.52 | $5.600 | $5.649 | $0.75 | $0.91 | $1.15 |
| $3.250 | $3.299 | $0.35 | $0.42 | $0.53 | $5.650 | $5.699 | $0.76 | $0.92 | $1.16 |
| $3.300 | $3.349 | $0.36 | $0.43 | $0.55 | $5.700 | $5.749 | $0.77 | $0.93 | $1.18 |
| $3.350 | $3.399 | $0.37 | $0.44 | $0.56 | $5.750 | $5.799 | $0.78 | $0.94 | $1.19 |
| $3.400 | $3.449 | $0.37 | $0.45 | $0.57 | $5.800 | $5.849 | $0.79 | $0.95 | $1.20 |
| $3.450 | $3.499 | $0.38 | $0.46 | $0.59 | $5.850 | $5.899 | $0.80 | $0.96 | $1.22 |
| $3.500 | $3.549 | $0.39 | $0.47 | $0.60 | $5.900 | $5.949 | $0.81 | $0.97 | $1.23 |
| $3.550 | $3.599 | $0.40 | $0.48 | $0.61 | $5.950 | $5.999 | $0.81 | $0.98 | $1.24 |
| $3.600 | $3.649 | $0.41 | $0.49 | $0.62 | $6.000 | $6.049 | $0.82 | $0.99 | $1.26 |

Defendants' Motion for Partial Summary Judgment Exhibit 5

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

* The loaded miles determine the Mileage / MPG bracket

* The Fuel Stabilization rate per mile is paid on all approved, dispatched, practical miles

* This table is subject to change and is available on CARRIER's website, www.qualitydistribution.com, and is also available from CARRIER in written form upon request

# SCHEDULE A – 3
## DEDUCTIONS TABLE

Pursuant to Section II of Schedule A of the Agreement, CONTRACTOR hereby authorizes CARRIER to deduct or recover the items in the Deductions Table below. Deductions will be computed as indicated in the column headed "Amount of Deduction or Method of Computation."

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|
| **Accessorial Equipment** - Pursuant to Agreement Exhibit 2. | As outlined in Agreement Exhibit 2. |
| **Advances,** pursuant to Section 6.02. | Amount of advance, plus an administrative fee of $5.00 for each advance. |
| **Claims** – Pursuant to Section 2.02, resulting from cargo loss, spills, damage, delays or shortages occurring while cargo is under CONTRACTOR's care, custody or control to the extent that CARRIER is responsible for such loss, damage or delay under the terms of any applicable tariff or agreement. | Amount CARRIER paid or otherwise incurred, subject to any indemnity limits set forth in the Agreement. |
| **Communications Systems and Services** – Pursuant to Agreement Exhibit 1. | As outlined in Agreement Exhibit 1. |
| **Deductions Agreed Upon in Advance** between CARRIER and CONTRACTOR and authorized payments to third parties. | Amount of deduction or payment agreed to or authorized. |
| **Deductions Required by Law,** such as (but not limited to) garnishments, tax liens, court-ordered child or spousal support. | Amount CARRIER paid in compliance with any lawfully issued order or lien, plus an administrative fee in the amount authorized by the applicable law. After termination of, but not during, this Agreement, CARRIER shall deduct from CONTRACTOR's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in CONTRACTOR's final settlement. |

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|
| **Escrow Fund** contributions, pursuant to Section 9. | Pursuant to Section 9(a), minimum principal amount of $3,000.00, to be deducted at $50.00 per settlement period, with deductions to continue until a principal balance of $3,000.00 is reached.<br><br>Pursuant to Section 9(b), the minimum principal balance of the Escrow Fund is increased by $2,000 above the $3,000 minimum of Section 9(a) for each additional tractor contracted to CARRIER.<br><br>For purposes of determining the interest to be paid on the balance of the Escrow Fund, CARRIER may at its election deduct a sum equal to the average advance as described in Section 9(c). |
| **Fines and Penalties,** other than those contemplated by Section 5.06, or violations resulting from the acts or omissions of CONTRACTOR or CONTRACTOR's employees and/or agents arising out of the operation of the equipment regardless of whether such fines, penalties or amounts are imposed or assessed upon CONTRACTOR or CARRIER. | Amount of fines or penalties. |
| **Fuel and Mileage Taxes and Fuel Tax Reporting** | As outlined in Section 5.04, including any and all state law use taxes, tax assessments, IFTA assessments and prior or current amounts resulting from audits of past payments. |
| **Fuel and Oil Purchases** that CONTRACTOR elects to make through CARRIER's fuel card as outlined in Section 5.03. | Retail pump price. |

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|
| **Inclusive Fuel Surcharges** billed to Customers to cover the shortfall, if any, between customer fuel pay and stabilization need. | Amount charged to Customer and as described in Paragraph 2(i) of Schedule A-1. |
| **Insurance (Occupational Accident, Workers' Compensation or Other)** – If CONTRACTOR so elected or as described in Section 7.05. | See Sections 7.03(b), 7.03(c) and 7.05. |
| **Licensing (Base Plates) and Registration fees,** if CONTRACTOR elected for CARRIER to obtain a base plate pursuant to Section 5.05, including associated administrative fees. | See Section 5.05. |
| **Linehaul Revenue** – The difference between expected linehaul revenue from preliminary settlement described in Section 6.03 and actual linehaul revenue collected from customer. | See Paragraph 2 of Schedule A-1. |
| **Loan Payments** if CONTRACTOR elects, with CARRIER's consent, to borrow an amount from CARRIER to cover cost of maintenance, repairs, or other expenses. | Payments based on principal and interest agreed to by CONTRACTOR and CARRIER. |
| **Maintenance, Repairs, Parts and Replacement Tires** for Equipment if CONTRACTOR elects, and CARRIER each time agrees, to have CARRIER advance funds for the purchase and charge CONTRACTOR back for it. | Amount of advance. |
| **Operating Expenses not otherwise listed** in this table for which CONTRACTOR is responsible under this Agreement and regarding which CARRIER receives a purchase order or invoice or is otherwise requested by CONTRACTOR to make an expenditure in the first instance. | Amount CARRIER paid or otherwise incurred. |

| CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|
| **Overweight / Overdimension Fines and Penalties.** See Section 5.01(f). | Amount of fine or penalty, except as provided for in Section 5.06. |
| **Permits.** See Section 5.01(e). | See Section 5.01(e). |
| **Product Disposal –** Pursuant to Section 3.03, if amount of product in tank exceeds three gallons, unless specifically agreed or directed by CARRIER. | Amount CARRIER paid or otherwise incurred. |
| **Third-Party Equipment Lease Obligations.** Third-party equipment lease charges and expenses incurred by CARRIER on CONTRACTOR's behalf and/or remitted to a third-party leasing entity by CARRIER on CONTRACTOR's behalf. | *See* Addendum for Equipment Lease Charges, if applicable.<br><br>Also, upon termination of CONTRACTOR's third-party equipment lease, any reseat costs incurred by CARRIER as described in Section 10.03(d). |
| **Termination Expenses** incurred by CONTRACTOR as described in Sections 10.03 and 10.04. | See Sections 10.03 and 10.04. |
| **Unauthorized Charges and Expenses** incurred by CONTRACTOR in the CARRIER's name, including but not limited to any unauthorized highway, bridge or ferry tolls or any charges for communications, lodging, meals, fuel or repair of the equipment or the CARRIER's trailers. | Amounts of charges and expenses. |

**CHANGES IN EXISTING DEDUCTION ITEMS.** If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until ten (10) calendar days after such notice or such later time as is set forth in the notice. **CONTRACTOR's failure, by the end of ten calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the deductions from CONTRACTOR's Settlement Compensation, beginning immediately after the ten-day period.** Such modified amounts shall replace and supersede those shown in the table above. If CONTRACTOR fails to notify CARRIER of CONTRACTOR's objection within

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

the ten-day period, or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the ten-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate the Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate the Agreement in accordance with the procedures set forth in this Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of CONTRACTOR's termination).

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

## EXHIBIT 1
## COMMUNICATIONS SYSTEM AND SERVICES AGREEMENT

This Exhibit 1 is attached to and made a part of the Independent Contractor Agreement between Quality Carriers, Inc. ("CARRIER") and SALTER, CLAYTON M. ("CONTRACTOR").

**WHEREAS**, CARRIER and CONTRACTOR are parties to an INDEPENDENT CONTRACTOR AGREEMENT ("ICA"); and

**WHEREAS**, CONTRACTOR is required under the ICA to obtain (and install, if applicable), at CONTRACTOR's sole expense, a CARRIER-compatible communications system ("Communications System") for each vehicle to be used in performing CONTRACTOR's obligations under the ICA; and

**WHEREAS**, CONTRACTOR is not required under the ICA to purchase or lease a Communications System or any other products, equipment, or services from CARRIER; and

**WHEREAS**, CONTRACTOR wishes to purchase or otherwise obtain the use of certain Communications System(s) equipment and services necessary to operate such Communications System(s) equipment from CARRIER; and

**WHEREAS**, CARRIER is willing to sell or otherwise provide such Communications System(s) equipment and services to CONTRACTOR;

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, and pursuant to the terms and conditions of the ICA, which are hereby incorporated by reference, CARRIER and CONTRACTOR agree as follows:

1. CONTRACTOR authorizes CARRIER to provide (and install, if applicable) an electronic logging device and all associated antennas and parts required to capture accurate GPS and ECM data for each vehicle leased to CARRIER.

2. CARRIER agrees to provide the Communications Systems for CONTRACTOR's use for each vehicle contracted to CARRIER under the ICA without any charge to CONTRACTOR, except as set forth in the ICA.

3. CONTRACTOR agrees to pay CARRIER a weekly fee of $13.00 per vehicle for hardware rental services, to be deducted from CONTRACTOR's compensation pursuant to the ICA.

4. CONTRACTOR shall maintain all Communications Systems in good working order at all times throughout the term of this Agreement and shall be responsible for promptly repairing or replacing Communications Systems equipment as necessary, at CONTRACTOR's sole cost and expense.

5. CONTRACTOR acknowledges and agrees that any and all Communications Systems are and shall remain the exclusive property of CARRIER at all times. CONTRACTOR

shall return any and all Communications Systems (including all components thereof, unless CARRIER has explicitly authorized that return of a component is not necessary) to CARRIER immediately upon termination or expiration of this Agreement, in the same condition in which they were originally received by CONTRACTOR, normal wear and tear excepted. CONTRACTOR agrees to indemnify and hold CARRIER harmless for any and all lost or damaged Communications Systems (or any component(s) thereof), and further authorizes CARRIER to deduct the costs of any such loss or damage from CONTRACTOR's compensation pursuant to the ICA.

6.      At the termination of the ICA, if CONTRACTOR fails to return the PeopleNet tracking device, CONTRACTOR authorizes CARRIER to deduct up to $1,250 for replacement equipment, which will be refunded to CONTRACTOR upon return of the device.

7.      This Agreement constitutes the sole and entire agreement between the parties with respect to the subject matter contained herein, and supersedes all prior agreements and undertakings, oral and written, expressed or implied, or practices, between the parties, and expresses all obligations and restrictions imposed on each of the respective parties during its term.  This Agreement may not be amended or changed except by written agreement signed by CARRIER and CONTRACTOR.  Either party's failure to insist upon strict performance of any provision of this Agreement or exercise any right under this Agreement shall not be construed as a waiver of such provision or right, nor shall such failure excuse the other party from future performance.

8.      This Agreement shall terminate upon the termination or expiration of the ICA.


AGREED:

**CARRIER:  Quality Carriers, Inc.**          **CONTRACTOR**

Signature: _Tracy LaGrone_                    Signature: _____
           BD85DF4972364A3...                            585A978ADE864EA...

Name Printed: Tracy LaGrone                   Name Printed: CLAYTON M SALTER

Title: License & Permit Manager              Title: Mr Clayton salter.

Date: 6/21/2018 | 5:52:26 AM PDT             Date: 6/20/2018 | 4:35:34 PM PDT

DocuSign Envelope ID: 4772733E-F4A8-4A27-9219-B4B1D5688B92

# EXHIBIT 2
## ACCESSORIAL EQUIPMENT AGREEMENT

This Exhibit 2 is attached to and made a part of the Independent Contractor Agreement between Quality Carriers, Inc. ("CARRIER") and  SALTER, CLAYTON M. ("CONTRACTOR").

**WHEREAS**, CARRIER and CONTRACTOR are parties to an CONTRACTOR AGREEMENT ("ICA"); and

**WHEREAS**, CONTRACTOR requires certain vehicle accessorial equipment ("Accessorial Equipment") to perform its obligations under the ICA; and

**WHEREAS**, CONTRACTOR is not required under the ICA to purchase or lease such Accessorial Equipment or any other products, equipment, or services from CARRIER; and

**WHEREAS**, CONTRACTOR wishes to purchase such Accessorial Equipment from CARRIER and have CARRIER install such Accessorial Equipment on CONTRACTOR's vehicle(s); and

**WHEREAS**, CARRIER is willing to sell such Accessorial Equipment to CONTRACTOR and install the Accessorial Equipment on CONTRACTOR's vehicle(s);

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, and pursuant to the terms and conditions of the ICA, which are hereby incorporated by reference, CARRIER and CONTRACTOR hereby agree as follows:

1.    CONTRACTOR hereby authorizes CARRIER to provide and install the Accessorial Equipment indicated below on the vehicle(s) leased by CONTRACTOR to CARRIER under the ICA:

| Equipment Description | Estimated Cost (including installation) | Circle One on Each Line and Initial | | |
|---|---|---|---|---|
| Pump and Compressor | $6,785.00 | Accept | X Decline | CA |
| Blower | $9,385.00 | Accept | X Decline | CA |
| Hydro Pack | $7,690.00 | Accept | X Decline | CA |
| Fifth Wheel Riser | $1,000.00 | Accept | X Decline | CA |

2.    CONTRACTOR understands and agrees that the prices listed above are estimates only, and that the actual cost of purchasing and installing the Accessorial Equipment will vary depending on vendor, equipment availability, and vehicle configuration. CONTRACTOR agrees to pay CARRIER's actual cost, as indicated on an itemized invoice that CARRIER shall provide upon completion of installation.

Defendants' Motion for Partial Summary Judgment Exhibit 5

3.    CONTRACTOR agrees that CARRIER shall deduct the total purchase price for the Accessorial Equipment, including installation, from CONTRACTOR's compensation pursuant to the ICA weekly until paid in full.  The deduction shall be at the rate of $100 per week until paid in full.

4.    If CONTRACTOR fails to make any payment as set forth in Section 3, above, when due, CARRIER shall have the right, but not the obligation, at its sole discretion, to declare the entire principal amount outstanding and accrued interest immediately due and collectible.

5.    This Agreement shall terminate upon the termination of the ICA, in which event the entire principal amount outstanding and interest shall become immediately due and collectible.  Any sums that may be owed by CARRIER to CONTRACTOR pursuant to the ICA may be applied to the outstanding amount due; provided, however, that the application of such funds shall not relieve CONTRACTOR from fully satisfying its obligations as set forth herein.

6.    In the event that CARRIER institutes a lawsuit or other action to collect any sums owed by CONTRACTOR under this Agreement, CONTRACTOR agrees that CARRIER shall be entitled to recover its costs, including, but not limited to, reasonable attorneys' fees.

7.    CONTRACTOR agrees to maintain the Accessorial Equipment.  CONTRACTOR assumes sole responsibility for the costs of any and all necessary maintenance and repairs, and assumes sole risk of loss or damage to the Accessorial Equipment.

8.    All right, title and interest in the Accessorial Equipment shall remain with CARRIER until all sums due from CONTRACTOR to CARRIER under this Agreement are paid in full.

Agreed:

**CARRIER:  Quality Carriers, Inc.**          **CONTRACTOR**

Signature: _Tracy LaGrone_                     Signature: _____

Name Printed: Tracy LaGrone                    Name Printed: CLAYTON M SALTER

Title: License & Permit Manager                Title: Mr Clayton salter.

Date: 6/21/2018 | 5:52:26 AM PDT               Date: 6/20/2018 | 4:35:34 PM PDT

## RECEIPT FOR POSSESSION OF CONTRACTED VEHICLE(S)

Received from  SALTER, CLAYTON M.                                          the vehicle(s)

described in the Independent Contractor Agreement dated  6/21/2018 | 5:52:26 AM PDT

Equipment received at  709 QCI - TORRANCE, CA                      on

  6/21/2018 | 5:52:26 AM PDT                                                   .

By:  _Tracy LaGrone_
      (CARRIER representative's signature)

Printed Name:  Tracy LaGrone

-------------------------------------------------------------------------------------

## RECEIPT FOR RETURN OF CONTRACTED VEHICLE(S)

Received in good order from _____ the vehicle(s)

 described in the Independent Contractor Agreement dated _____.

Equipment received at _____ on

_____.

By:_____
     (INDEPENDENT CONTRACTOR's signature)

Printed Name:_____



## Certificate Of Completion

Envelope Id: 4772733EF4A84A279219B4B1D5688B92     Status: Completed
Subject: Independent Contractor Agreement requiring signatures
Source Envelope:
Document Pages: 41    Signatures: 11    Envelope Originator:
Certificate Pages: 5    Initials: 4    Tracy LaGrone
AutoNav: Enabled    4041 Park Oaks Blvd
EnvelopeId Stamping: Enabled    Suite 200
Time Zone: (UTC-08:00) Pacific Time (US & Canada)    Tampa, FL 33610
tlagrone@qualitydistribution.com
IP Address: 209.83.123.198

## Record Tracking

Status: Original    Holder: Tracy LaGrone    Location: DocuSign
    4/16/2018 9:00:30 AM    tlagrone@qualitydistribution.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| CLAYTON M SALTER<br>cs0091@qcdrivers.com<br>Mr Clayton salter.<br>Security Level: Email, Account Authentication (None) | <br>585A978ADE864EA...<br>Using IP Address: 162.231.147.158<br>Signed using mobile | Sent: 4/16/2018 9:00:32 AM<br>Viewed: 6/20/2018 4:31:44 PM<br>Signed: 6/20/2018 4:35:34 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 6/20/2018 4:31:44 PM<br>ID: ac33b935-bf66-452c-93b6-976ef35fc468 | | |
| Tracy LaGrone<br>tlagrone@qualitydistribution.com<br>License & Permit Manager<br>Quality Distribution, Inc.<br>Signing Group: License & Permits<br>Security Level: Email, Account Authentication (None) | <br>BD85DF4972364A3...<br>Using IP Address: 209.83.123.198 | Sent: 6/20/2018 4:35:35 PM<br>Viewed: 6/21/2018 5:52:16 AM<br>Signed: 6/21/2018 5:52:26 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/20/2018 4:35:35 PM |
| Certified Delivered | Security Checked | 6/21/2018 5:52:16 AM |
| Signing Complete | Security Checked | 6/21/2018 5:52:26 AM |
| Completed | Security Checked | 6/21/2018 5:52:26 AM |

| Payment Events | Status | Timestamps |
|---|---|---|
| **Electronic Record and Signature Disclosure** | | |

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Quality Distribution, Inc. (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Quality Distribution, Inc.:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: jtoth@qualitydistribution.com


**To advise Quality Distribution, Inc. of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at jtoth@qualitydistribution.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Quality Distribution, Inc.**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to jtoth@qualitydistribution.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Quality Distribution, Inc.**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to jtoth@qualitydistribution.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**
To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.
By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Quality Distribution, Inc. as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Quality Distribution, Inc. during the course of my relationship with you.